United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Equal Employment Opportunity Commission, Plaintiff, | ) ) ) | |
| & | ) ) | |
| Louise Davidson–Schmich, Intervenor-Plaintiff, | ) ) ) | Civil Action No. 19-23131-Civ-Scola |
| v. | ) ) | |
| University of Miami, Defendant. | ) | |

### Order on Cross-Motions for Summary Judgment

The Equal Employment Opportunity Commission ("EEOC") brings claims of gender discrimination in pay against the Defendant University of Miami (the "University") under the Equal Pay Act, 29 U.S.C. § 206(d)(1), and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2. The EEOC alleges that the University discriminated against Louise Davidson–Schmich, Intervenor Plaintiff and a professor at the University, by paying her less than her counterpart John Gregory Koger, a male professor who performed the same job at the University. (ECF No. 1).

The EEOC and the University have filed cross-motions for summary judgment. The EEOC filed a motion for partial summary judgment on the University's affirmative defenses of laches, failure to mitigate, and failure to conciliate. (*See generally*, EEOC Mot. for Summary J., ECF No. 79.) The University moves for summary judgment on all the EEOC's claims. (*See generally* University Mot. for Summary J., ECF No. 82.) The University avers that the record shows that Davidson–Schmich and Koger did not perform the same job at the University. And even if they did perform the same job, the University contends that the record shows that the pay differential was based on factors other than the professors' sex. Both motions have been fully briefed, with both sides filing their oppositions and replies. The Court has carefully reviewed the parties' written submissions, the record, and the relevant case law. For the reasons discussed below, the University's motion for summary judgment is **denied (ECF No. 82)** and the EEOC's motion for partial summary judgement is **granted in part and denied in part. (ECF No. 79.)**

## 1. Facts

The following background facts are based on the parties' factual submission including the University's and the EEOC's respective statements of undisputed facts and responses thereto[1], and their respective exhibits, including deposition transcripts and communications.

### A. The University's Political Science Department

The University's political science department is currently part of the College of Arts and Sciences. The department is not officially divided into different subclasses, but generally, there are five different subclasses within the field of political science: (1) American politics, (2) comparative politics, (3) international relations (4) theory, and (5) public administration. The University does not impose different guidelines or requirements based on the subfields of political science. Rather, the requirements are based on the different ranks within the department: assistant professor, associate professor, and full professor. The associate professor and full professor ranks require success in three areas: teaching, research, and service. (West Dep., ECF No. 104–2 at 120:9–17); (Bachas Dep., ECF No. 104–3 at 41:22–42:15). These three requirements and all department guidelines are applied equally to all subspecialities although the types of venues for publication or benchmarks may be different for subspecialities. (Bachas Dep., ECF No. 104–3 at 138:19–9, 139:4–18); (Sugrue Dep., ECF No. 104–5 at 139:92–18.). The department's guidelines state that "the most important indicator of [success in scholarship] is publication in high-quality, peer reviewed research on a continuous basis." (ECF No. 104–17.)

When the University identifies a need for a new hire within the political science department, it publishes a job posting and a salary range is determined. (West Dep., ECF No. 104–2 at 156:23–157:25.) The University, through various department heads including Dean Leonidas Bachas, Dean Paul Sugrue, and Department Chairs Jonathan West and Fred Frohock, consider several factors in determining an appropriate salary for a specific position. They consider the salaries of comparable professors within the department and at other institutions. (*Id.* at 144:7–145:1, 160:24–161:20.) The University did not refer to a written guidance or list of salaries at other institutions and employed a less formal process involving what members of the

---

[1] In its reply, the University argues that the EEOC failed to clearly challenge the University's statement of facts by pointing to specific parts of the record. While the EEOC's citations were not perfect, its statement of facts sufficiently disputed the University's statement of facts with citations to the record.

department knew about the salaries at other institutions. (West Dep., ECF No. 104–2 at 149:10–25.) In the early 2000s, it was impossible to determine what the actual market was for professors due to lack of information, and the market was gauged with offers that were accepted versus those that were rejected. (Sugrue Dep., ECF No. 104–5 at 244:2–246:4.) Sometime after 2009, after Bachas became Chair, the University began performing a CUPA analysis to aid in calculating salaries by referring to an official public list of salaries at various institutions that could be narrowed by each university. (Bachas Dep., ECF No. 104–3 at 22:2–23:12.) The University also considers candidate-specific information like credentials, past teaching experience, research record, and publications. (West Dep., ECF No. 104–2 at 163:3–17.)

The University provides annual salary increases from fixed merit and market pools set by the Board of Trustees. (Pl. Statement of Facts, ECF No. 106 at ¶ 117); (Def. Reply Statement of Facts, ECF No. 118 at ¶ 117.) The raises for individual professors are at the discretion of the Chair and the Dean. (Pl. Statement of Facts, ECF No. 106 at ¶ 117); (Def. Reply Statement of Facts, ECF No. 118 at ¶ 117.) There are no written guidelines about how to award merit or market raises; however, factors that could be considered were: teaching, service, and research, publications, and the salary structure of the department. Indeed, merit increases were based on the professors' performance in the prior year as reported in annual activity reports. (Pl. Statement of Facts, ECF No. 106 at ¶ 120.) Market increases are meant to address counteroffers or risk of being poached by other institutions. (*Id.* at ¶ 121.)

### B. The University Hires Davidson-Schmich and Koger

Davidson–Schmich earned a doctorate degree in political science from Duke University in 1999 and her specialization is in comparative politics. (Pl. Statement of Facts, ECF No. 106 at ¶ 78.) In 2000, the University hired Davidson–Schmich as an assistant professor in political science with a specialization in comparative politics. (*Id.* at ¶ 78.) Her initial salary was $50,000. (*Id.* at¶ 80.) This position was subject to reappointment every year. Davidson–Schmich was reappointed to her position every year. In 2003 and 2005, Davidson–Schmich requested a course reduction due to parental responsibilities. (Def. Statement of Facts, ECF No. 80 at ¶¶ 13–15.) In 2005, Davidson–Schmich obtained a book contract with the University of Notre Dame Press to publish a book. (*Id.* at ¶ 17.) Dean Sugrue's subjective opinion is that Notre Dame Press is not as prestigious as the University of Chicago Press. (Sugrue Dep., ECF No. 104–5 at 288:21–289:4.)

In 2006, Davidson–Schmich applied for a promotion to associate professor with tenure at the University. (Def. Statement of Facts, ECF No. 80 at

¶ 20.) In February 2007, the University informed Davidson–Schmich that her application had been approved and she was promoted to the position of associate professor effective June 2007. (*Id.* at ¶ 21.) However, the Tenure and Promotions Committee voted against her tenure citing lack of significant impact in her field. (*Id.*) In April 2007, the University informed Davidson–Schmich that her salary as an associate professor would be $72,504. (*Id.* at ¶ 23.)

In 2005, the University posted a position for an associate or full professor in the political science department with a specialization in American politics. (*Id.* at ¶ 25.) That same year, Koger, who at the time was teaching at the University of Montana, applied for the position. (*Id.*) During this time, he had been applying to comparable positions at other institutions. (*Id.*) He received offers from the University and from Texas Tech University. (*Id.*) He turned down both offers. (*Id.*) Texas Tech's employment offer came with a salary of $50,000, which Koger attempted to negotiate but cannot recall the final number. (Koger Dep., ECF No. 104–1 at 43:1–12.) He rejected the offer because he was waiting on an application for a scholarship he applied to through a different institution. (*Id.* at 44:23–45:2.) He ultimately did not receive the scholarship. Koger cannot recall the University's offer but does remember that he turned it down because he was concerned that the offer was inadequate given the higher cost of living in Miami. (Koger Dep., ECF No. 104–1 at 49:23–50:13.)

In 2006 or 2007, Koger learned that the position at the University was still available and reapplied. (Def. Statement of Facts, ECF No. 80 at ¶ 27.) The University had determined that an appropriate salary range was $73,000 through $75,000. (West Dep., ECF No. 104–2 at 156:23–157:25.) The University made Koger an offer for an assistant professor position with a specialization in American politics. Koger negotiated that offer to $81,000. Koger believes that this was the market rate for that position because "I was willing to take it, so that's what the market will be bear." (Kroger Dep., ECF No. 104–1 at 280:8–21.) Kroger was hired at a rank below Davidson–Schmich, yet his salary was $8,500 more than Davidson–Schmich.

Dean Sugrue stated that subspecialties did not determine the salaries across the three ranks in the political science department and assumed that salaries for professors of the same rank in the same department were probably close. (Sugrue Dep., ECF No. 104–5 at 170:2–14.) However, Dean Sugrue explained that Koger's salary was higher because he had teaching experience and had a book contract with the University of Chicago Press. (Sugrue Dep., ECF No. 104–5 at 283–288.) Dean Sugrue believed Davidson–Schmich and Koger were "probably about the same," the only difference being that he perceived Koger's publisher to be more prestigious and that Koger, unlike

Davidson-Schmich, "test[ed] the market." (*Id.* at 289:9–25.) An official list of journal rankings was not always considered during hiring decisions. (West Dep., ECF No. 104–2 at 59:24–64:25.) Dean Sugrue also explained that the pay differential was due to market compression and market forces. In other words, Davidson–Schmich's lower salary was related to the time when she was hired and the University's need for a professor in her specialty.

In the following years, both Davidson–Schmich and Koger conducted research, published articles, and participated in different service activities, including leading different organizations. They taught introductory and upper–level classes in their respective specialties. (Koger Dep., ECF No. 104–1 at 162:7–22, 181:17–182:4.) Both professors consistently received positive evaluations. (Koger Evaluations, ECF No. 104–15; Davidson-Schmich Evaluations, ECF No. 104–14.)[2]

Koger was promoted to associate professor in 2010. (Pl. Statement of Facts, ECF No. 106 at ¶ 92); (Def. Reply Statement of Facts, ECF No. 118 at ¶ 92.) At this time, Koger and Davidson-Schmich held the same rank within the same department. Koger's salary as an associate professor increased to $90,542 and Davidson–Schmich's salary had increased to $79,981 through fixed raises. (*Id.*)

In 2016, Davidson-Schmich and Koger applied for a promotion to the rank of full professor. Both applications were unanimously supported by the tenure committee. In his letter assessing Koger's application, Dean Bachas described Koger's work as highly influential, although, he noted that there were concerns about the placement of his articles and that his journal output was slow and limited. (Bachas's Promotion Evaluation for Kroger, ECF No. 104–22.) Similarly, in his assessment of Davidson–Schmich's application, Dean Bachas described her work as very high quality and substantially innovative, noting that her upcoming book is of high-significance and visibility. Bachas indicated that he would prefer that her articles were published in higher–impact venues.

---

[2] The University argues that the Court should not consider the professors' annual evaluations or those completed by Dean Bachas (ECF Nos. 104–14, ECF No. 104–15, 104–20, 104–22) because they are unauthenticated. However, this argument ignores the long–standing principle that evidence need not be in admissible form at the summary judgment stage, as long as that evidence can be reduced to admissible form at trial. *Wright v. Greensky, Inc.*, No. 20-CV-62441, 2021 WL 2414170, at *6 (S.D. Fla. June 14, 2021) (Bloom, J.) (citing *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.")). The University does not explain whether the evaluations are capable of being admitted at trial by having the person who completed the evaluations testify as to the contents of the evaluations. Nevertheless, upon close examination of the documents at issue, the Court is satisfied that EEOC's exhibits are what they purport to be. *Id.*

(Bachas's Promotion Evaluation for Davidson-Schmich, ECF No. 104–20). Ultimately, both Davidson–Schmich's and Koger's applications were accepted, and they were both promoted to the rank of full professor. After their respective promotions, Koger's salary increased to $137,366 and Davidson-Schmich's salary increased to $109,359. (Pl. Statement of Facts, ECF No. 106 at ¶ 96); (Def. Reply Statement of Facts, ECF No. 118 at ¶ 96.)

### C. 2016 and 2018 Salary Studies

In 2016, the University's Ad Hoc Committee on Women Faculty commissioned a study on salary differentials between male and female faculty within the College of Arts and Sciences. (2016 Ad Hoc Committee Study, ECF No. 104–21.) The study revealed that overall male faculty members out-earn female faculty members by an average of $32,889.60. (*Id.*) In the social sciences program, including the political science department, men generally out earn women as associate professors. (*Id.*) Women generally earn more than men as full professors. (*Id.*) The overall pay differential could be attributed to the lower pay of lecturers, most of whom are women, and by differences in gender distribution by rank. (*Id.*) The study also revealed a disparity between male and female faculty members in the service requirement, noting that female professors' requirement is harsher. (*Id.*)

The study recommended that the College of Arts and Sciences make a salary equity raise for women lecturers, conduct a survey to identify other areas of potential improvement beyond questions of salary, and consider additional strategies to clarify the requirements for and steps toward promotion to full professor. (*Id.*)

In 2018, a second study was conducted on the pay differential within the College of Arts and Sciences. (2018 Salary Data Study Analysis, ECF No. 104–26.) The study revealed that the pay differential between male and female faculty members had decreased to $28,086.60. (*Id.*) Notably, in the social and behavioral sciences, the pay gap was lowered to $21,687.20. (*Id.*) Like in the 2016 study, male associate professors had higher average salaries than female associate professors; and women full professors had higher average salaries than male full professors. (2018 Salary Data Study Report, ECF No. 104–18.) This discrepancy could also be attributed to gender distribution by rank; however, because several faculty members had left the college, it was uncertain if that was the case. (2018 Salary Data Study Analysis, ECF No. 104–26.)

### D. Complaints About Unequal Pay

In 2010, Dean Frohock "urge[d] an increase in allocation to Davidson-

Schmich['s]" salary, indicating that he would be willing to give up part of his own raise. (Frohock 2010 Email, ECF No. 104–19.) One year later, Dean Frohock reported that Davidson–Schmich was "grossly underpaid" and that it is a "familiar issue." (Frohock 2011 Email, ECF No. 104–18.) He noted that Davidson–Schmich made less than professors of lower rank. (*Id.*) Dean West also recommended that Davidson-Schmich's salary was "in need of adjustment." (West Justification for Market Recommendations, ECF No. 104–30.)  "She has been on the UM faculty longer than several of our relatively higher paid junior faculty, yet the annual allocations for merit and market adjustments have fallen short of our ability to provide her with the salary she deserves." (*Id.*) By comparison, West recommended a lower salary increases for Koger and other male faculty members. (*Id.*)

Before her promotion to full professor, Davidson–Schmich reviewed the 2016 salary analysis showing gender differences by rank across social sciences, including the political science department. (Schmich–Davidson Dep., ECF No. 102–1 at 135:18–136:3.) Upon her promotion to full professor, Davidson–Schmich's salary increased from $102,300 to $109,359, prompting her to speak to Dean West regarding why she was making less than lower-ranked male professors. (*Id.* at 149:12–150:2.)

In 2017, Davidson–Schmich and other women faculty members within the political science department notified Dean Bachas of their concerns regarding pay inequity based on their gender. (*Id.* at 619–627.) Dean Bachas reviewed all salaries in the department and the salary analysis from the prior year and determined that there was no gender disparity. (Bachas Dep., ECF No. 104–3 at 358:5–18, 360:14–362:22.) Around that time, Davidson–Schmich complained to the University's Title IX Officer, who advised her to wait until the results of the 2018 salary study. (Pl. Statement of Facts, ECF No. 106 at ¶ 125.) The Title IX Officer testified that someone should have investigated Davidson–Schmich's complaint but that she does not know if anyone ever did. (*Id.* at ¶ 126.)

Davidson–Schmich explained that she does not believe that the University was intentionally discriminatory; however, she claims that the University knowingly employs hiring practices that result in gender discrimination: "So, if you are paying men more at one rank than you are paying women at that rank and then you say 'I'm going to promote you to a new position, a higher level position . . . and I'm going to base your pay on what you were earning before,' and the woman is earning less and the man is earning more, then the process of promotion widens the gap. . . and perpetuates those inequities." (Davidson-Schmich Dep., ECF No. 81–1 at 234:10–235:1.)

### E. The EEOC Charge and the EEOC's Investigation and Determination

On May 14, 2018, Davidson–Schmich inadvertently received an email circulated by West, the chair of the political science department, disclosing the annual salaries of several faculty members, including Koger. (May 14, 2018 West Email, ECF No. 78–2.) This was the first time Davidson–Schmich learned Koger's salary and the salary of other members.

On June 5, 2018, Davidson–Schmich filed a charge of discrimination with the EEOC, alleging that the University was paying her less than a male professor (Koger) for equal work. Three days later, the EEOC notified the University of the charges against it and launched an investigation into the charge. Latesha Shamese Nelson, an investigator with the EEOC, was assigned to investigate Davidson–Schmich' charge. Generally, an EEOC investigation is commenced after receipt of a charge and involves obtaining the employer's position statement, the charging party's rebuttal, requests for information and a predetermination interview of the employer. (Nelson Dep., ECF No. 78–6 at 58:17–22.) Nelson "vaguely recalls" that these steps were completed in the investigation at issue and recalls completing a request of information, a fact-finding conference, and a predetermination interview with the University. (*Id.* at 58:23–59:12.)

On March 5, 2019, the EEOC issued to the University a letter of determination finding reasonable cause to believe it had violated the Equal Pay Act and Title VII by paying Davidson-Schmich less than her male comparator for equal work. (Letter of Determination, ECF No. 78–9). The letter stated: "the Commission now invites the parties to join with it in reaching a just resolution of this matter. . .[i]f you wish to engage in the conciliation process, please complete the enclosed Invitation to Conciliate EEOC Form 153, and return it to the EEOC within ten (10) calendar days of your receipt of this Determination." (*Id.*) The deadline to respond was approximately March 15, 2019. On March 19, 2019, the parties exchanged communications about an extension of the conciliation period. On March 20, 2019, the University sent a letter to the EEOC requesting reconsideration of the EEOC's determination and challenging the EEOC's finding of disparate treatment. The University did not return the Invitation to Conciliate Form. Two days later, the EEOC issued a letter closing the conciliation period and citing the parties' inability to reach a voluntary settlement. The EEOC initiated this action on June 29, 2019.

### 2. Legal Standard

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the

moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. N. Carolina*, 560 U.S. 330, 130 S. Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010) (quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S. Ct. 1598, 26 L.Ed.2d 142 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007). Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the record as a whole could not lead a rational trier of fact to find in the nonmovant's favor, there is no genuine issue of fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x. 791, 794 (11th Cir. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 (citation omitted). "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox–Jones v. Bd. of Regents of Univ. of Ga.*, 448 F. App'x. 17, 19 (11th Cir. 2011). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348.

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). Thus, a court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

### 3. Analysis

At the heart of this dispute is the question of whether the University

discriminated against Davidson–Schmich in 2007 when it hired her as an associate professor at a salary of $72,000 and that same year hired Koger, a male professor with comparable qualifications for a lower–ranked position in the same department, at a salary of $81,000. The EEOC also claims that due to the 2007 discriminatory pay differential, the University's fixed pay increases have failed to correct the original discrepancy. Indeed, despite both Davidson–Schmich's and Koger's promotion to full professors, he still made approximately $28,000 more than her.

The University's motion for summary judgment argues that the EEOC's claims under the Equal Pay Act and Title VII must fail for similar reasons: First, the EEOC cannot establish a prima facie case of pay discrimination because Davidson–Schmich and Koger have never performed substantially equal jobs. Even if the EEOC met its initial burden, the University argues it can establish a legitimate and non-discriminatory basis for the pay differential. The burden would then shift back to the EEOC to show pretext for the pay differential, which the University contends it has failed to show. For the reasons discussed below, the Court denies the University's motion for summary judgment and allows the EEOC's claims to proceed.

In its own motion for partial summary judgment, the EEOC claims that judgment in its favor is appropriate on three of the University's affirmative defenses: failure to conciliate, laches, and failure to mitigate. The EEOC's motion is granted in part and denied in part. The motion is granted with respect to the University's affirmative defenses for failure to conciliate and laches. The motion is denied as to the affirmative defense of failure to mitigate.

### A. Equal Pay Act Discrimination Claims

The EEOC claims that the University violated the Equal Pay Act by paying Davidson–Schmich less than Koger despite their performing the same job within the University's political science department. The University argues that summary judgment is warranted on the EEOC's claims for two reasons: First, Schmich-Davidson and Koger perform different jobs within the political science department. Second, even if they performed the same job, the disparity in salary was not based on the factor of sex.

An employee establishes a *prima facie* case under the Equal Pay Act by showing that the employer paid differing wages to employees of opposite sexes for "equal work on jobs . . . which require[ ] equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *see Smith v. Fla. A & M Univ. Bd. of Trustees*, 831 F. App'x 434, 439 (11th Cir. 2020), *cert. denied sub nom. Smith v. Fla. Agric. & Mech. Univ. Bd. of Trustees*, 209 L. Ed. 2d 752 (May 17, 2021). Once the employee

has established a *prima facie* case, the employer may avoid liability by proving by a preponderance of the evidence that the payments were made pursuant to:

> (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1) (emphasis in original). "The burden to prove these affirmative defenses is heavy and must demonstrate that the factor of sex provided *no basis* for the wage differential." *Smith,* 831 F. App'x at 439. The employee may then rebut the employer's defense by putting forth evidence demonstrating that the employer's alternative bases for the pay disparity were pretextual or offered as a post-event justification for a sex-based differential. *Id.*; *Reddy v. Dep't of Educ., Alabama,* 808 F. App'x 803, 810 (11th Cir. 2020) ("To establish pretext, the plaintiff "must produce evidence which directly establishes discrimination, or which permits a jury to reasonably disbelieve the employer's proffered reason.").

### 1) Substantially Similar Jobs

The parties disagree over whether Davidson–Schmich and Koger perform the same job as required by the statute. To establish a prima facie case under the Equal Pay Act, a plaintiff must prove that the employer paid an employee of the opposite sex more for equal work in an equal position. 29 U.S.C. § 206(d)(1). "Whether that employee of the opposite sex—typically called a comparator—performs equal work in an equal position depends on the 'primary duties of each job,' and the inquiry emphasizes 'actual job content' over formal job titles or descriptions. *Edwards v. Fulton Cnty., Ga.,* 509 F. App'x 882, 886 (11th Cir. 2013) (quoting *Arrington v. Cobb Cnty.,* 139 F.3d 865, 876 (11th Cir. 1998)). "The plaintiff need not prove that the job held by her . . . comparator is identical to hers; she must demonstrate only that the skill, effort and responsibility required in the performance of the jobs are 'substantially equal.'" *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1533 (11th Cir. 1992).

The record indicates that a reasonable jury reviewing the duties performed by Davidson–Schmich and Koger could find that the positions are substantially equal. It is undisputed that both Davidson–Schmich and Koger are tenure-track full professors within the University's political science department. Although the professors have different political science specialties and therefore different knowledge regarding subtopics of political science, there

is evidence that the two hold substantially similar jobs. (Sugrue Dep., ECF No. 104–5 at 200:9–20) (stating that two professors in the political science department perform similar jobs despite different specializations because "they are both coming in as assistant professors in the same department, same school, same university.") Indeed, both Davidson–Schmich and Koger have doctorate degrees in political science and generally teach the same number of courses at the introductory and upper–class levels. (Koger Dep., ECF No. 104–1 at 181:17–182:4.) Moreover, Davidson–Schmich and Koger are subject to the same requirements and expectations set forth by the Chair of the political science department and bound to the same guidelines. They are both required to teach, research, and provide service within the University and in the scholarly community. (Bachas Dep., ECF No. 104–3 at 138:19–9, 139:4–18); (Sugrue Dep., ECF No. 104–5 at 139:92–18.) The University requires that all members of the political science department teach two classes in the Spring and two classes in the Fall. (Bachas Dep., ECF No. 104-3 at 143:7–14.) The research requirement does not vary between subspecialities, rather, the requirement is that professors conduct research and produce articles or books that are impactful to their specific areas. (*Id.* at 139:1–25); (Sugrue Dep., ECF No. 104–5 at 94:16–25.)

    In consideration of this evidence and making all inferences in the light most favorable to the EEOC, as is required, the Court finds that there remains a genuine issue of fact regarding whether the professors perform substantially equal jobs. *See Edwards*, 509 F. App' x at 886 (reversing entry of summary judgment, noting that there was evidence that the plaintiff and the comparator performed jobs that were of equal complexity and were similar in their managerial responsibilities, and holding that "[w]hile Edwards and Stewart managed a slightly different number of programs, supervised a slightly different number of employees with different decision-band classifications, and had slightly different job titles, these facts fail to convince us that, viewing the evidence in the light most favorable to Edwards, no genuine issue of material fact existed as to the substantial equality of the two jobs."); *see also Arrington,* 139 F.3d at 876 (reversing a grant of summary judgment where appellant presented "significant evidence" that her actual job duties and the comparator's actual job duties were very similar, despite a disparity in formal job titles and descriptions); *Hankinson v. Thomas Cnty. Sch. Sys.*, 257 F. App'x 199, 201 (11th Cir. 2007) (holding that "reasonable minds could differ as to whether the two positions [of high school softball and baseball coaches] were

substantially similar" such that a genuine issue of material fact existed).[3]

The University does not dispute that Koger is paid more than Davidson–Schmich. Instead, it argues that the two are not comparable because "they do not teach (and never have taught) the same classes at the University. They do not publish in the same publications. They also do not specialize in the same teaching/research areas." (University Mot. for Summary J., ECF No. 82 at 7.) The University also argues that Koger's publications were published in more prestigious journals and that he has drawn attention to the University's program.

The Court does not find either argument persuasive under the circumstances. While there is evidence that it would be unusual that a professor who specialized in comparative politics would be hired to teach courses on American politics, it is possible because the lines between those specialties "are a little bit fluid." (West Dep., ECF No. 104–2 at 37:2–22.) Additionally, the professors' specializations within the field of political science do not appear to be dispositive as to the question of substantial job similarity. Indeed, Dean Bachas explained that subspeciality is not determinative in terms of the requirements for professors within the political science department. Rather, subspecialities are considered when evaluating whether a professor conducted research and was subsequently published in high–ranking journals relevant to their respective specializations. (Bachas Dep., ECF No. 104–3 at 139:4–18.) However, the Court notes that Dean Bachas also testified that Davidson–Schmich and Koger are not comparable because they focus on different specializations and thus, publish in different types of journals. (*Id.* at 312:4–21.) Dean Bachas's inconsistent testimony and the other evidence mentioned herein raise a genuine issue of fact as to the issue of substantially equal jobs. Nor is the Court persuaded that the quality of Koger's publications and number of cite counts are determinative of this inquiry because the Plaintiff's prima facie case requires a comparison of jobs, not the skills and qualifications of the individuals who hold the jobs. *Miranda,* 975 F.2d at 1533.

The University relies on several non-binding legal authorities in support of its arguments. However, the Court finds these cases inapposite. For example, in *Schultz v. Bd. of Trustees of Univ. of W. Fla.*, No.

---

[3] The EEOC relies on the Honorable Kathleen Williams's order denying the University's motion for summary judgment on similar grounds. *Joo v. Univ. of Miami*, No. 18-23904-CIV, 2019 WL 7376765, at *1 (S.D. Fla. Nov. 13, 2019), *vacated* (Dec. 11, 2019). The University criticizes the EEOC's reliance on *Joo*, which this Court notes is similar to this case, because the order was vacated.  The Court finds the University's argument unavailing since it fails to note that the order was only vacated as a part of the settlement terms offered and stipulated to by the parties. *Joo v. Univ. of Miami*, No. 18-23904-CIV. Joint Stipulation (ECF No. 64) (Dec. 11, 2019).

306CV442/RS/MD, 2007 WL 2066183, at *19 (N.D. Fla. July 13, 2007) (Smoak, J.), the district court found that the plaintiff, a female professor, did not perform a substantially equal job as the proffered male comparators. There, the court noted that the plaintiff and the comparators were parts of different departments within the college of business and those departments were further divided into eight subject areas. *Id.* at *19. The plaintiff had a doctorate degree in the field of education and her comparators had doctorate degrees in the field of business. Due to her education, the plaintiff was limited in the subjects and courses she could teach, specifically, limited to introductory courses. *Id.* Lastly, the court observed that the plaintiff's courses were considered "softer" than the more specialized business courses in computer, scientific, and mathematical areas, which require more sophisticated and complex knowledge. *Id.* Unlike *Schultz*, the record here shows that although Davidson–Schmich and Koger have different specializations, they hold doctorate degrees in political science and both teach different political science courses at the same levels (introductory and upper-level courses). Moreover, the record here does not point to any significant differences in the complexity of the courses taught by Davidson–Schmich and Koger. (Sugrue Dep., ECF No. 104–5 at 103:6–14) (witness cannot recall if there are any differences in recognition between Schmich–Davidson and Koger's specialties).

The University also relies on a Fourth Circuit case *Spencer v. Virginia State University*, which granted summary judgment to Virginia State University because the male and female professors did not engage in equal work. 919 F.3d 199 (4th Cir. 2019). The Fourth Circuit reasoned that the professors did not perform equal work because they taught in different departments and "the differences between academic departments generally involve differences in skill and responsibility." *Id.* at 204-205. The court further reasoned that the professors engaged in different work because the female professor taught undergraduate courses, while the two male professors taught graduate courses. *Id.* at 205. Here, Davidson–Schmich and Koger teach within the same department and teach both introductory and upper-level courses.

### 2) *Non–Discriminatory Basis for the Pay Differential and Pretext*

Because the Court finds that the EEOC has met its prima facie burden, the burden shifts to the University to show, by a preponderance of the evidence, that the disparate salaries are caused by a seniority system, a merit system, a production-quota system, or any factor other than sex. *E.E.O.C. v. White and Sons Enter.*, 881 F.2d 1006, 1010 (11th Cir.1989). The University can meet this burden by showing "that the factor of sex provided *no basis* for the wage differential." *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir.

2003).

The University argues that the pay differential here is based on "any other factor other than sex." (University's Mot. for Summary J., ECF No. 82 at 12.) The University claims that Davidson–Schmich and Koger's starting salaries "are market-based." (*Id.*) Annual raises are determined by individual performance (including teaching, publication, and prestige/reputational benefit to the University) and allocated from limited pools of funds. (*Id.* at 12–13.) Lastly, multiple salary analyses confirm there is no relationship between gender and salary at the University. (*Id.* at 13.)

The University's market–theory argument is problematic because the record contains vague testimony as to what the market was in 2007 and how the University determined that. Dean Sugrue testified that between 2000 and 2007 it was impossible to determine what the actual market was for professors due to lack of information and that the market was gauged with offers that were accepted versus those that were rejected. (Sugrue Dep., ECF No. 104–5 at 244:3–9; 245:5—246:4.) The University began comparing employment data across comparable instructors in 2010, after both Davidson-Schmich and Koger were hired as associate professors. (Bachas Dep., ECF No. 104–3 at 17:20—18:8.) Even Koger himself is unable to explain how his market value was determined and summarizes it as "I was willing to take it, so that's what the market will bear." (Koger Dep., ECF No. 104–1 at 280:8–25.)

Moreover, West testified that the predetermined salary range of $73,000–$75,000 was based on many factors, including the salaries of other similar positions within the department and informal employment data of other comparable universities. (West Dep., ECF No. 104–2 at 167:11–168:11.) The market comparison was informal and based on "the knowledge of the departments and the people in our department who might know about those [comparable] universities. . ." (*Id.* at 168:14–24.) It is unknown from the record what market information was actually considered in calculating Koger's final offer of $81,000.

Even accepting the University was able to pinpoint the market value for an assistant professor in the political science department, the pertinent question is: Whether the University can adduce evidence of factors other than sex to explain why Koger was offered $81,000, which was several thousand dollars more than the predetermined range, while Davidson–Schmich was only offered $72,000 for a higher–ranking position. The University attempts to explain the differential by citing to Dean Sugrue's testimony stating that Koger was paid more because he had teaching experience and a "big book contract." (Sugrue Dep., ECF No. 104–5 at 283:12–23.) It was Sugrue's subjective impression that Koger's publisher was better than the publisher that had

agreed to publish Davidson–Schmich's book around the same time. (*Id.* at 288:21–289:4.) Sugrue was not familiar with Davidson–Schmich's other publishers and therefore, could not opine as to whether they were prestigious or not. However, all in all, Sugrue believes the two had comparable credentials and Davidson–Schmich's lower salary is the result of market compression compared to Koger who went out and tested the market. (*Id.* at 289:15–290:25.) As discussed, there is questionable evidence as to how the market was calculated let alone how it was compressed. Additionally, there is no evidence that in 2007, Koger had received any competing offers for employment or had tested the market by any means other than simply asking the University for a higher offer. In terms of raises to keep Koger from being poached by another institution, West testified that he considers both Koger and Davidson-Schmich to be competitive professors. (West Dep., ECF No. 104–2 at 239:9–24.) Accordingly, there remain issues of fact as to what market forces or differences between two comparable professors were considered that resulted in disparate salaries. *Brennan v. Victoria Bank & Tr. Co.*, 493 F.2d 896, 902 (5th Cir. 1974) (rejecting market force theory that women will work for less than men and holding that there is "just not substantial evidence that the disparate salaries were derived from factors other than sex.")

Moreover, the Court is not convinced that the pay differential is due to disproportionate performance in the areas of teaching and publication and reputational benefit. As the University notes, there is evidence that Koger is extremely valuable to the University because he excels in the three areas of evaluation for raises: teaching, research, and service. His performance evaluations merit the raises he has received over time. Dean Bachas testified that Davidson-Schmich publishes at a slower rate and is published in less prestigious journals, which explains why she makes less. (Bachas Dep., ECF No. 104–3 at 288:2–18.) The Court notes, however, that Dean Bachas conceded that he did not review her salary increases and the reasons for the amounts awarded. (*Id.*) Further in his assessment of Davidson–Schmich's application for full professor, Dean Bachas described her work as very high quality and substantially innovative, noting that her upcoming book is of high-significance and visibility. (Bachas's Promotion Evaluation for Davidson–Schmich, ECF No. 104–22). And Bachas noted concerns of publication placement for both Davidson–Schmich and Koger. (Bachas's Promotion Evaluation for Davidson–Schmich, ECF No. 104–22); (Bachas's Promotion Evaluation for Koger, ECF No. 104–22.)

The University's argument is further belied by Davidson–Schmich's performance evaluations. In her 2007 evaluation, Davidson–Schmich was reported to be an "able scholar" and an "excellent and responsible teacher."

(ECF No. 104-14 at 1.) In her 2010 evaluation, it was reported that "she is one of the leading authorities of Western Europe. . . and we can expect a more robust published agenda next year at this time." (*Id.* at 16.) Her 2011 evaluation was also positive, listing several publications and noting that she had taught well over the median number of students for tenure track faculty. (*Id.* at 24.) In sum, her evaluations through 2019 were overwhelmingly positive. (*Id.* at 66, 120, 160.)

The record also contains evidence that, if viewed in the light most favorable to Davidson–Schmich, indicates that gender played a role in salary disparities. For example, West was aware that three women, including Davidson-Schmich, complained about disparate pay between them and male faculty members, yet it appears that no corrective action was taken. (West Dep., ECF No. 104–2 at 324:12–325:25.) West and Bachas had discussed general gender disparities at the national level and within the University, as well as the results of an internal study that indicated that the University placed a higher service requirement on female professors. The same study recommended that the University collect and share data on annual raises by gender. (*Id.* at 322:7–324:6, 328:1–20.) Moreover, there is evidence that the University increased male professor's salaries to close the gap between them and comparable female professors who had higher salaries. (West Dep., ECF No. 104–2 at 298:5–299:8.); (Bachas Dep., ECF No. 104–3 at 416:1–418:14.) Notwithstanding this practice, the University did not meaningfully increase Davidson–Schmich's salary despite both her positive evaluations and an email from West recommending that the University increase Davidson-Schmich's pay, as she was "grossly underpaid" and earning less than many junior faculty members despite her rank and other qualifications. (Bachas Dep., ECF No. 104–3 at 279:8–11, 286:20–25, 296:2–5, 302:14–23.) When asked why he did not do the same for Davidson–Schmich, Bachas explained that he was "not here when these things happened." (*Id.* at 418:15–18.) Lastly, in support of its other-facts-other-than-sex argument, the University notes that the highest paid person in the department is a woman who has been with the department since the 1970's. This argument is unavailing in light of all the aforementioned evidence.

Drawing all inferences in Davidson–Schmich's favor, as the Court must, a genuine issue of material fact remains as to whether the pay differential is based on factors other than sex. *Edwards*, 509 F. App'x at 888; *Mulhall*, 19 F.3d at 597.

### B. Title VII Disparate Pay Claims

Title VII, among other things, prohibits an employer from discriminating

against any individual with respect to compensation because of that individual's sex. 42 U.S.C. § 2000e–2(a)(1). Under the familiar *McDonnell Douglas* test, a plaintiff must establish a *prima facie* case of discrimination under Title VII by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was subjected to adverse employment action; (3) the plaintiff's employer treated similarly situated employees, who are not within the protected class, more favorably; and (4) the plaintiff was qualified for the job at issue. *See Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 842-43 (11th Cir. 2000) (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory basis for the action at issue. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011). Once such a basis is articulated, the burden falls back to the plaintiff to show that the employer's reason was pretext for unlawful discrimination. *See id.* at 1326.

Because the EEOC has established its disparate pay claim under the more rigorous analysis of the Equal Pay Act, the Court finds that it has met its initial burden of showing its prima facie case under Title VII. *See Mulhall*, 19 F.3d at 598 ("Clearly, if plaintiff makes a prima facie case under the EPA, she simultaneously establishes facts necessary to go forward on a Title VII claim.").

The burden shifts to the University to *articulate* a legitimate basis for the pay differential. The University has articulated legitimate, non-discriminatory reasons for initially paying Koger more than Davidson–Schmich: chiefly, market considerations that involve salaries at the University and in other schools, competitive resume, and the increased costs of living in Miami. The University likewise articulated valid reasons for continuing to pay Koger more than Davidson-Schmich: disproportionate performance in the areas of teaching, research, and service and disproportionate rates of publication.

The University has met its burden; therefore, it shifts back to the EEOC to proffer evidence that the explanation is pretextual. The Court must, in viewing of all the evidence, determine whether the EEOC has cast sufficient doubt on the University's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that its justifications were not what actually motivated its conduct. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (quoting *Cooper–Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir.1994)). The Court finds that the EEOC has met its burden.

As discussed in length in the prior section, Davidson–Schmich has advanced sufficient evidence to cast doubt on the University's purportedly legitimate basis for the pay differential. Davidson–Schmich cites to evidence that the University's market analysis in the early 2000s was informal and not

based on reliable data. Moreover, at the time they were hired in 2007, Davidson–Schmich and Koger were comparable in most respects. The University was put on notice of gender pay disparities within the department by way of complaints and through a study that revealed a bias against female professors with respect to their service requirements. West recommended that Davidson–Schmich's salary be increased on at least two occasions because she was "grossly underpaid" and made less than professors of lower rank. Lastly, and perhaps most damning, there is evidence that the University increased male professor's salaries to close the gap between their salaries and those of comparable female professors and did not increase Davidson–Schmich's salary to close the gap between her and comparable Koger. For these reasons, the Court finds that Davidson–Schmich's claims under Title VII survive summary judgment.[4]

For these reasons, the Court **denies** the University's motion for summary judgment. **(ECF No. 82.)**

### C. Affirmative Defenses

Turning to the EEOC's motion for summary judgment on three of the University's affirmative defenses: failure to conciliate, laches, and failure to mitigate. For the reasons explained below, the motion is granted in part and denied in part.

### 1) Conciliation Efforts

In its first affirmative defense, the University alleges that:

The EEOC lacks standing to pursue its claim because of its failure to conciliate prior to filing this lawsuit. Despite overwhelming and unrebutted documentary evidence demonstrating that no violations of the Equal Pay Act or Title VII ever occurred, the EEOC erroneously concluded (in its Letter of Determination dated March 5, 2019) that there was "reasonable cause" to believe that the University had violated the Equal Pay Act and Title VII vis-à-vis Dr. Davidson Schmich. By letter dated March 20, 2019, the University responded to the EEOC's Letter of

---

[4] In the alternative, Davidson-Schmich argues that her claims would survive under the "convincing mosaic of circumstantial evidence" test that permits a jury to infer intentional discrimination. A "convincing mosaic" is shown by demonstrating: (1) suspicious timing or other "bits and pieces from which an inference of discriminatory intent might be drawn," (2) "systematically better treatment of similarly situated employees," and (3) evidence that the employer's justification is pretextual. *See Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019). Certainly, the aforementioned evidence constitutes "bits and pieces" from which a reasonable jury could draw discriminatory intent and there is evidence of systemic better treatment for male professors and of pretext.

Determination to request that the EEOC reconsider its decision in light of the evidence summarized therein. Without even responding to the University's letter or addressing the matters raised therein, the EEOC—two days later—issued a Notice of Failure of Conciliation. Under these facts, the EEOC breached its statutory/legal obligations to conciliate in good faith. That failure bars the EEOC from bringing this lawsuit.

(ECF No. 28 at 7).

The EEOC argues that it is entitled to summary judgment because the "defense does not exist under the law." (EEOC's Mot. for Summary J., ECF No. 79 at 4.) This argument was rejected by the Court in its denial of the EEOC's motion to strike affirmative defenses. Indeed, in her report and recommendation, which was adopted in its entirety, United States Magistrate Judge Louis listed several cases that recognize this defense as a matter of law.

Next, the EEOC argues that summary judgment is warranted because the University has admitted all the facts necessary to demonstrate that the EEOC complied with its requirement to conciliate. The University disputes this contention and argues that there is evidence that EEOC did not satisfy its conciliation requirements.

Before filling suit against an employer alleging work-place discrimination, the EEOC must first try to remedy the illegal practice through informal conciliation. 42 U.S.C. § 2000e-5(b); *Mach Mining, LLC. v. E.E.O.C.*, 575 U.S. 480, 482–83 (2015). To satisfy this requirement, the EEOC must: (1) outline to the employer the reasonable cause for its belief that Title VII has been violated; (2) offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer. *E.E.O.C. v. Asplundh Tree Expert Co.*, 340 F.3d 1256, 1259 (11th Cir. 2003) (quoting *EEOC v. Klingler Elec. Corp.*, 636 F.2d 104, 107 (5th Cir. 1981)). The EEOC has the burden of proving compliance with Title VII's conditions precedent. *See* Fed. R. Civ. P. 8(c). Although the statute does not expressly define the EEOC's precise conciliatory duties, courts in this circuit have held that the agency must attempt conciliation in good faith. *See EEOC v. Klingler Elec. Corp.*, 636 F.2d 104, 107 (5th Cir.1981); *Asplundh*, 340 F.3d at 1259; Thus, the court must look to see whether EEOC made satisfactory and good faith efforts in the conciliation process. To this extent, the absolute refusal to bargain is unacceptable. *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1237, 1242 (M.D. Ala. 2001) (De Ment, J.). However, it serves no useful purpose to force the EEOC to attempt further conciliation after the employer has rejected its offer. *Id.* (citing *Marshall v. Sun Oil Co.*, 605 F.2d 1331, 1334–39 (5th Cir.1979). The Court's review of conciliation communications efforts between the EEOC and an employer is narrow and focuses on the

reasonableness of the opportunities to conciliate. *E.E.O.C. v. Fla. Com. Sec. Servs., Corp.*, No. 13-20465-CIV, 2014 WL 4771887, at *20 (S.D. Fla. Sept. 24, 2014) (O' Sullivan, MJ).

The Court looks to two recent cases for guidance. In *Asplundh*, the EEOC took three years to issue its [l]etter of [d]etermination and one week later provided the defendant with a "proposed, nation-wide [c]onciliation [a]greement, which [only] provided twelve days for" the defendant's counsel to accept, reject or submit a counterproposal to the conciliation agreement. *Id.* at 1259–60. Additionally, the EEOC in *Asplundh* never communicated to the defendant a theory of liability for the alleged conduct of a non-employee, did not respond to the defendant's request for "a reasonable extension of time" and "the very next day . . . sent another letter . . . terminating conciliation and announcing its intent to sue." *Id.* at 1260. Thirteen days later, the EEOC filed a lawsuit. *Id.* The Eleventh Circuit affirmed dismissal of the EEOC's complaint because it found the EEOC's consolation actions "grossly arbitrary." *Id.*

In *Florida Commercial*, the district court granted summary judgment in favor of the EEOC on the employer's affirmative defense. 2014 WL 4771887, at *21. There, the EEOC invited the employer to conciliate and imposed a deadline to respond to a proposed conciliation agreement that was not attached to the correspondence. *Id.* at *6. Before the deadline expired, the employer wrote to the EEOC to raising concerns. *Id.* The EEOC did not respond to that letter and closed the conciliation period. *Id.* After realizing its error, the EEOC reopened the conciliation period and sent the proposed conciliation agreement with a deadline to respond. *Id.* at *7, *21. There was no evidence that the employer attempted to conciliate or otherwise engage in settlement discussions. *Id.* at *21. The EEOC waited one month after the deadline to notify the employer that conciliation efforts had failed. *Id.* At summary judgment, the employer argued that the EEOC's conciliation efforts were unreasonable and not in good faith because the proposed agreement did not address its concerns raised in the first conciliation period and the EEOC made no additional attempt to contact the employer. *Id.* The court rejected both arguments. *Id.* at *22. The court explained that the employer had the burden of showing the reasonableness of its concerns to the Court and it had failed to specifically identify the concerns raised in the communications or provide evidence of same at summary judgment. *Id.* at *21 n.12. The court also noted that the EEOC's conciliation efforts were not perfect, but it corrected its error by sending the promised proposed agreement and affording the employer additional time to conciliate or engage in settlement negotiations. *Id.* at *21. The employer did not adduce any evidence that it took advantage of this opportunity. Thus, the Court granted summary judgment on that affirmative defense in favor of the EEOC.

This case is more analogous to *Florida Commercial*. On March 5, 2019, the EEOC sent the University a letter of determination finding reasonable cause to believe that there had been violations of the Equal Pay Act and Title VII by the University paying Davidson-Schmich less than Koger. (Letter of Determination, ECF No. 78–9). The letter stated: "the Commission now invites the parties to join with it in reaching a just resolution of this matter. . . [i]f you wish to engage in the conciliation process, please complete the enclosed Invitation to Conciliate EEOC Form 153, and return it to the EEOC within ten (10) calendar days of your receipt of this Determination." (*Id.*) The deadline to respond was approximately March 15, 2019. On March 19, 2019, the parties exchanged communications about an extension of the conciliation period. On March 20, 2019, the University sent a letter to the EEOC requesting reconsideration of the EEOC's determination and challenging the EEOC's finding of disparate treatment. It is undisputed that the University did not return the Invitation to Conciliate Form.

The University argues that the EEOC failed in its conciliation efforts because it did not respond to the concerns raised in its March 20 letter and instead found that conciliation efforts had failed. Like the employer in *Florida Commercial*, the University summarily argues that it raised concerns regarding the EEOC's determination without explaining what specific concerns were raised or what contrary evidence it referred to in its letter. *Fla. Com. Sec. Servs., Corp.*, 2014 WL 4771887, at *21. Moreover, the University's arguments fail to appreciate that, by its own characterization, the March 20 letter was not an attempt to accept the EEOC's offer to conciliate or engage in settlement negotiations, rather it was a total challenge to the EEOC's determination. The Court need not force the EEOC to make subsequent attempts to conciliate after the employer rejects its invitation to have such discussions. *Dinkins*, 133 F. Supp. 2d at 1243. Nor does the University argue that the EEOC failed to honor the extension of time by prematurely closing the conciliation period upon receipt of the March 20 letter. Lastly, the Court notes that unlike *Florida Commercial*, the EEOC here did not send a proposed conciliation agreement. However, this fact is not determinative. "Congress left to the EEOC such strategic decisions as whether to make a bare-minimum offer, to lay all its cards on the table, or to respond to each of an employer's counter-offers, however far afield. So too Congress granted the EEOC discretion over the pace and duration of conciliation efforts, the plasticity or firmness of its negotiating positions, and the content of its demands for relief." *Mach Mining*, 575 U.S. at 492. Here, the EEOC invited the University to engage in conciliation conversation by completing a form attached to the determination letter. For these reasons, the Court grants summary judgment in favor of the EEOC on

the University's first affirmative defense.[5]

## 2) Laches

In its motion for partial summary judgment, the EEOC argues that judgment should be entered in its favor on the University's affirmative defense of laches.

"It is well settled that the United States is not . . . subject to the defense of laches in enforcing its rights." *United States v. Summerlin,* 310 U.S. 414, 416, 60 S. Ct. 1019, 1020, 84 L. Ed. 1283 (1940). Accordingly, where, as in this case, a government agency brings an enforcement action to protect the public interest, laches is not a defense. *S.E.C. v. Silverman*, 328 F. App'x 601, 605 (11th Cir. 2009).

The Eleventh Circuit, however, has recognized that there have been "rare exceptions to this rule in certain civil cases." *United States v. Delgado*, 321 F.3d 1338, 1349 (11th Cir. 2003) (citing *Herman v. S. Carolina Nat. Bank*, 140 F.3d 1413, 1427 (11th Cir. 1998) (laches bars Equal Employment Opportunities Commission suits because Title VII contains no statute of limitations)); *see also Stone v. U.S. Postal Serv.*, 383 F. App'x 873, 874 (11th Cir. 2010) ("Title VII employers may raise various defenses in the face of unreasonable and prejudicial delay" such as the affirmative defense of laches.")). "To apply laches in a particular case, the court must find both that the plaintiff delayed inexcusably in bringing the suit and that this delay unduly prejudiced defendants." *Id.* (quoting *E.E.O.C. v. Dresser Indus., Inc.,* 668 F.2d 1199, 1202 (11th Cir.1982)).

The EEOC argues that it did not delay bringing this suit because it is undisputed that it promptly notified the University of the charges against it and that it conducted an investigation, rendered its determination, and filed this action approximately a year after receipt of Davidson–Schmich's charge. It also argues that the University was not prejudiced by any delays in the process. The Court agrees.

The University argues that the EEOC is required by statute to complete its investigation within 180 days of the filing of the employee's charge, and in this case, the EEOC took 274 days to issue its determination letter. (University's Resp., ECF 93 at 13.) Then, after the EEOC determined

---

[5] In its response in opposition, the University also argues that the EEOC's investigation was deficient and failed to abide by the statutory disclosure requirements. The Court will not delve into these arguments because they are outside the scope of the specific affirmative defense at issue in the EEOC's motion for summary judgment and the arguments were not raised in the University's own motion for summary judgment. Additionally, the Court notes that the EEOC did not cite any case law in support of its argument.

conciliation efforts had failed, it waited four months to file this action. The Court does not find that this amounts to an inexcusable delay, and the Court notes that the University has not cited a case that supports its position. *Cf E.E.O.C. v. Phillips Colls., Inc.,* 984 F. Supp. 1464, 1467–69(M.D. Fla. 1997) (M.D.Fla.1997) (applying laches where it took the EEOC, from the time the employee filed his charges, four years to file this lawsuit and "it took the EEOC, from the date on which it issued a Notice of Failure to Conciliate, a year and six months to file suit"); *see also E.E.O.C. v. Moore Grp., Inc.,* No. C75–1029A, 1976 WL 554, at *2 (N.D. Ga. Mar. 25, 1976) (applying laches to a five–year-old claim when the EEOC ended conciliation over a year and a half before filing suit).

Nor was the University prejudiced by the EEOC's delay. The University claims that it has been prejudiced by the EEOC's delays because it "has been charged with defending hiring/compensation decisions that were made as far back as 1999. . . given that timeframe, certain information/witnesses no longer are available." (University's Resp., ECF 93 at 13.) This argument is unavailing because it challenges the temporal scope of the EEOC's claims, not whether there was any delay in the EEOC's procedures.

Next, the University summarily argues that its statement of facts has raised sufficient questions regarding the EEOC's "affirmative misconduct." (*Id.* at 12.) The Court assumes that the misconduct that the University is referring to are its claims that the EEOC failed to conciliate and was deficient in complying with other statutory requirements. These purported instances of misconduct do not relate to the Court's laches inquiry of whether the EEOC's process was unreasonably delayed such that it prejudiced the University. Moreover, the Court already determined that the EEOC was not unreasonable or arbitrary in its conciliation efforts. Lastly, even if the EEOC's failure to strictly abide by the statutory requirements by which its representatives could execute the letter of determination, this misconduct does not have a nexus to the University's claim of prejudice due to of lack of witnesses. For these reasons, the Court grants summary judgment in favor of the EEOC on the University's laches defense.

### 3) *Failure to Mitigate*

The EEOC argues that summary judgment should be entered against the University on its affirmative defense for failure to mitigate. The EEOC avers that summary judgment is proper because the defense is not applicable to claims under the Equal Pay Act and because Davidson-Schmich is still employed at the University and she is therefore not obligated to seek another job to mitigate the unequal pay. (EEOC's Mot. for Summary J., ECF No. 79 at 9–10.) Lastly, the EEOC contends, even if she does have a duty to mitigate,

there is no evidence that she has failed to do so. (*Id.* at 10.)

The Court is not convinced that Davidson-Schmich's duty to mitigate was relieved simply because she filed a claim under the Equal Pay Act. *Carter v. DecisionOne Corp. Through C.T. Corp. Sys.*, 122 F.3d 997, 1006 (11th Cir. 1997) (recognizing that affirmative defense of failure to mitigate in an action raising claims under Title VII and the Equal Pay Act and suggesting the issue was for the jury); *Joyner v. Town of Elberta*, No. CV 13-00067-CG-N, 2014 WL 12902418, at *2 (S.D. Ala. Jan. 8, 2014) (recognizing in discovery dispute that that both Title VII and the Equal Pay Act allow back pay and the defendant properly raised the affirmative of failure to mitigate). On the contrary, it is possible that Davidson–Schmich mitigated her damages by staying in her current position. *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 66 (5th Cir. 1980) ("We think that unequal pay alone does not constitute such an aggravated situation that a reasonable employee would be forced to resign. Unequal pay is not a sufficient justification to relieve Ms. Bourque of her duty to mitigate damages by remaining on the job."). It is undisputed that Davidson-Schmich has applied to six jobs since 2018. Neither side makes a meaningful effort to show the outcome of her applications. Thus, a question remains as to whether Davidson-Schmich took reasonable steps to mitigate her damages. *See Scoggins v. Floyd Healthcare Mgmt. Inc.*, No. 414CV00274HLMWEJ, 2016 WL 11544774, at *40 (N.D. Ga. June 10, 2016), *report and recommendation adopted,* No. 414CV00274HLMWEJ, 2016 WL 11544908 (N.D. Ga. Aug. 30, 2016) ("Whether a plaintiff acted reasonably to mitigate his damages is typically a question of fact for the jury, and this Court cannot say that Plaintiff acted unreasonably as a matter of law.").

### 4. Conclusion

For the reasons discussed above, the University's motion for summary judgement is **denied (ECF No. 82)** and the EEOC' motion for partial summary judgment is **granted in part and denied in part. (ECF No. 79.)**

**Done and ordered** at Miami, Florida on September 28, 2021.

_____
Robert N. Scola, Jr.
United States District Judge