EXHIBIT

1   2.19.2021   A.V.

# UNIVERSITY OF MIAMI FACULTY MANUAL

# 2016-2017

**EXHIBIT P-001**

i

UM/EEOC-D. SCHMICH - 0836

## Contents

FOREWORD FROM THE PRESIDENT .................................................................. vii
UNIVERSITY OF MIAMI MISSION STATEMENT ............................................... vii
FOREWORD FROM THE FACULTY SENATE ..................................................... viii
PHILOSOPHY AND OBJECTIVES ...................................................................... ix
FACULTY GOVERNMENT .................................................................................. 1
CHARTER ........................................................................................................... 1
A1     Preamble .............................................................................................. 1
A2     Definitions ............................................................................................ 1
A3     Voting Rights of the UNIVERSITY FACULTY ........................................... 3
A4     Authority of the FACULTY ..................................................................... 4
A5     School Councils .................................................................................... 6
A6     Authority of the Senate ........................................................................ 7
A7     Composition of the Senate ................................................................... 8
A8     Officers of the Senate .......................................................................... 9
A9     Committee on General Welfare ........................................................... 10
A10    Actions by the Faculty ......................................................................... 11
A11    Department Structure ........................................................................... 13
A12    Responsibilities of Administrative Officers ........................................... 13
A13    Appointment and Retention of Administrative Officers .......................... 14
A14    Faculty Appointment, Retention, Tenure, Promotion, and Merit Salary Increases ....... 20
A15    Committees  of the UNIVERSITY FACULTY ........................................... 21
BYLAWS ............................................................................................................. 23
B1     Faculty-Administration Relationships ................................................... 23
B2     Meetings .............................................................................................. 25
B3     Senate Election and Voting Procedures ............................................... 26
B4     Standing Committees ........................................................................... 28
B5     Consultative Committees ...................................................................... 38
B6     Academic Organizational Structure ...................................................... 39
POLICIES ........................................................................................................... 42
C1     Effective Date of Changes to the Faculty Manual ............................... 42
C2     Definitions      ..................................................................................... 42
C2.1   See Section A2.1 for the definitions of the following terms: The General Faculty,
       University Faculty, Regular Faculty, Research Faculty, Educator Faculty, Librarian
       Faculty, Associated Faculty, and the University Faculty of Each School. ................. 42
C2.2   The Graduate Faculty ........................................................................ 42
C2.3   Instructor ........................................................................................... 42
C2.4   Titles of ASSOCIATED FACULTY   ....................................................... 43
C2.5   Scholarly and Professional Qualifications for Each Rank of the UNIVERSITY
       FACULTY .......................................................................................... 43
C3     Voting Rights ....................................................................................... 44
C4     The Faculty .......................................................................................... 45
C4.1   Appointing Authorities ........................................................................ 45
C4.2   Faculty Status ..................................................................................... 45
C4.3   Change of Type of Faculty Appointment .............................................. 46
C4.4   Joint Appointments    ......................................................................... 47
C4.5   Secondary Appointments .................................................................... 48

UM/EEOC-D. SCHMICH - 0837

C4.6    Privileges and Benefits of University Faculty, Emeritus Faculty and Associated Faculty ...................................................................................................... 48
C5    Appointments ..................................................................................................... 49
  C5.1    General Policy .............................................................................................. 49
  C5.2    Kinds of Appointments ............................................................................... 49
  C5.3    Notice of Termination of Appointment or Intention not to Reappoint for RESEARCH FACULTY, EDUCATOR FACULTY, and LIBRARIAN FACULTY. ........................................ 50
  C5.4    Terms in Writing ......................................................................................... 51
  C5.5    Probationary Period for Regular Appointments ....................................... 51
  C5.6    Term of Probationary Appointments ........................................................ 53
  C5.7    Notice of Intention not to Reappoint Regular Faculty ............................. 53
  C5.8    Term Appointments Following Retirement ............................................... 54
C6    Administrative Appointments ............................................................................ 54
  C6.1    General Policy .............................................................................................. 54
  C6.2    Regular Appointments from Outside the Academic Unit ......................... 54
  C6.3    Interim Appointments ................................................................................ 54
  C6.4    Acting for Temporarily Absent Officers .................................................... 55
  C6.5    Senate Officers ........................................................................................... 55
C7    Tenure ................................................................................................................ 55
  C7.1    Administrators and Tenure ........................................................................ 55
  C7.2    Attainment of Tenure ................................................................................. 56
  C7.3    Standards and Procedures for Attaining Tenure ....................................... 56
  C7.4    Meaning of Tenure ..................................................................................... 57
  C7.5    Termination of Tenure Because of Declared Financial Exigency or Reorganization 57
  C7.6    Obligations of Tenure ................................................................................. 57
  C7.7    Retention of Existing Rights ....................................................................... 57
C8    Academic Freedom ............................................................................................ 58
C9    Scholarly and Professional Qualifications of the Faculty ................................. 58
  C9.1    Mission of the Faculty ................................................................................ 58
  C9.2    Scholarship ................................................................................................. 58
  C9.3    Teaching ...................................................................................................... 59
  C9.4    University Service and Administration ....................................................... 59
  C9.5    Service in the Libraries ............................................................................... 59
  C9.6    Recognition of Degrees .............................................................................. 59
C10   Consultation on Appointment, Reappointment, Promotion, and Award of Tenure .......... 60
C11   Initial Appointment ........................................................................................... 60
C12   Annual Salary and Performance Review .......................................................... 61
C13   Review of the Faculty for Reappointment, Promotion, and the Award of Tenure ....... 61
  C13.1   Notification of Standards and Procedures ................................................. 61
  C13.2   Types of Review .......................................................................................... 62
  C13.3   Faculty Files ................................................................................................ 62
  C13.4    Special Reviews ......................................................................................... 62
C14   Trustee Authority in Tenure .............................................................................. 67
C15   Termination of Appointment for Cause ............................................................ 68
  C15.1   Definition of Cause ..................................................................................... 68
  C15.2   Preliminary Proceedings Concerning the Fitness of a Faculty Member ........... 68
  C15.3   Formal Proceedings: Purpose and Nature ................................................. 69
  C15.4   Parties ......................................................................................................... 69
  C15.5   Suspension of the Faculty Member ........................................................... 69
  C15.6   Filing of Documents .................................................................................... 69

UM/EEOC-D. SCHMICH - 0838

C15.7    Notice of Commencement: Grounds for Termination and Bill of Particulars ....... 69
C15.8    Right to Hearing: Response by Faculty Member .............................................. 69
C15.9    Faculty Hearing Committee ............................................................................... 70
C15.10   Attendance by Panel Members ........................................................................... 71
C15.11   Discovery ........................................................................................................... 72
C15.12   Hearing ............................................................................................................... 72
C15.13   Attendance of Witnesses .................................................................................... 72
C15.14   Order of Proof; Conduct of Proceedings ........................................................... 72
C15.15   Consideration and Recommendation by the Hearing Committee ....................... 73
C15.16   Consideration by Board of Trustees ................................................................... 74
C15.17   Publicity ............................................................................................................. 74
C16      Sabbatical Leave .....................................................................................................75
C16.1    Purpose ............................................................................................................... 75
C16.2    Eligibility ........................................................................................................... 75
C16.3    Terms of Sabbatical Leave ................................................................................. 75
C17      Faculty Benefits ......................................................................................................75
C17.1    Administration of Benefits.................................................................................. 75
C17.2    Retirement Plans ............................................................................................... 75
C17.3    Group Life Insurance and Long-term Disability Plans ....................................... 77
C17.4    Health Plans ....................................................................................................... 77
C17.5    Degree Enrollment and Tuition Benefits ........................................................... 77
C18      Centers, Institutes and Other Named or Titled Academic Units....................................82
C18.1    Naming................................................................................................................ 82
C18.2    Terms of Approval and Periodic Reviews ......................................................... 83
C19      Faculty Senate Awards ...........................................................................................84
C19.1    James W. McLamore Outstanding Service Award.............................................. 84
C19.2    Distinguished Faculty Scholar Award................................................................. 84
C19.3    Outstanding Teaching Award ............................................................................. 85
C20      Miscellaneous Provisions .......................................................................................86
C20.1    Use of Academic Counsel and Legal Counsel ................................................... 86
C20.2    Eligibility to Serve as Counsel .......................................................................... 87
C20.3    Lists of Academic Counsel ................................................................................ 88
C20.4    Lists of Mediators .............................................................................................. 88
C20.5    Academic Days ................................................................................................... 89
C20.6    Discretionary Authority of Senate Officers During Academic Breaks ................ 89
C20.7    Form and Effective Date of Required Notices .................................................... 90
C20.8    Voting Procedures for Departments and Schools/Colleges ................................ 91
FACULTY HANDBOOK .................................................................................................. 92
ETHICAL MATTERS ...................................................................................................... 93
Statement on Professors and Political Activity.................................................................93
Consulting and Compensation for Non-University Activities............................................93
Conflict of Interest Policy................................................................................................94
I.       Business Matters .................................................................................................. 94
II.      Academic Matters ................................................................................................ 95
III.     Sponsored Research ............................................................................................ 96
IV.      Consulting ........................................................................................................... 98
Personal Relationships ....................................................................................................99
UM Policy Statement on Consensual Amorous, Romantic or Sexual Relationships ........100
Nondiscrimination Policy of the University ...................................................................102
Faculty Policy on Sexual Harassment ...........................................................................102
I.       General Matters .................................................................................................. 104

UM/EEOC-D. SCHMICH - 0839

II.     Types of Procedures ..................................................................... 105
III.    Informal Procedures ...................................................................... 105
IV.     Formal Procedures ........................................................................ 106
V.      Reports ........................................................................................... 107
    Employment of Relatives (Nepotism) ............................................107
    Communication with Trustees .........................................................111
ACADEMIC MATTERS ................................................................................ 112
    Faculty Produced Teaching Materials .............................................112
    Graduate Study by Faculty Members and Spouses .........................112
    Guest Speakers ................................................................................112
    Illness or Other Emergency ............................................................112
    Leaves of Absence ...........................................................................112
    Libraries ..........................................................................................113
    Non-classroom Duties .....................................................................113
    Overload and Special Arrangements ...............................................113
    Personnel Files ................................................................................114
    Resignation ......................................................................................114
    Summer Teaching ............................................................................114
    Vacation ...........................................................................................115
    Research and Sponsored Programs ..................................................116
    Policies and Procedures of the University of Miami Relating to Allegations of Misconduct in
        Research   ....................................................................................124
    Dissemination of This Statement of Policies and Procedures .........134
UNIVERSITY OF MIAMI POLICY ON INVENTIONS, INTELLECTUAL PROPERTY AND
    TECHNOLOGY TRANSFER   ...................................................... 135
I.      GENERAL ......................................................................................135
II.     DEFINITIONS and ABBREVIATIONS ..........................................135
III.    OWNERSHIP ...................................................................................137
IV.     ADMINISTRATION OF THE POLICY ...........................................138
V.      DISCLOSURE, REVIEW AND PROTECTION OF INNOVATIONS .........................139
VI.     DISTRIBUTION OF REVENUE DERIVED FROM COMMERCIALIZATION OF
        INNOVATIONS .............................................................................142
UNIVERSITY ADMINISTRATIVE STRUCTURE .................................... 145
    Board of Trustees .............................................................................145
    Office of the President .....................................................................145
    Division of Academic Affairs ..........................................................145
    Academic Deans' Policy Council .....................................................145
    Academic Deans' Administrative Council ........................................146
    Chairs of Academic Departments ....................................................146
ACADEMIC REGULATIONS ...................................................................... 147
    Academic Bulletins ..........................................................................147
    Changes of Courses or Withdrawals ................................................148
    Class Periods ....................................................................................148
    Class Rolls .......................................................................................148
    Grade Reports ...................................................................................149
    Grading System ................................................................................149
    Religious Holy Day Policy   .............................................................149
    Undergraduate   Final Examination Policy ......................................150
    Classroom Assignment .....................................................................151
    Class Schedules ................................................................................151
FACULTY-ADMINISTRATIVE COMMITTEES ........................................ 152

UM/EEOC-D. SCHMICH - 0840

FACULTY-STUDENT RELATIONS ........................................................................ 157
    Advising  ...................................................................................................... 157
    Faculty Responsibilities in Student Activities .............................................. 157
    Faculty Roles in Student Volunteer Service  ................................................ 158
    Non-Academic Discipline  ............................................................................ 158
    Honor Code ................................................................................................... 158
    Ombudsperson and University Troubleshooters   Program ........................... 159
    Student Records ............................................................................................ 159
UNIVERSITY ADVANCEMENT ......................................................................... 160
    Division of University Advancement ............................................................ 160
    Alumni Association ....................................................................................... 160
    Citizens' Board ............................................................................................. 160
    University Volunteer Groups ........................................................................ 160
    Advertising.................................................................................................... 161
    Public Information Policy ............................................................................. 161
OTHER GENERAL MATTERS ............................................................................ 162
    Archives ........................................................................................................ 162
    Bookstore ...................................................................................................... 162
    Audio/Visual Services .................................................................................. 162
    Faculty Club.................................................................................................. 162
    Holidays ........................................................................................................ 162
    Office of Human Resources........................................................................... 162
    Parking .......................................................................................................... 163
    Post Office ..................................................................................................... 163
    Solicitations .................................................................................................. 163

UM/EEOC-D. SCHMICH - 0841

**FOREWORD FROM THE PRESIDENT**

On behalf of the Board of Trustees, the faculty, and the entire University community, it is my pleasure to welcome you back to a new academic year and extend a cordial greeting to our incoming faculty members.

This new edition of the University of Miami *Faculty Manual* includes a description of the University's governance and administrative structure, faculty rights and responsibilities, and procedural bylaws.  It is the latest version of an evolving document that reflects the core academic values, policies and procedures of the University.

Annually, the University implements changes in the Charter and the Bylaws. Changes to the *Faculty Manual* are frequently considered, and this volume is revised as needed.  Faculty members who have a question or a concern about any part of the *Manual* should consult the chair of their department, their dean or the Faculty Senate.

Thank you for your valuable commitment to the students of the University of Miami.

With my best wishes for your continued success in the year ahead,

Julio Frenk

**UNIVERSITY OF MIAMI MISSION STATEMENT**

The University of Miami's mission is to educate and nurture students, to create knowledge, and to provide service to our community and beyond. Committed to excellence and proud of the diversity of our University family, we strive to develop future leaders of our nation and the world.[1]

---

[1] #2007-18 (B)

UM/EEOC-D. SCHMICH - 0842

## FOREWORD FROM THE FACULTY SENATE

The *Faculty Manual* sets forth principles and procedures which protect our academic freedom, specifies our rights to participate in the governance of the University, and establishes the Faculty Senate. Its provisions are part of a faculty member's contract with the University.

Section "A" is the Faculty Government Charter, and for over a half century represents the Constitution of faculty governance. It specifies governing principles which can only be amended by the Senate with the agreement of the President and the Trustees and an affirmative vote of the voting REGULAR FACULTY of the University.

Section "B" contains the Bylaws, which translate Charter provisions into practice and set forth the mandates for the Senate's standing committees.

Section "C" details numerous governance matters, including:

- The categories of faculty and voting rights associated with each;
- Types of appointments, and tenure policies, rights, and procedures;
- Grounds and procedures for deciding allegations of unprofessional conduct and for termination for cause; and
- Sabbaticals and faculty benefits.

The *Faculty Manual* also contains the *Faculty Handbook*, which describes additional policies governing life at the university, such as consulting, ethics, conflicts of interest, harassment, outside speakers, discoveries and inventions, and classroom duties.

This current version of the *Manual* represents the result of decades of effort by dedicated Senate members, who are too numerous to mention. The on-line version is frequently updated to reflect changes. Please contact the Faculty Senate Office [facsen@miami.edu] if you have a question of interpretation or believe that there might be an error or need for clarification in any passage.

The Faculty Senate is a democratically elected legislative body. Among its powers are adoption of changes in the *Faculty Manual* and other legislation, approval of new programs, centers and institutes, and new degrees, majors, minors, certificates, and tracks. It conducts periodic evaluations of chairs, deans and the Provost. It monitors academic life, and either legislates on or makes recommendations concerning the wellbeing of the faculty and the continued improvement of the University. Its committees and hearing panels consider such vital matters as denial of tenure; termination for cause; allegations of unprofessional conduct; and disputes concerning rank, salary and conditions of employment. The Senate's prestigious awards recognize outstanding achievements by members of the University in scholarship, service and teaching.

The work of the Senate is carried out by its officers, the Committee on General Welfare, a network of standing and ad hoc committees, and plenary sessions of the elected Senators. The Senate maintains close contact with the President, the Provost, other University officers, and the Board of Trustees and its Committees.

The Faculty Senate is your instrument, along with the School Councils, for participation in our collegial governance. Senate meetings are open to all faculty members and agendas are posted on the Senate's webpage, http://www.miami.edu/index.php/faculty_senate/ . The Senate can best serve all affected communities if it reflects the voices, the interests and the participation of the faculty. We urge you to join our efforts and become involved in the activities of the Senate.


Tomás A. Salerno
Chair, Faculty Senate

UM/EEOC-D. SCHMICH - 0843

## PHILOSOPHY AND OBJECTIVES

*In 1982 the Faculty Senate and the President approved the following Statement of Philosophy and Objectives:*

Universities as institutions are created by society; they are nurtured by society; their reason for being is service to society; and society will continue their existence only if their services are worth the costs entailed.

The University as an institution endeavors to meet four great obligations:

**(1) To Society**

To bring to bear on society's problems its knowledge, independent judgment, objective inquiry, free expression, scholarly approach, and rational argument.

To graduate mature and responsible men and women with broad education, special abilities in their respective professional fields, and with potential as thoughtful, informed citizens in a free, democratic, pluralistic and complex society.

**(2) To Its Students**

To use the most effective methods to nurture the learning process, and to instill the desire for lifelong learning.

To stimulate and encourage the identification of the values and judgments implicit in personal, institutional and social decisions.

To develop the whole person including: needed competencies, creative talents, and the will to become involved as citizens with self-developed commitments.

**(3) To the World of Knowledge**

To add to the fund of knowledge through investigation and research.

To organize, preserve, and evaluate existing knowledge.

To disseminate knowledge.

**(4) To Itself**

To maintain the freedom to explore all of the ideas of man free to question, argue, create, accept or reject.

To provide an exemplary environment and opportunities for every individual, regardless or race, creed, nationality or sex.

UM/EEOC-D. SCHMICH - 0844

## FACULTY GOVERNMENT

*The revised Faculty Government Charter and Bylaws were approved by vote of the Faculty on June 15, 1967. Some revisions were approved by the Faculty Senate on September 27, 1965. The whole document was approved by the Board of Trustees on November 22, 1967. This edition includes all revisions and materials that have been approved through the date shown at the bottom of each page.  These items are posted within one week of having been approved.*

*As described in Section C1 of the Faculty Government Policies, changes normally become effective on the first day of June next following*[2]*.  Changes that have been made during the current 1 June – 31 May period that are not yet in effect are shown as ~~strikeout~~ for delete and* <u>underline</u> *for addition.*

## CHARTER

### A1      Preamble

A1.1   A university is a community of scholars contributing, according to their individual talents and interests, to the transmission and advancement of knowledge. Because of its diversity of interests, a university is a complex organization, not quite like any other in its management, which requires the understanding and good faith of people dedicated to a common purpose. A university administration must seek wisely and diligently to advance the common effort, and the strength of a university is greatest when its faculty and administration join for the advancement of common objectives.

A1.2   Much of the existing faculty-administration relationship has been established through long experience and has the weight and good sense of academic form and tradition. Some of the traditions of the University of Miami are given expression and are extended in this document. Yet these and other common understandings have meaning only to the extent that they reflect the integrity and faith of the faculty and the administration in the day-to-day accomplishment of their joint effort.

### A2       Definitions

A2.1   (a) The GENERAL FACULTY shall consist of the UNIVERSITY FACULTY and the ASSOCIATED FACULTY.

(b) The UNIVERSITY FACULTY shall consist of the President, the Executive Vice President and Provost, the academic deans, the REGULAR, RESEARCH, LIBRARIAN, and EDUCATOR FACULTY.

(c) The REGULAR FACULTY shall consist of all faculty having tenured or tenure-earning appointments who hold the rank of Professor, Associate Professor, or Assistant Professor.

---

[2] #2000-26(B)

UM/EEOC-D. SCHMICH - 0845

Faculty Government Charter

(d) The RESEARCH FACULTY shall consist of those faculty whose major function is to conduct research in the academic units of the University and who hold the rank of Research Professor, Research Associate Professor, or Research Assistant Professor. RESEARCH FACULTY shall not hold tenured or tenure-earning appointments.

(e) The EDUCATOR FACULTY shall consist of i) INSTRUCTORS appointed before June 1, 2013[3] and ii) those faculty with professorial titles engaged primarily in professional practice and in teaching associated with that practice, such as licensed health practitioners with terminal doctoral degrees and physicians who are in the clinical departments of the Miller School of Medicine or nurses in the clinical programs of the School of Nursing and Health Studies with titles [rank] of Clinical [department], (e.g., ASSOCIATE PROFESSOR of Clinical Surgery or PROFESSOR of Clinical Nursing). The REGULAR FACULTY of a School may vote to propose to the Faculty Senate the creation of other professorial EDUCATOR FACULTY positions in addition to those already authorized by the Senate. It may do so for any of its Departments on the recommendation of the faculty of the department concerned, including at least half of that department's REGULAR FACULTY, or for the School as a whole. Proposals to be considered by the Senate shall define these positions by department and shall include for each department the descriptive modified professorial title, the requisite qualifications and duties that identify the professional practice, and a cap on such positions, specified by number. EDUCATOR FACULTY shall not hold tenured or tenure-earning appointments.[4] [5]

(f) The LIBRARIAN FACULTY shall consist of those faculty serving in the libraries of the University who hold the rank of Librarian Professor, Librarian Associate Professor, or Librarian Assistant Professor and who perform normal professional duties in the libraries, but are not required to undertake scholarly research.  LIBRARIAN FACULTY shall not hold tenured or tenure-earning appointments[6].

(g) The ASSOCIATED FACULTY are all faculty with authorized professorial titles prefixed by "Voluntary," "Adjunct", "Visiting", or "Affiliated", Instructors appointed on or after June 1, 2013,[7] and all Lecturers. Additional titles for ASSOCIATED FACULTY may be created by a special Bylaw defining the title.[8]

(h) The UNIVERSITY FACULTY OF EACH SCHOOL are the President, the Executive Vice President and Provost, the Dean of the school, and the UNIVERSITY FACULTY who hold appointments in the school.

(i) The term SCHOOL means a school or college of the University, including the Graduate School, having its own faculty and academic program leading to a degree. The Richter

---

[3] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.
[4] #99026(A)
[5] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.
[6] #2001-23(A)
[7] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.
[8] #99026(A)

UM/EEOC-D. SCHMICH - 0846

Faculty Government Charter

Library shall have status equivalent to that of a school and the University Librarian shall be considered to be the dean.

(j) The term DEPARTMENT includes divisions of a school and undepartmentalized schools.

(k) The term PRESIDENT shall mean the President of the University or a designee authorized to act for the President in specified areas, except where the context clearly refers to the President as an individual.

(l) A GRADUATE DEGREE is any earned post-baccalaureate degree administered by the Graduate School.

## A3     Voting Rights of the UNIVERSITY FACULTY

A3.1   (a)The REGULAR FACULTY are entitled to vote on all matters for which they are qualified by rank and tenure status including all voting rights extended to other members of the UNIVERSITY FACULTY.[9]

(b) The RESEARCH FACULTY are entitled to vote on all matters for which they are qualified with the exception of appointment, reappointment, promotion, the award of tenure, evaluation of the chair or the dean, and ratification of amendments to the Faculty Government Charter. A school may, by majority vote of its tenured REGULAR FACULTY, extend voting rights to RESEARCH FACULTY in any or all of the following matters:

(1) Reappointment of RESEARCH FACULTY of lower rank;[10]
(2) Promotion of RESEARCH FACULTY of lower rank;
(3) Evaluation of the department chair; and
(4) Evaluation of the dean.

Extension of voting rights to RESEARCH FACULTY apply only in that school. The tenured Regular Faculty must vote annually on whether to renew any extension of voting rights to RESEARCH FACULTY.

(c) The EDUCATOR FACULTY are entitled to vote on all matters for which they are qualified with the exception of appointment, reappointment, promotion, the award of tenure, evaluation of the chair or the dean, and ratification of amendments to the Faculty Government Charter. A school may, by majority vote of its tenured REGULAR FACULTY, extend voting rights to EDUCATOR FACULTY with professorial titles in any or all of the following matters:

(1) Reappointment of EDUCATOR FACULTY of lower rank;[11]
(2) Promotion of EDUCATOR FACULTY of lower rank;
(3) Evaluation of the department chair; and
(4) Evaluation of the dean.

---

[9] #2001-09(A)
[10] #96006(A)
[11] #96007(A)

UM/EEOC-D. SCHMICH - 0847

Faculty Government Charter

Extension of voting rights to EDUCATOR FACULTY apply only in that school. The tenured REGULAR FACULTY must vote annually on whether to renew any extension of voting rights to EDUCATOR FACULTY with professorial titles.

(d)[12]Extension of voting rights to LIBRARIAN FACULTY apply only in the Richter Library. [13] The LIBRARIAN FACULTY are entitled to vote on all matters, including those listed below, for which they are qualified by rank and title, with the exception of reappointment, promotion and award of tenure of the REGULAR FACULTY, evaluation of the Provost, and ratification of amendments to the Faculty Government Charter.  LIBRARIAN FACULTY holding five-year term appointments may vote on:

(1) Appointment of LIBRARIAN FACULTY of equal or lower rank;
(2) Reappointment of LIBRARIAN FACULTY of lower rank, or of equal rank with less time in rank;
(3) Promotion of LIBRARIAN FACULTY of lower rank; and
(4) Evaluation of the Dean and University Librarian.

(e) [14] Unless otherwise determined by the voting faculty of the department concerned, voting rights under subsections A3.1(a)-(d) shall be suspended during any continuous period that has exceeded one calendar year [15]when the faculty member has no duties as a member of the faculty of the University, because he or she is on a voluntary leave of absence or long-term disability leave. All such voting rights will automatically be reinstated if and when the faculty member again takes up his or her duties as a member of the faculty of the University.

(f) Voting rights of RESEARCH FACULTY, EDUCATOR FACULTY or LIBRARIAN FACULTY may not be extended to any matter pertaining to charter amendments, the rights and privileges of the tenured REGULAR FACULTY, or to the reappointment, promotion or tenure of members of the REGULAR FACULTY.

(g) Members of the UNIVERSITY FACULTY may vote only once on a single question. Persons holding appointive administrative office may not vote on any matter that is subject to or may be reviewed by their office.

## A4        Authority of the FACULTY [16]

A4.1  The UNIVERSITY FACULTY[17] is authorized to enact regulations and to formulate rules for the immediate government of the University in such matters as curriculum, scholastic standards, graduation and honors, approval of candidates for earned degrees, and examination and testing programs. The UNIVERSITY FACULTY is authorized to share with the President in decisions regarding the future development of the University, including the institution of new schools, degrees, departments, curricula, and the like, and in the

---

[12] #2010-08(A)
[13] #2002-04(A)
[14] #2004-06(B)
[15] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[16] See section B1 of the Faculty Government Bylaws
[17] See section A2.1(b) of the Faculty Government Charter for definition

UM/EEOC-D. SCHMICH - 0848

enactment of regulations and the formulation of rules for the immediate government of the University pertinent to: educational and research policy and general welfare; environmental conditions; student conduct and activities; requirements for admission and exclusion of students; faculty appointment, retention, tenure and promotion; the University budget; the appointment and retention of administrative officers; faculty teaching loads; and the responsibilities and duties of faculty members. Normal procedures for decision-making in each of these matters shall be consistent with the differing functional responsibilities of the President and the UNIVERSITY FACULTY. In order to exercise these responsibilities the UNIVERSITY FACULTY is authorized to establish its own organization and rules of procedure. Under this authority the UNIVERSITY FACULTY hereby establishes the Faculty Senate (hereinafter referred to as the Senate) as its legislative and executive agency.

A4.2    The following powers and duties are granted to the faculty of each SCHOOL[18], except the Graduate School and the Richter Library: to determine its requirements for admission and graduation; to determine the scholastic standards required of its students; to approve those of its students who qualify for degrees; to participate in the determination of teaching loads, responsibilities and duties of its members; to recommend to the appropriate authority action necessary to provide adequate instruction and supervision of its students; to participate in the appointment, retention, promotion, award of tenure, and merit salary increases of its members; to participate in the selection and retention of its administrative officers; to promote the educational and research policy and the general welfare of the school; to formulate plans for the future development of the school; and to delegate any of its powers and duties to the faculties of its several departments. These powers and duties are subject, however, to the authority of the Senate to determine policies that the general welfare of the University or that are necessary for the coordination of the various schools and, except when specifically delegated to the faculty, are also subject to the authority of the President. In order to exercise these responsibilities the faculty of each school is authorized to determine its own organization and rules of procedure. Under this authority the faculty of each school shall establish a Council as its executive agency.

A4.3    The following powers and duties are granted to the faculty of each DEPARTMENT[19]: to determine the graduation requirements for a major or minor in that department; to determine its curriculum and academic program, both undergraduate and graduate; to determine the scholastic standards required of its students; to determine which of its students have fulfilled the requirements for a major in that department; to exercise the additional powers necessary to provide adequate instruction and supervision of its students; to participate in the determination of the teaching loads, responsibilities and duties of its members; to participate in the appointment, retention, promotion, award of tenure, and merit salary increases of its members; to initiate budget recommendations; to promote the educational and research policy and the general welfare of the department; to formulate plans for the future development of the department; to nominate members of the department to the graduate faculty; to participate in the selection and retention of its administrative officers and to determine its own organization and rules of procedure. These powers and duties are subject, however, to the authority of the appropriate school faculty

---

[18] See section B6.2 of the Faculty Government Bylaws for definition
[19] See section B6.3 of the Faculty Government Bylaws for definition

UM/EEOC-D. SCHMICH - 0849

to determine policies that affect the general welfare of the school or that are necessary for the coordination of the several departments within the school, are subject also to the corresponding authority of the Senate, and, except when specifically delegated to the faculty, are subject also to the authority of the President.

A4.4   The following powers and duties are granted to the GRADUATE FACULTY: to determine the requirements for the admission and retention of graduate students; to approve those of its students who qualify for a graduate degree; to approve the requirements for graduate degrees; to determine which departments are qualified to give courses leading to graduate degrees; to recommend to the Board of Trustees the designation of graduate degrees; to determine the scholastic standards required of graduate students; to promote research and scholarship by members of the faculty; to promote the educational and research policy and the general welfare of the Graduate School; to formulate plans for the future development of the Graduate School; to determine its own membership following nomination by the department faculties; to participate in the selection and retention of its administrative officers. These powers and duties are subject, however, to the authority of the Senate to determine policies that affect the general welfare of the University or that are necessary for the coordination of the various schools and, except when specifically delegated to the faculty, are subject also to the authority of the President. In order to exercise these responsibilities the graduate faculty is authorized to determine its own organization and rules of procedure. Under this authority the graduate faculty shall establish a Council as its executive agency.

A4.5   The following powers and duties are granted to the faculty of the RICHTER LIBRARY: to participate in the appointment, retention, promotion, award of tenure, and merit salary increases of its members; to participate in the selection and retention of its administrative officers; to promote the educational and research policy and the general welfare of the Library. These powers and duties are subject, however, to the authority of the Senate to determine policies that affect the general welfare of the University or that are necessary for the coordination of the various schools and, except when specifically delegated to the faculty, are subject also to the authority of the President. In order to exercise these responsibilities the faculty of the Library is authorized to determine its own organization and rules of procedure. Under this authority the faculty of the Library shall establish a Council as its executive agency.

## A5       School Councils

A5.1   The faculty of each school, including the Graduate School and the Library, shall establish a Council as its executive agency. The voting members of the faculty of each school shall elect from their members a Council which shall act as the committee on academic planning, educational and research policy, and general welfare of the school; it shall elect all committees of the school faculty; it shall act as confidential counsel to the dean of the school in any matter submitted by the dean; it or its designee shall set the date and hour and prepare the agenda for all regular meetings of the school faculty; it shall include in the agenda any matter requested in writing by five[20] percent of the voting members of the school faculty; a majority of the voting faculty of a department, or any

---

[20]  2014-32(A) Effective 10/21/2015.

UM/EEOC-D. SCHMICH - 0850

Faculty Government Charter

items or matters submitted by the dean or his/her principal deputy;[21] it may make recommendations to the school faculty concerning proposed actions; it may act for the school faculty, as authorized annually by the school faculty, and report such actions at the next meeting of the school faculty. The authority of the Council to elect committees of the school faculty in no way limits the authority of the dean to appoint *ad hoc* committees from the school faculty to advise the dean.

A5.2    The School Council shall consist of at least three elected members, each serving for a three-year term, the terms to be staggered in order to provide continuity. One or more alternates may also be elected.  A majority of the members shall be REGULAR FACULTY. In departmentalized schools, except as provided to the contrary in a written bylaw, representatives will be elected from each department.[22]  The Council of a school containing a small number of faculty members may consist of all voting members of the school faculty. Should a member of the Council resign or should a position for any other reason become vacant a successor shall be chosen by the remaining members of the Council to serve for the unexpired term.

A5.3    In departmentalized schools, the School Council shall yearly elect one of its members to be the Speaker of the Council to preside at meetings of the Council; to represent the wishes of the faculty; to provide advice or recommendation to the dean; and to administer the activities of the Council. Up to two Vice Speakers may be elected to assist the Speaker in all administrative duties and will assume the duties of the Speaker in his or her absence. The Dean of the school will serve as a non-voting *ex officio* member of the Council except as may be necessary to break a tie vote.  The Dean will attend at least one meeting each semester. All meetings of the Council will be open to UNIVERSITY FACULTY members of that school or college[23], except for executive sessions which will be attended only by elected members or in their absence, their alternates. The Council shall receive administrative support from the Office of the Dean, and a Secretary to the Council shall be employed to assist the Speaker and the Council in the conduct of its activities.[24]

## A6    Authority of the Senate

A6.1    In the exercise of its prescribed powers and duties the Senate shall be guided by the principle that the primary concern of the Senate is the general welfare of the University and the UNIVERSITY FACULTY. In taking actions to promote this general welfare, the Senate shall consider the views of schools, departments or individuals whose interests may be affected by any proposed measure.

A6.2    The Senate may enact legislation pertaining to the autonomous authority of the UNIVERSITY FACULTY or to the authority shared by the UNIVERSITY FACULTY and the President. In matters delegated to the faculty of a school or a department, the legislative authority of the Senate is limited to the determination of policies that affect the general

---

[21] 2014-32(A) Effective 10/21/2015.
[22] 2014-32(A) Effective 10/21/2015
[23] The phrase "of that school or college" was accepted as a friendly amendment at the 3/25/15 Senate meeting.
[24] 2014-32(A) Effective 10/21/2015.

UM/EEOC-D. SCHMICH - 0851

welfare of the University, or that are necessary for coordination, or to such other policies as are referred to it by an administrator.

A6.3   The Senate may create, modify or discharge any *ad hoc* committee of the UNIVERSITY FACULTY and define its powers and duties. This in no way limits the authority of any administrator to appoint *ad hoc* advisory committees composed of faculty members.

A6.4   Whenever an official representative of the UNIVERSITY FACULTY is needed for ceremonial purposes, the Chair of the Senate shall designate a person to act in that capacity. Whenever representation of the UNIVERSITY FACULTY is needed for matters of University governance, the representative(s) shall be elected by the faculty in a manner to be determined by the Senate.

A6.5   The Senate shall act upon resolutions submitted by the faculty in an assembled meeting submitted by petition, or submitted by a committee of the UNIVERSITY FACULTY. The Senate shall act upon recommendations or legislation initiated by the faculty of any school or department potentially affecting the general welfare of the University. The Senate may adopt resolutions on its own behalf and may enact and amend its own Bylaws. The Senate, with the approval of the President, is empowered to permit modification of any section of this charter insofar as it applies to a particular school, upon petition of the faculty of that school and the presentation of satisfactory evidence that the application of that section adversely affects the welfare of the school.

A6.6   Questions as to the classification of individual members of the UNIVERSITY FACULTY as voting members of the faculty shall be resolved by the Senate. Each voting member of the faculty who is not a member of a school faculty shall be assigned by the Senate to a specified school.

A6.7   The Senate is empowered to award through a Bylaw, with the approval of the President, some or all of the powers and duties assigned to department or school faculties to identifiable faculty groups not associated with a school. This Bylaw shall specify the powers and duties of the group, including its representation in the Senate and the level of its participation in the appointment and retention of its administrative officers and in the appointment, promotion, and award of tenure of its members.

A6.8   The Senate shall interpret, with the concurrence of the President, the Faculty Government Charter.

## A7   Composition of the Senate

A7.1   The members of the Senate shall be voting members of the UNIVERSITY FACULTY who are elected by the voting members of the UNIVERSITY FACULTY in conformity with the following principles:

(a) [25]The senators shall be democratically selected with care that small or minority groups are assured a voice in University affairs. To this end, larger, more heterogeneous schools

---

[25] See section B3.4(c ) of the Faculty Government Bylaws

UM/EEOC-D. SCHMICH - 0852

may adopt election procedures to ensure that senators are selected by groups who know them personally and are best able to evaluate their qualities.

(b) [26]The Faculty Senate shall consist of 30-50 voting members. Each school with faculty tenured in that school, and the Library,[27] shall be allotted at least one senator. The remaining senators shall be apportioned such that the ratio of faculty per senator in any school shall increase with the size of the faculty of that school. The number of senators allotted and apportioned to any two schools shall be less than 50% of the total voting membership. The Senate shall adopt a Bylaw to implement these principles and shall apply this Bylaw annually to apportion itself. The Senate may through a special Bylaw provide representation to other academic units.

(c) Senators shall be elected for a three-year term, staggered so that one third of the senators are elected each year.

(d) Each senator shall be a representative of the UNIVERSITY FACULTY as a whole as well as of a particular school.

(e) It shall be permissible for a school to reduce its representation in the Senate by a majority vote of the voting members of the school faculty.

(f) The President, the Executive Vice President and Provost, Vice Presidents, Vice Provosts, Assistant Provosts, Deans, Vice Deans, Associate Deans and Assistant Deans, and other equivalent administrators, shall be excluded from serving in the Faculty Senate.[28]

(g) Directors, Associate Directors, and Assistant Directors whose duties are primarily administrative shall also be excluded from serving in the Faculty Senate.[29]

## A8        Officers of the Senate

A8.1    As prescribed in the Senate rules of procedure, the Senate shall elect a Chair and two Vice-Chairs. The Chair and the Vice-Chairs become members at large of the Senate during their terms as officers. Schools shall appoint an alternate to vote in the Senate during the terms of office of the Chair and the Vice-Chairs[30]. The Chair shall select and the University shall employ a person to serve as Secretary to the Senate. The Chair may appoint, with the approval of the Senate, an Advisory Council to assist in the operations of the Senate and to advise on matters coming before the Senate.

A8.2    The Chair shall preside at all meetings of the Senate and of the Committee on General Welfare, and shall sign the official copies of all Senate actions. The Chair, after appropriate consultation: shall set the date and hour of all regular and special meetings of

---

[26] See section B3.3 of the Faculty Government Bylaws

[27] #2011-40(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

[28] #76009(A)

[29] #76009(A)

[30] The appointment of an alternate is only necessary if the person elected as Chair or Vice-Chair is a member of the Senate at the time of election; #2003-08(B)

UM/EEOC-D. SCHMICH - 0853

the Senate; shall prepare the agenda for Senate meetings and shall include in the agenda any resolution submitted by the UNIVERSITY FACULTY in meeting assembled; shall include in the agenda any matter requested in writing by ten percent of the voting members of the UNIVERSITY FACULTY; may include in the agenda any item requested in writing by an individual faculty member; may make recommendations to the Senate concerning proposed actions; and may act as a confidential consultant to individual faculty members or to the President. The Chair shall bring before the Senate, after a reasonable time for consideration, all matters duly referred to the Senate in accordance with Sections A6.2 and A6.5. The Chair shall not make any changes in presentations to the Senate unless authorized by the originating source, but the Chair may transmit recommendations and alternate proposals to that being presented.

A8.3   The Vice Chairs shall report and explain to the Senate all pending actions. When the Chair is absent the First Vice Chair shall act in the Chair's place.

A8.4   The Secretary to the Senate shall act as secretary for the Senate, the Advisory Council, and the Committee on General Welfare. The Secretary shall keep records and minutes and perform the additional duties elsewhere described.

A8.5   If during the summer a subject for Senate consideration and action is deemed by the President or by the Chair of the Senate to be of such importance that postponement of consideration until the first Senate meeting in the fall would be detrimental to the general welfare of the University, the Chair shall call a special meeting of the Senate. If a quorum is not attained at such a meeting, then the assembled senators may nevertheless consider the matter and only if there is no dissenting vote, may they make a recommendation. Any such recommendation must then be circulated to the Senate by all appropriate means and the membership polled. The recommendation becomes effective only if approved by a majority of the membership of the Senate.

A8.6   One senator, other than the Chair of the Senate, shall be selected by the Executive Committee of the Board of Trustees to act as liaison representative to that body.

## A9        Committee on General Welfare

A9.1   The sphere of interest of the Committee on General Welfare shall include general welfare, tenure, the academic freedom of faculty and of students, and faculty-administration relationships. The Committee shall be composed of the Chair, the Vice-Chairs, and one senator elected by the Senate from each school with faculty tenured in that school[31], and the Library[32].

A9.2   The Committee may informally advise the President on general educational policy; may, at its own discretion, informally discuss with a dean or other administrative officer alleged violations of good academic practices that are brought to its attention; shall collect and transmit the opinions of the faculty in the quadrennial review of the Provost, deans and chairs; and shall perform such other duties as the Senate may assign it through a Bylaw.

---

[31] See section B3.6, regarding alternate members to the General Welfare Committee

[32] #2011-40(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0854

## A10        Actions by the Faculty

A10.1  The voting members of a department faculty may by annual vote extend partial voting privileges to full-time or part-time members of the department not previously designated as voting members. These voting privileges shall not include voting privileges in the school or UNIVERSITY FACULTY, membership on the consultative committee for the appointment of a chair, or voting privileges on the reappointment of a chair.

A10.2     A quorum in a department shall consist of a majority of its voting members, including those members of the department to whom partial voting privileges have been extended. A proposed action by a department is effective only if passed by a majority of the voting members present at a meeting of the department. Such an action shall be effective at the time determined by the department unless, in the opinion of the department chair, the action potentially affects school or University policy or procedures. In this event, the chair of the department shall transmit the action to the dean and may also transmit an independent opinion in support of or in opposition to the action. The dean may request a reconsideration of the action by the department and may present an independent opinion in writing or in person. If, in the opinion of the dean, the action does not potentially affect school or University policy or procedures, the dean shall return a copy of the action, so designated, to the chair, and the action is thereby effective. If, in the opinion of the dean, the action potentially affects school or University policy or procedures, the dean shall transmit the action to the appropriate committee of the school faculty or UNIVERSITY FACULTY, or, if there is no appropriate committee, to the Council of the school or to the Senate. The dean may also transmit an opinion in support of or in opposition to the action. If the dean neither acts within 10 academic [33] days nor requests additional time for consideration, the department may transmit the action directly to the Council of the school or to the Senate.

A10.3  A proposed action by a school faculty is effective only if passed by a majority of the voting members present at a meeting of the school faculty or by a majority of members of an authorized committee. Such an action shall be effective at the time determined by the school faculty unless, in the opinion of the dean, the action potentially affects University policy or procedures. In this event, the dean shall transmit the action to the appropriate committee of the UNIVERSITY FACULTY, or, if there is no appropriate committee, to the Senate. The dean may also transmit an opinion supporting or opposing the action. If the committee of reference or the Senate finds that the action does not affect University policy or procedures, it will report this to the dean and the action will become effective. Otherwise, the committee of reference or the Senate will take the action under review for consideration and decision.

A10.4  An action proposed by a committee of the UNIVERSITY FACULTY, whether originated by the committee or by the committee of a department or school, becomes effective only if passed by a majority vote. The chair of the committee shall transmit such an action, along with all written concurring and opposing opinions, to the Senate for consideration and recommendation.

---

[33] #2011-25(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0855

A10.5    A quorum of the Senate shall consist of a majority of its members. An action proposed by the Senate, whether originated by the Senate, by a committee of the UNIVERSITY FACULTY, or otherwise, becomes effective only if passed by a majority of the members present at a meeting of the Senate. At the discretion of the chair, or upon request from the floor by one member, a Senate vote shall be by secret ballot. Actions passed by the Senate shall be classified by the Senate as follows:

Class A: Senate actions that amend or revise the Faculty Government Charter.

Class B: Senate actions of a legislative nature over which the faculty and the President have joint responsibility; or any Senate action whatsoever on matters submitted to it by the President; or the enactment of Bylaws that interpret this Charter.

Class C: Senate actions of a legislative nature over which the faculty normally has exclusive authority.

Class D: Actions of the Senate other than those of a legislative nature, including passage of resolutions, advice or recommendations, appointment of committees, reception of reports or information, and determination of Senate Bylaws.

A10.6    A Class D Senate action becomes effective upon adoption by the Senate. Such actions or a summary of them shall be duplicated by the Secretary and distributed to the faculty.

A10.7   Two official copies of a Class C Senate action shall be certified by the Chair and transmitted to the President by the Secretary. If the President approves, the President shall note an approval upon one copy and return it to the Secretary. If the President disapproves or requests modification of the action, the President may reclassify the action to a Class B action. If the President does not either approve or reclassify the action to a Class B action within 10 academic [34] days of notification of the Senate action, nor request a reasonable extension of time for consideration, the action shall be deemed approved. The approved action shall be deemed effective and the action, or a summary of it, shall be duplicated by the Secretary and distributed to the faculty.

A10.8   Two official copies of a Class B action shall be prepared by the Secretary, certified by the Chair and transmitted to the President by the Secretary. If the President approves, the President shall note an approval upon one copy and return it to the Secretary. If the President disapproves or desires modification of the action, the President may request consideration by a Joint Referral Committee consisting of the Chair of the Senate, the Executive Vice President and Provost, two academic deans appointed by the Executive Vice President and Provost, and the two Senate Vice-Chairs. If the Joint Referral Committee is unable to recommend modifications that resolve the differences and the President does not either disapprove or approve the Senate action within a reasonable length of time, not to exceed 40 academic [35]days, nor formally request a necessary reasonable length of time for further consideration, the action shall be deemed approved. If

---

[34] #2011-25(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[35] #2011-25(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0856

the President disapproves the action, the President shall present, in person or in writing, the reasons for the disapproval. The Senate shall then reconsider its action, and if reaffirmed, attempt, with the President, to arrive at a mutually acceptable solution. If no mutually acceptable solution is arrived at within six calendar [36]months, the matter may be referred by either the President or the Senate or both to the Board of Trustees for final action. Such final action shall be taken by the Board of Trustees within 60 academic days [28]of referral, after an opportunity is provided for a representative of the Senate to present the Senate's position. The approved or final action shall be deemed effective and the action, or a summary of it, shall be duplicated by the Secretary and distributed to the faculty.

A10.9   The procedure following adoption by the Senate of a Class A action shall be the same as for a Class B action, except that the action must be ratified by a majority of the members of the voting faculty who vote on the matter and subsequently approved by the Board of Trustees.

## A11   Department Structure

A11.1   The diversity of size of the various academic departments, in their functions, in their traditions and in their stages of academic development precludes the existence of a uniform organizational structure for all departments. A department whose function is primarily teaching should be administered by a distinguished educator, and the administrative demands of this office should not be so great as to impair the administrator's continuing growth as an educator. A department whose function is both research and teaching should be administered by a distinguished scholar, and the demands of this office should not be so great as to impair the administrator's continuing growth as a scholar. A department, such as some departments in the Miller School of Medicine, with clinical, research and teaching functions, should be administered by either a distinguished clinician or by a distinguished scholar, and the demands of this office should not be so great as to impair the administrator's continuing growth as a clinician or a scholar. As warranted by the size and responsibilities of the department, one or more members of the department, selected by the chair in consultation with the voting members of the department, may assume primary responsibility for appropriate categories of department activities such as the curriculum, the advisement of students, the preparation of schedules and teaching assignments, graduate admissions, and research.

A11.2   With the approval of the Senate and the President, other plans for department structure may be implemented. For example, a homogeneous department at a high level of academic development may be authorized to elect its chair and determine its own organization.

## A12   Responsibilities of Administrative Officers

A12.1   The chair of a department is responsible to the dean of the school and to the faculty of the department for all matters relating to its educational, research, professional, and administrative affairs. In these matters the chair is the representative, through the dean, of

---

[36] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0857

the President and also of the department faculty and is responsible for the observance by the department of the general policies of the school and of the University. The chair of a department shall prepare and transmit recommendations and actions of the department to the appropriate agencies and may also transmit independent recommendations on such matters. The chair shall continually evaluate the educational, research, professional, and administrative activities of the department and formulate plans for its future development. The chair is expected to provide leadership for the development of the department and for the improvement of its faculty and curriculum. The chair shall keep the dean informed on all department matters of concern to the school. The chair shall preside at meetings of the department faculty.

A12.2  The dean of a school is responsible to the President and to the faculty of the school for all matters relating to its educational, research and administrative affairs. In these matters the dean is the representative of the President and also of the faculty of the school and is responsible for observance by the school of the general policies of the University. The dean shall transmit recommendations and actions initiated by faculty groups to the departments of the school or by the faculty of the school to the appropriate agencies; the dean may also transmit independent opinions on such matters. The dean shall continually evaluate the educational, research, clinical and administrative activities of the school and formulate plans for its future development. The dean is expected to provide leadership for the development of the school and the continuous improvement of its faculty. The dean shall preside at meetings of the school faculty.

A12.3  The President of the University is responsible to the Board of Trustees and to the UNIVERSITY FACULTY for all matters relating to its educational, research, clinical, and administrative affairs. In these matters the President is the representative of the Board of Trustees and also of the faculty of the University and is responsible for observance by the University of its general policies. The President shall continually evaluate the educational activities of the University and formulate plans for its future development. The President is expected to provide leadership for the development of the University and for its continuous improvement.

## A13      Appointment and Retention of Administrative Officers

A13.1  The following principles shall apply in establishing the authority and methods of appointment and reappointment of administrators: sufficient authority and continuity should be provided to permit vigorous leadership, but absolute authority should be withheld in order to prevent arbitrary or dictatorial administrative action; and the more proximate the administrator is to the faculty, the greater should be the degree of faculty participation in the administrator's selection and retention. To these ends, each administrator specified herein shall be appointed by an appointing authority, there shall be no limit to the number of possible reappointments, and appropriate faculty shall participate in the initial selection.

A13.2  The chair of each department, and the President shall be appointed after consultation as follows: the Consultative Committee for the appointment of a department chair shall consist of all voting members of the department (or school) faculty, except that by a vote of the faculty of a departmentalized school, a committee may be formed consisting of representatives of several related departments. In the instance of the establishment of a new

UM/EEOC-D. SCHMICH - 0858

department the enabling legislation shall specify the initial Consultative Committee. The Consultative Committee for the President shall consist of the deans of all schools and the members of the General Welfare Committee. The Consultative Committee shall initially be convened by the appointing agent and shall elect its own chair. Nominations for any of these academic administrative positions may be made by the appointing agent and by members of the Consultative Committee. Supporting information on each seriously considered candidate shall be compiled and made available to the Consultative Committee, and an opportunity shall be provided for an interview with the Committee and for a vote by the Committee which shall be reported to the appointing agent in a manner specified in the Bylaws. Normally, consistent with the information provided by the Consultative Committee, but also exercising judgment relative to the effect of the appointment on the general welfare of the department, school, University and profession, the dean of the school shall appoint department chairs, and the Board of Trustees shall appoint the President[37].

A13.3   [38]When it is time to appoint the Dean of a School (including the University Librarian), a Search Committee shall be established to identify and recommend candidates. It is responsible to the appointing authority and to the Faculty of the School. The Committee shall have between nine and fifteen members as determined by the appointing authority. No member of the Committee may be a candidate for the position.

The Faculty of each School should establish in its by-laws a procedure for nominating faculty members for service on the Committee and for determining the Faculty's views on the candidates. Pursuant to this procedure, the Faculty should submit to the appointing authority a list of faculty members that has no fewer names than the total number of members to be appointed[39]. If no submission is made by the designated time, the list will be deemed to include all members of the Regular Faculty of the School. The appointing authority shall select at least two-thirds of the members from the list submitted by the Faculty of the School.

The appointing authority shall convene the first meeting of the Search Committee. The appointing authority shall select the chair from among University Faculty members of the Committee. The appointing authority shall make available the resources, including staff, necessary to conduct a successful search. The Committee shall regularly inform the appointing authority of its progress and shall confer with the Faculty of the School to the fullest extent it deems possible consistent with conducting a successful search. The Committee shall assure that the Faculty of the School has the opportunity to meet with candidates invited to campus. It shall consult with the Faculty of the School before making its recommendations to the appointing authority and shall accurately transmit the views of the Faculty of the School together with its recommendations. Should the Committee's opinion differ from that of the Faculty of the School, the Committee shall specifically explain the reasons to the appointing authority and to the Faculty.  The appointing authority shall explain the decision to the Faculty of the School.

---

[37] See section C4.1(a) of the Faculty Government Policies

[38] #2002-16(A)

[39] Upon completion of two searches, the President and the Senate shall revisit the formula for the number of names submitted by the Faculty (as noted in Legislation #2002-16(A))

UM/EEOC-D. SCHMICH - 0859

Faculty Government Charter

Normally, consistent with the information provided by the Search Committee, but also exercising judgment relative to the effect of the appointment on the general welfare of the school and the University and profession, the President shall appoint deans.

A13.4 [40]When it is time to appoint the Executive Vice President and Provost, a Search Committee shall be established to identify and recommend candidates. It is responsible to the appointing authority and to the University Faculty as represented by the Faculty Senate. The Committee shall have fifteen members. No member of the Committee may be a candidate for the position.

The Faculty Senate should submit to the appointing authority a list of no fewer than fifteen faculty members as nominees to serve on the Search Committee. The appointing authority shall select at least ten members from the list submitted by the Faculty Senate.

The appointing authority shall select the chair from among the members of the Committee and shall convene the first meeting of the Search Committee. The appointing authority shall make available the resources, including staff, necessary to conduct a successful search. The Committee shall regularly inform the appointing authority of its progress and shall confer with  the General Welfare Committee of the Faculty Senate and the deans of all schools to the fullest extent it deems possible consistent with conducting a successful search. The Committee shall assure that the General Welfare Committee, the deans of all schools, and other University officials as determined by the appointing authority have the opportunity to meet with candidates invited to campus. It shall consult with the General Welfare Committee before making its recommendations to the appointing authority and shall accurately transmit the views of the General Welfare Committee together with its recommendations. The Committee shall provide the appointing authority with a list of two or three candidates and an evaluation of their strengths and weaknesses from which list the appointing authority shall attempt to recruit one of the candidates to the position. Should the Committee's opinion differ from that of the General Welfare Committee, the Committee shall specifically explain the reasons to the appointing authority and to the General Welfare Committee.

Normally, consistent with the information provided by the Search Committee, but also exercising judgment relative to the effect of the appointment on the general welfare of the University and profession, the President shall appoint the Executive Vice President and Provost.

A13.5[41] At four-year intervals, the voting members of each school or college other than the dean, [42] Provost, and President, shall be afforded an opportunity to express their opinions as to whether the interests of their school or college, profession and the University would be best served by replacement or retention of its dean.

---

[40] #2004-05(A)

[41] #2011-20(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

[42] #2003-08(B)

UM/EEOC-D. SCHMICH - 0860

A13.6[43]  At four-year intervals, the voting members of each department, other than the department chairs,[44] deans, Provost, and President, shall be afforded an opportunity to express their opinion as to whether the interests of their department, profession and the University would be best served by replacement or retention of its chair.

A13.7[45]  The Secretary to the Senate shall initiate the vote, and tally the results.  The process shall ensure the anonymity of each respondent[46] and the confidentiality of all comments so designated.

The Senate shall adopt and publish written procedures as Class D legislation for:
(1)  The responsibility of tallying and reviewing the comments;
(2)  Explanation of how the responses and summaries are distributed;
(3)  Explanation of the Senate Chair's role in summarizing the comments and confidential comments;
(4)  Other procedural matters relevant to this section. [As shown below.] [47]

(a) VOTE COLLECTION AND ANONYMITY. The Faculty Senate Office staff shall collect the results of the evaluation. Immediately upon transmission, the faculty member's vote and comments shall be electronically stripped from the sender's identification in order to make the votes and comments anonymous. The anonymous votes shall then be tallied by the Faculty Senate Office staff. In a Department with six or fewer eligible voting faculty members, one or two members of the Senate Committee on General Welfare ("GWC") shall personally interview each eligible faculty member in that Department in lieu of the faculty members' participation in the voting and commenting process. The GWC members involved in any aspect of the evaluation process shall not be from the same School or College as the person being evaluated or have any other conflict of interest, real or perceived.

(b) INDEPENDENT ASSESSMENT BY THE COMMITTEE ON GENERAL WELFARE. Once the votes have been collected, made anonymous and tallied by the Faculty Senate Office staff in keeping with paragraph (a), the votes shall be independently confirmed by two members of the GWC, and the general and confidential comments shall be reviewed. More than two GWC members may be used only if there are many voting faculty, as determined by the Chair of the Faculty Senate.

(c) GENERAL COMMENTS. General comments (those not labeled "confidential") are anonymous but not confidential. They shall be reviewed and summarized by at least two members of the GWC acting independent of each other. The summaries shall be provided to the Faculty Senate Chair and the Faculty Senate Secretary. The Senate Chair shall have the authority to treat a general comment as a confidential comment where necessary to preserve anonymity.

(d) CONFIDENTIAL COMMENTS. Confidential comments are those that a faculty member believes should be known but that (1) the faculty member does not want passed on verbatim

---

[43] #2011-20(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[44] #2003-08(B)
[45] #2011-20(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[46] #84014(A)
[47] #2011-43(D)

UM/EEOC-D. SCHMICH - 0861

and/or (2) the faculty member believes should not be passed on to the person being evaluated. Confidential comments shall be written on a separate portion of the rating ballot marked specifically for "confidential comments" and shall be both confidential and anonymous. If there are six or fewer total commenters for a single evaluation and there is a strong divergence in the responses, all comments shall be treated as confidential even if they are not written in the "confidential comments" portion of the ballot. Upon receiving these comments, the GWC members shall summarize them and, as necessary, rewrite these comments in very different language so as to guarantee anonymity, and provide the summaries to the Faculty Senate Chair and the Faculty Senate Secretary.

(e) FACULTY SENATE CHAIR'S REPORT. The Faculty Senate Chair shall prepare a report based on an independent reading of the ballots and the information provided by the GWC members. The Chair's report shall include a tally of the votes and a summary overview of the general and confidential comments and shall be distributed as outlined in paragraph (f). In the event that a comment is labeled confidential and cannot be reworded to disguise the identity of the faculty member who made the comment, the comment shall be omitted from the Senate Chair's report. If appropriate, the comment may be summarized and communicated orally to the President and the Provost in the case of review of the Dean, or to the Provost and the Dean in the case of review of a Chair.

(f) COMMENT DISTRIBUTION. The tally of votes, summary of general comments and summary of confidential comments contained in the Faculty Senate Chair's report shall be distributed as follows:

(i) In the case of a review of the Dean, the Senate Chair's report is distributed to the President and the Provost. The Dean, the President and the Provost shall receive the tally of votes. Except as provided in paragraph (d) concerning a small number of votes, the Dean, the President and the Provost shall also receive copies of the non-confidential comments. The Senate Chair's summary of confidential comments is forwarded to the President and the Provost, but not the Dean.

(ii) For an evaluation of a Chair, the Senate Chair's report is distributed to the Dean and the Provost. The Chair, the Dean and the Provost shall receive the tally of votes. The Chair, the Dean and the Provost shall also receive copies of the non-confidential comments unless there is a strong divergence in a very small response as outlined in paragraph (d). The Senate Chair's summary of confidential comments is forwarded to the Provost and the Dean, but not the Chair.

(iii) No one, other than the Faculty Senate Chair, the Secretary of the Faculty Senate, and the involved GWC members shall ever see the verbatim confidential comments. Confidential comments shall not be transmitted verbatim to the President, the Provost and/or the Dean and shall not be transmitted to the person being evaluated at all.

A13.8   The Dean (in the case of an evaluation of a chair) and the Provost (in the case of a dean) shall call a meeting of the voting faculty of a department or school for the purpose of discussing the results of the review of the chair or dean in advance of making a final retention decision. No later than 15 academic days after the retention decision is made, the appointing authority shall either hold meetings with the voting faculty to review the

UM/EEOC-D. SCHMICH - 0862

decision or shall, in lieu of such meetings, send a written report to the voting faculty to inform them of the decision[48].

The Dean or Provost shall invite a member of the Committee on General Welfare (who is not from the same school or college as the chair or dean) to be present at any meeting of the voting faculty held pursuant to this section, and shall send a copy of any written report to the Committee on General Welfare. The chair or dean that was evaluated shall not be present for any of these meetings. The GWC member will transmit a summary of the meetings to the Faculty Senate office. If a decision is made that is inconsistent with the expressed opinions of the consulted faculty, the appointing authority shall present a written explanation of this decision to the Committee on General Welfare for transmission to the consulted faculty.

A13.9 In the same manner as specified in Sections A13.5 or A13.6 and A13.7, but at an earlier time, the voting members of a department or school shall be accorded an opportunity to express their opinion as to whether the interests of the department, school, University and profession would be best served by the retention or replacement of a dean or chair.

Such an early evaluation may only be held if requested
    (1) by the appointing authority;
    (2) in a resolution voted on by a majority of the School Council;
    (3) in a petition signed by one quarter of the voting faculty as defined in Section A3; or
    (4) in accordance with a procedure contained in the Bylaws of a School or College.

Requests are to be sent to the Secretary of the Faculty Senate who may prepare a summary for disclosure to others, but shall not disclose the identities of any faculty signatories. To the extent feasible, the request shall delineate reasons why such an early evaluation is being requested.

No early evaluation triggered under the provisions (2, 3 or 4) above shall be held if the time until the scheduled quadrennial evaluation is less than 15 months from the Senate's receipt of the resolution or petition. Similarly, no such early evaluation shall be held unless the administrative official has been in office for at least 12 months as of the date of the resolution or petition, or since the last quadrennial or early evaluation.

An early evaluation shall normally be held to coincide with the scheduled quadrennial evaluations.  An early evaluation can be held at some other time only if extraordinary circumstances justify doing so, as determined by the Committee on General Welfare.

A13.10[49] At four-year intervals, the full-time members of the REGULAR FACULTY, other than the President and the Provost, shall be afforded an opportunity to express their opinion as to whether the interest of the University would best be served by replacement or retention of the Provost. The Secretary of the Senate shall initiate this process and collect the responses. The process shall ensure the anonymity of each respondent. The General Welfare Committee is charged with reviewing and condensing these responses and the

---

[48] #2001-05(A)
[49] #2001-11(A)

UM/EEOC-D. SCHMICH - 0863

Chair of the Faculty Senate shall prepare an appropriate summary for discussion at an executive session of the Faculty Senate. The Faculty Senate, after appropriate deliberation, shall formulate its recommendation to the President. The Chair of the Faculty Senate shall deliver the Senate's recommendation to the President along with the summary prepared by the General Welfare Committee as well as a copy of the original responses collected by the Secretary of the Senate. If a decision is then made that is inconsistent with the recommendation of the Faculty Senate, the President shall present a written explanation of this decision to the Committee on General Welfare for transmission to the Faculty Senate.

## A14   Faculty Appointment, Retention, Tenure, Promotion, and Merit Salary Increases

A14.1   The primary responsibility in nomination for new appointments of the faculty that do not involve the immediate award of tenure rests with the chair of the department to which the appointment is made. Qualified members of the department faculty shall be consulted and the recommendations will ordinarily be made in conformity with the results of this consultation. At the discretion of the chair of the department, the responsibility for new appointments not involving the immediate award of tenure may be assigned to an appointed committee. Recommendations on appointments along with all supporting information shall be submitted by the chair to the Executive Vice President and Provost for decision, through the dean of the school. The dean of the school may also submit independent recommendations.

A14.2   When a new appointment that involves the immediate award of tenure is favorably considered by a department chair, or when it is time to consider the renewal of a tenure-earning appointment to the faculty, or when it is time to consider the award of tenure to a faculty member, the following procedure shall apply. The tenured members of the department, equal or superior in rank to that of the candidate, shall vote on the matter. The vote shall be based on the scholarly and professional qualifications of the candidate as described in Section C9 of the Faculty Policies. The recommendation, including the numerical results of the vote, shall be transmitted through the dean of the school to the Executive Vice President and Provost. The chair and the dean shall also transmit their recommendations. All actions regarding tenure shall be taken in accord with the stated tenure policies of the University.

A14.3   Any member of the faculty below the rank of Professor shall, upon written request, be considered for promotion as described in Section C13 of the Faculty Policies. The tenured members of the department and those members of the department authorized to vote on this matter in accordance with Section A3.1[50] who are superior in academic rank to that faculty member shall decide whether to recommend the promotion. In this decision they shall take into account the qualifications for the several academic ranks described in Section C9 of the Faculty Policies. Promotion shall be based upon possession of these qualifications and not upon length of service. The department chair shall transmit a recommendation on promotion to the dean of the school along with supporting evidence, and may also transmit opinions. The dean shall attach a final recommendation and any additional information, and transmit to the Executive Vice President and Provost for decision.

---

[50] #2001-09(A)

UM/EEOC-D. SCHMICH - 0864

A14.4    It shall be the responsibility of each member of the faculty to maintain in the office of the department chair and in the office of the dean an active and current file containing all data pertinent to these decisions. The chair and the dean shall maintain these files in confidence, except as necessary for decisions on reappointment, tenure, or promotion or for review by the faculty committee on Rank, Salary and Conditions of Employment or the Tenure Review Board. The file in the office of the dean shall contain the annual recommendations of the faculty member's colleagues regarding promotion, the corresponding recommendations of the department chair and of the dean and the final decision; it shall also contain a continuing record of the faculty member's salary. Relevant materials from this file shall be forwarded to the Executive Vice President and Provost whenever promotion or the award of tenure is under consideration.

A14.5    Each year the chair of each department shall recommend, based upon systematic evaluation, each member of the department for merit salary increases. The chair shall then transmit recommendations to the dean of the school who shall, in turn, append recommendations and transmit to the Executive Vice President and Provost. The dean of the school shall recommend the salary increase merited by each department chair. The Executive Vice President and Provost shall then make the final recommendations, taking into account the differing philosophies of the chairs and deans as manifested by their recommendations.

A14.6    A faculty member may appeal an unfavorable decision regarding rank or salary in writing to the President via the Committee on Rank, Salary and Conditions of Employment. The President shall then request justification from the Executive Vice President and Provost. The President shall personally decide the matter.

## A15      Committees[51] of the UNIVERSITY FACULTY [52]

A15.1    The Senate may create such standing committees of the UNIVERSITY FACULTY as are deemed necessary. These committees, including a definition of their area of responsibility, shall be delineated in the Bylaws.

A15.2    The Chair of the Senate, after appropriate consultation, shall appoint all committees of the UNIVERSITY FACULTY and shall name the committee chairs. The Chair shall report the membership of all committees to the Senate. Whenever possible, at least one member of the Senate shall be appointed to each committee. Matters within the sphere of interest of a committee may be referred to it by the faculty of a department or school or by the appropriate administrator. The committee shall act in accordance with existing policies of the University. A committee quorum shall consist of a majority of its members. The committee chair is entitled to cast a vote in committee decisions.

A15.3    Each committee of the UNIVERSITY FACULTY may define, more specifically, its sphere of interest, responsibility and authority and present such definitions for the approval of the Senate. Any committee may suggest to the Senate that it be separated into two or more

---

[51] See section B4 of the Faculty Government Bylaws for a list of committees
[52] See section A2.1(b) of the Faculty Government Charter for definition

UM/EEOC-D. SCHMICH - 0865

subcommittees or that its size be increased or reduced. Any standing committee may itself appoint an *ad hoc* committee from the University Faculty to study a specified topic within its sphere of interest and report to the standing committee.

A15.4   Before a committee acts, its chair shall inform all faculty and administrative agencies that the chair believes to have a direct interest in the matter under consideration and shall provide an opportunity for the presentation of their views. An adverse decision of a committee of the University Faculty may be appealed in writing to the Senate by the person or persons affected.

UM/EEOC-D. SCHMICH - 0866

## BYLAWS

### B1    Faculty-Administration Relationships

B1.1   These Bylaws and policy statements are intended to clarify the meaning of Section A4 of the Faculty Government Charter. Some of the guiding principles for interpreting this section and related Bylaws are:

(a) The attainment of academic excellence is a deliberate, slow process requiring the concerted effort of all elements of the University. New policies and changes in existing policies are most likely to be effective if they are instituted only after due consideration and recommendations from those most affected by and most familiar with the problem. Ideally, if all those affected by a policy participated in its establishment, there should be a maximum effort devoted to the fulfillment of the goals of the policy.

(b) In a large, complex University many policies are necessary, ranging from those that are highly significant to those that are relatively minor, and excessive time and effort would be necessary to obtain full consideration of the entire spectrum of policies. The following is an attempt to spell out areas in which new policies, changes in policies, or decisions are most likely to have significant enough effects to justify formal consideration by existing representative bodies of the faculty.

(c) The desirability of having the UNIVERSITY FACULTY [53] "share in decisions" must be balanced against the need for keeping administrative officers free to provide progressive leadership, to carry out existing policies expeditiously, and to meet the day-by-day needs of the University. This balance can only be achieved by the faculty and administration harmoniously working together to understand each other's major concerns and needs and to establish precedents for the early recognition of areas significant enough to require "sharing in the decision."

B1.2   Procedures for decision making shall normally reflect the differing responsibilities of the President and other administrative officers and of the Senate and other formal faculty groups in the operation of the University. Some decisions (Category I) are made by individual faculty members or by formal or informal groups of faculty members without the necessity of referral to administrative officers or other faculty groups. Some decisions (Category II) are made by department or school faculties or by the Senate, but referral to an administrative officer is required prior to the making of the decision. Most university-wide academic decisions as well as those that directly affect the welfare of the faculty (Category III) are formally shared by the President and the Faculty Senate in that no policy in these matters will be established or disestablished without their formal agreement (or without resolution of continuing disagreement by the Board of Trustees). Some decisions (Category IV) are made by the President, but only after formal consultation with an

---

[53] See section A2.1(b) of the Faculty Government Charter for definition

UM/EEOC-D. SCHMICH - 0867

Faculty Government Bylaws

appropriate faculty group; in some instances the appropriate faculty group is specified in the Faculty Government Charter. Finally, some decisions (Category V) are made by the President without the necessity for consultation with or referral to the Senate or other faculty group. When the President or the Senate or other formal faculty group believes, however, that the general welfare of the University warrants such action, each may initiate a Senate action on matters falling within any of the five categories.

B1.3   Matters in Category I are generally characterized as those affecting relations between an individual or a single class of students with an individual faculty member or a group of faculty members teaching in a single course. These include such matters as class examinations and assignments, academic counseling, and the awarding of grades.

B1.4   Decisions over matters in Category II are made by well-defined groups of faculty members convened in formal meetings that include the presence of, or the referral to, an academic administrative officer to provide an opportunity for academic leadership. It is generally expected that decisions made on these matters by such faculty groups will prevail. These include curriculum matters, either University-wide or in existing departments or schools, such as: course content, level and prerequisites; requirements for and approval of candidates for degrees; requirements for honors; standards for academic probation; attendance requirements; and placement tests.

B1.5   Matters in Category III include the continuing and future academic development of the University, such as: the institution of new schools, departments, curricula or degrees, and the abolition, combination or subdivision of existing schools, departments, curricula, or degrees (including other kinds of formal University academic organizations such as Centers or Institutes); the University's educational and research policies; the general welfare of the faculty, such as retirement, tenure, insurance, sabbaticals, tuition benefits, graduate study, teaching loads, responsibilities and duties of faculty members, including non-classroom and non-university related activities; academically related services, such as the library, computing center, and student assistance; student conduct and activities, such as academic and personal freedom, dismissal of scheduled classes, organizations, intercollegiate activities, and publications; and requirements for admission and exclusion of students.

B1.6   Matters in Category IV, for which the consultative faculty group is specified in the Faculty Government Charter, include faculty appointments, retention, tenure and promotion; and the appointment and retention of academic administrative officers. For a newly established department, institute or school, appropriate consultative faculty groups for this purpose shall be selected from related existing departments. Additional matters in Category IV for which appropriate consultative faculty groups shall be selected include the planning of components for the academic physical plant and the establishment of goals for University fund drives.

UM/EEOC-D. SCHMICH - 0868

Faculty Government Bylaws

B1.7   Matters in Category V include the implementation and execution of existing policies; the establishment of the University budget; environmental conditions of a non- academic nature, such as housing, food services, health services, placement services, parking, and maintenance; the physical development of the University, such as the planning of non-academic units and the construction of all components of the physical plant; and the financial development of the University, such as the investment of general funds and endowment.

## B2       Meetings

B2.1   Meetings of the faculty of a school shall be held at least once each semester. The Senate and the School Councils[54] shall meet at least once a month during the academic year.

B2.2   Regular meetings of the Senate shall be open to all members of the UNIVERSITY FACULTY[55].

B2.3   The President and the Executive Vice President and Provost shall be considered *ex officio* members of the Senate with floor privileges, without vote and ineligible to hold office in the Senate. The President shall be invited to address the Senate at the opening of each Senate meeting, to inform the Senate about future plans and to discuss any other matter.

B2.4   One graduate student selected by the Graduate Student Association, one law student selected by the Student Bar Association, two undergraduate students selected by the Undergraduate Student Body Government, and one medical student selected by the Medical Student Council[56] shall have full speaking privileges and the right to make motions from the floor of the Senate, but shall have no voting rights. [57]

B2.5   The President and the Executive Vice President and Provost shall be invited to an informal session just prior to each regular meeting of the Senate to discuss items on the Senate agenda and proposals that the administration desires the Senate to consider.

B2.6   At the discretion of the Chair, or at the request of the Committee on General Welfare[58], or upon petition of five or more senators, or upon a privileged motion supported by ten or more senators, the Chair shall call a caucus session of the Senate which only duly elected senators may attend. Such a session shall not

---

[54] See section A5.1 of the Faculty Government Charter
[55] See section A2.1(b) of the Faculty Government Charter for definition
[56] #99007(B)
[57] 2013-35(C)
[58] See section A9 of  the Faculty Government Charter

UM/EEOC-D. SCHMICH - 0869

interfere with a regularly scheduled meeting of the Senate nor shall any Senate action be taken therein.

B2.7   The Chair of the Senate, after appropriate consultation, shall appoint the standing[59] and *ad hoc*[60] committees of the UNIVERSITY FACULTY[61] and their chairs. The Chair shall report the membership of all committees to the Senate. Whenever possible, at least one member of the Senate shall be appointed to each committee.

## B3        Senate Election and Voting Procedures

B3.1   Each voting member[62] of the UNIVERSITY FACULTY[63] who is willing to serve in the Faculty Senate or on the Council of the appropriate school shall indicate this in writing to the Secretary of the Senate in February of each academic year[64]. With the consent of the Senate, schools may through a school bylaw provide for alternative methods of nominating and electing their representatives to the Senate.

B3.2   The Senate shall generally determine the voting members of the faculty, from a list provided by the President that shall include all full-time members of the regular, research, educator or library faculty holding the rank of professor, associate professor, or assistant professor.

B3.3   From the data available on November 15 of each year the General Welfare Committee shall recommend, and the Senate approve, an apportionment of senators such that a school authorized to have Senators in keeping with A7.1(b)[65] shall receive N senators, N being the largest integer for which it is the case that the number of  voting faculty members of the school (F) is equal to or exceeds the value of a constant (K) times the sum of the sequence two plus three plus four . . . up to N: that is, F$\geq$ [2+3+4+ . . .N] x K. The value of the constant (K) shall be selected each year by the Senate upon recommendation of the Chair such that the Senate shall consist of 30-50[66] voting members. In any apportionment, the Graduate School shall have two senators and every other school shall have at least one senator.[67]

B3.4   (a) In March of each year, the continuing members of the Council of each school shall constitute themselves as an Election Commission to conduct the election of Council members and representatives to the Senate. The Election Commission shall elect from its membership a chair.

---

[59] See section B4 of the Faculty Government Bylaws for list of standing committees
[60] See section A6.3 of the Faculty Government Charter
[61] See section A2.1(b) of the Faculty Government Charter for definition
[62] See section A3 of the Faculty Government Charter
[63] See section A2.1(b) of the Faculty Government Charter for definition
[64] #2013-27(D) The procedure for soliciting faculty volunteers changed.
[65] #2011-40(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[66] See section A7.1(b) of the Faculty Government Charter
[67] #2005-10(B)

UM/EEOC-D. SCHMICH - 0870

Faculty Government Bylaws

(b) In February of each year, the Secretary of the Senate shall inform the Councils of the number of senators to be elected from their schools.

(c) Election procedures shall provide for the allocation of senators[68] and members of Councils to departments or groups of departments and for nomination and election of senators and members of the Council by and within such units.

(d) Each school[69] shall adopt appropriate procedures to elect at least one alternate who may represent the school in Senate meetings in the absence of a regular member.

(e) The Senate must be informed of the procedures established in each school.

(f) The Senate shall also transmit to the Council of each school a list of all members of the faculty who have indicated their willingness to serve in the Senate or on the Council of their school.

(g) Nominations and elections shall be by secret written ballot.

B3.5   (a) Each voting member[70] of the faculty may nominate from the fellow members twice the number to be elected, and that same number who have been most frequently nominated shall stand for election.

(b) Each voting member of the faculty of the school shall then vote for the number of members to be elected for each post and those obtaining the largest number of votes shall be deemed elected.

(c) Tie votes for the last elected position shall be decided by the Election Commission.

(d) The Election Commission of each school shall certify in writing the numerical results of the election to the Secretary of the Senate and the dean of the school

B3.6   At the March meeting of the Senate, a Nominating Committee for the Chair and the Vice-Chairs shall be formed, elected by the Senate or appointed by the Chair, as determined by vote of the Senate.  The nominating Committee shall, no later than five academic days[71] prior to the meeting at which the election will be held, submit its list of nominees to the Senate office, which shall promptly distribute it to the senators.

---

[68] See section A7.1(a) of the Faculty Government Charter
[69] See section A2.1(i) of the Faculty Government Charter for definition
[70] See section A3 of the Faculty Government Charter
[71] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0871

Faculty Government Bylaws

Elections for the new Senate officers and General Welfare Committee members shall take place at a meeting five academic days [72]after the April meeting of the Senate.[73] At that meeting, the Senate would also elect an alternate General Welfare Committee member for each school to serve when the regular member cannot attend.[74]

B3.7   [75]Should a senator resign or should a senator's position for any other reason become vacant, a successor shall be chosen by an election for the remainder of the term. The School Council may appoint a temporary replacement until this election is completed. Should a senator be absent from three successive meetings of the Senate, the Chair shall inquire of the Senator as to the circumstances surrounding such absences. The Chair of the Senate shall report annually to the Senate a summary of attendance.

## B4        Standing Committees

B4.1   The following are the standing committees of the UNIVERSITY FACULTY[76]. The area of responsibility defining its potential sphere of interest is indicated for each committee.

Visit https://umshare.miami.edu/web/wda/facultysenate/Committees/standing_committee_guidelines.doc to view Standing Committee Guidelines. This document includes information on the obligations of committees and chairs, including annual reports and submission of committee recommendations[77].

B4.2   The ACADEMIC PLANNING COMMITTEE[78] deals with educational and research policy, scholastic standards, admission and exclusion of students, undergraduate degree requirements, new degree programs, graduation honors, academic scholarships, and the academic organization of the University.  The committee membership shall be identical to that of the General Welfare Committee.  The Executive Vice President and Provost shall meet with the Committee at its request. The committee shall report to the Senate and to the President.

B4.3   The ACADEMIC STANDARDS COMMITTEE deals with all matters relating to scholastic standards, especially the admission and retention of undergraduate students, academic probation and dismissal, and graduation honors[79] of

---

[72] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[73] #2006-13 (B)
[74] #2009-05(D)
[75] #2001-03(C)
[76] See section A2(b) of the Faculty Government Charter for definition
[77] #2003-04(B)
[78] #2002-13(B)
[79] The Academic Standards Committee handles policy questions dealing with these matters. Cases involving individual undergraduate students with complaints concerning grades or dismissal are the province of the Student Affairs Committee.

UM/EEOC-D. SCHMICH - 0872

undergraduate students[80]. The committee shall propose policies on academic standards and monitor compliance with them. It shall report each year to the Senate [81]twice annually: in February on Undergraduate Admissions for the current academic year and in March, on Undergraduate Grading Patterns for the previous fall semester. The chair of this committee shall act as liaison to the Academic Deans' Administrative Council. [82]The Chair of the Budget and Compensation Committee, and the Chair of the Academic Deans' Administrative Council shall be an *ex officio* non-voting member of the Academic Standards Committee[83].

B4.4   The ADMINISTRATIVE SERVICES COMMITTEE monitors and reviews, either on its own, upon request by the Chair of the Senate, or upon request of a faculty member, the administrative services of the University. One of the committee's goals shall be to improve the efficiency of administrative services. In order to avoid lengthy delays, the chair of the committee may deal directly with the Office of the Executive Vice President and Provost on procedural matters.

B4.5   The ATHLETICS COMMITTEE [84] deals with matters pertaining to the Department of Intercollegiate Athletics[85].

B4.6   The BUDGET AND COMPENSATION COMMITTEE represents the faculty in the development of the budget of the University.  Through regular and timely meetings with the Provost and others involved in the budget process, the committee shall be an active participant in the development of the budget at every stage at which key decisions are made so as to communicate to the administration and to the Board of Trustees the faculty's perspective on such issues as long range budgetary policies, large scale expenditures, [86]faculty salary increases and fringe benefits, including group insurance programs, retirement, tuition benefits and other benefits that are part of the compensation of the faculty. The chair or co-chairs of the committee will act as liaison representative(s) to the University Budget Committee, and [87]the Chair shall serve as an *ex officio* non-voting member of the Academic Standards Committee.  [88]The Faculty Senate Chair shall be an *ex officio* non-voting member. [89]One of the four Employee Benefits Advisory[90] Council representatives appointed by the Faculty Senate shall be designated to serve *ex officio* on the Budget and Compensation Committee.

---

[80] 2013-35(C)
[81] #2003-08(B)
[82] #2004-03(B)
[83] #93001(B)
[84] #2003-04 (B)
[85] #2014-03(D)
[86] #2007-36(B)
[87] #2004-03(B)
[88] #2003-04 (B)
[89] #2003-04 (B)
[90] #2007-30(B)

UM/EEOC-D. SCHMICH - 0873

Faculty Government Bylaws

B4.7    The FACILITIES AND PLANNING COMMITTEE reviews with the administration all aspects of master planning, erection or renovation of facilities, landscape alteration and aesthetic enhancement on the several campuses of the University, and makes such recommendations as may be appropriate. [91] [92]

B4.8    The LIBRARY AND INFORMATION RESOURCE COMMITTEE makes recommendations to the University Librarian and the Faculty Senate concerning matters of policy on the allocation of print and electronic resources within the University, on the use of the Library and access to on- and off-campus information resources and on developing the roles of the Library and other information service providers in support of research and teaching. The committee shall consist of six to nine faculty members (including one librarian). The committee shall invite representatives from the Undergraduate Student Government, the Graduate Student Association, and Information Technology. The University Librarian and the Executive Director of Academic & Research Systems[93] shall be *ex officio*, non-voting members of the committee.[94]  The Miller School of Medicine Library Committee Chair shall be an *ex officio*, voting member of the Committee[95]. The Committee Chair shall serve as an *ex officio* voting member of the Academic Computing Advisory Committee (ACAC). [96]

B4.9    (a) The COMMITTEE ON PROFESSIONAL CONDUCT (CPC) has jurisdiction over complaints that a member of the UNIVERSITY FACULTY has committed unprofessional conduct. [97]

(b)     The CPC consists of eleven to twenty members, elected annually by the Faculty Senate.  Each member shall be a tenured faculty member, ordinarily with the rank of full Professor and with substantial time on the University faculty.  No member shall be a member or alternate member of the Senate, nor may a member be the holder of any administrative position specified in section A7.1(f) or (g).

(c)     A complaint that a member of the UNIVERSITY FACULTY has engaged in unprofessional conduct can be brought:
(i)     either by the University, acting through the President, the Provost, the Vice Provost for Faculty Affairs, or an Academic Dean.  Before the University may file a complaint under this sub-paragraph, a thorough investigation must take place; or
(ii)    by a member of the UNIVERSITY FACULTY who does not fall within (c)(i).

(d)     The complaint shall be addressed to the Chair of the Faculty Senate in writing. The complaint shall include, at a minimum:

[91] #2004-07(B)
[92] #2008-08(B)
[93] #2001-20(B)
[94] #98006(B)
[95] #2003-04(B)
[96] #2011-16(B)
[97] #2009-28(B)

UM/EEOC-D. SCHMICH - 0874

(i)     a brief recitation of the alleged conduct and when it occurred;

(ii)    a concise statement as to why, in the opinion of the complaining party, the conduct is unprofessional; and

(iii)   a declaration that all attempts at informal resolution have been exhausted, or an explanation as to why, in the opinion of the complaining party, further attempts at informal resolution would be pointless.

(e)     Except as provided in paragraphs (f) or (h), upon receipt of a complaint meeting the requirements of paragraphs (c) and (d), the Chair of the Faculty Senate must appoint a hearing panel for the case as soon as it is feasible to do so.

(f)     The Chair of the Faculty Senate may not appoint a hearing panel if:

(i)     the complaint, even if assumed to be correct in all its factual allegations, does not allege conduct that any reasonable hearing panel could construe as unprofessional; or

(ii)    the gap between the time in which the allegedly unprofessional conduct occurred and the filing of the complaint is so great as to make the complaint untimely in terms of the availability of evidence and witnesses, prejudice to the accused, or other relevant factors.

(g)     If the complaining party disagrees with the decision of the Chair of the Faculty Senate under paragraph (f), the party may appeal the ruling to the Committee on General Welfare within 10 academic working days from the date the Chair's decision is sent to the complaining party.  The Committee on General Welfare has 10 academic working days from the time of receipt of the appeal in which to render a decision.  At its sole discretion, it may make the decision on the basis of written documents, or may request the complaining party and the Chair of the Faculty Senate to make oral presentations.

(h)     The Chair of the Faculty Senate has the discretion not to appoint a hearing panel if the same or substantially the same conduct is under investigation by the Committee to Investigate Misconduct in Research, by the Faculty Sexual Harassment Officer, by the Senate's Committee on Rank, Salary and Conditions of Employment, or by the Faculty Hearing Committee as these roles are specified in the Faculty Manual.  The Chair has similar discretion if the matter is subject to an indictment or information by a State or Federal prosecutor. Any decision not to appoint a hearing panel on one of the grounds listed in this paragraph is without prejudice to the filing of a complaint after such investigations or proceedings have concluded.

(i)     The hearing panel for a particular case shall consist of three members of the CPC selected by the Chair of the Faculty Senate.  To the extent feasible, the selected members of the hearing panel shall include one member who has had legal training.  No member of the hearing panel may be:

(i)     from the same department or undepartmentalized school as the accused;

UM/EEOC-D. SCHMICH - 0875

(ii)    from the same department or undepartmentalized school as the complainant in the case of a complaint filed pursuant to paragraph (c)(ii); or

(iii)    a relative or domestic partner of the accused, of the complainant, or of an individual who holds one of the offices listed in (c)(i).

(j)    As soon as the hearing panel is constituted, the Secretary of the Faculty Senate shall forward a copy of the charges to the accused and the complainant, notifying them of the following matters in writing:

(i)    the appointment of the hearing panel and the names of its members;

(ii)    the requirement that the accused provide a brief reply to the charges;

(iii)    the requirement that any communications related to the matter before the hearing panel by a party or that party's counsel with the panel, with the other party, or with any official listed in (c)(i) be made only through the Faculty Senate Office; and

(iv)    the procedures by which the hearing panel will carry out its work.

(k)    In the case of a complaint filed by the university pursuant to paragraph (c)(i):

(i)    The hearing panel shall hold a hearing promptly after its appointment.

(ii)    The hearing panel must present its final report within 30 academic working days, measured from the receipt of the complaint by the hearing panel to the date a final report is sent to the President and Senate, unless the Chair of the Faculty Senate, for good cause, grants an extension of not more than 20 academic working days.

(iii)    The accused shall have the right to represent him or herself or to be represented at the hearing by academic counsel or legal counsel.  The University shall be represented by the Office of the General Counsel.  However, the university may utilize outside counsel if the accused decides to be represented by legal counsel.

(l)    In the case of a complaint filed by a faculty member pursuant to paragraph (c)(ii):

(i)    The complaint shall be investigated by one or more investigators appointed by the Chair of the Faculty Senate from the membership of the CPC.  No investigator may be a member of the hearing panel for the same case, nor may an investigator be appointed who is excludable from panel membership for the same case under the provisions of paragraph (i).

(ii)    The accused and the complainant each have the right to explain the facts and circumstances to the investigators, but without counsel present. The accused also has the right, without prejudice, to decline to speak with the investigators.

(iii)    The investigators shall report their findings in detail to the hearing panel as quickly as a careful investigation will allow, but in any event within 30 academic working days.

(iv)    If upon consideration of the report by the investigators, the hearing panel concludes that there appear to be sufficient facts which, if established at a

UM/EEOC-D. SCHMICH - 0876

Faculty Government Bylaws

hearing, make it more likely than not that unprofessional conduct has taken place, a hearing shall be held promptly.

(v)    From the date the hearing panel receives the report of the investigators, the hearing panel has 20 academic working days to conduct the hearing and present its report to the President and Senate, unless the Chair of the Faculty Senate, for good cause, grants an extension of not more than 20 academic working days.

(vi)    The accused and the complainant shall have the right to be represented at the hearing by academic counsel or legal counsel.  The Office of the General Counsel may participate at its discretion.

(m)    In any hearing pursuant to this section:

(i)    A hearing panel member or investigator has a duty to recuse him or herself if there would be, or there would appear to be a conflict of interest or any reason why the panel member could not be neutral and impartial.  The accused shall have the right to request that the Chair of the Faculty Senate remove a panel member for good cause shown.

(ii)    The accused has a right to waive the hearing, in which case the decision of the hearing panel shall be based on the information already available to the hearing panel. The accused also has the right, without prejudice, to decline to speak during the hearing.

(iii)    The accused may plead guilty to one or more of the charges, in which case, the hearing will then be held concerning the remaining charges, if any.

(iv)    The panel may, at its discretion, require the filing of briefs, memoranda or other documents by the parties before or during the hearing, and may issue orders governing the conduct of the hearing and the panel's processes.

(v)    The complainant, the accused, and the General Counsel's office shall have the right to make opening and closing statements; to examine all briefs, and other documents presented to the hearing panel; and to present, examine, and cross examine witnesses.

(vi)    The accused has the right, during or after the hearing but before the panel concludes its report, to make an oral statement or to file a written statement to the hearing panel explaining matters in mitigation.

(n)    If the hearing panel has reason to believe that an individual acting as complainant or witness has knowingly introduced evidence that has been fabricated or has knowingly given false testimony, the panel may recommend:

(i)    in the case of a faculty member, that the Chair of the Faculty Senate bring a charge of unprofessional conduct against the faculty member; or

(ii)    in the case of an employee who is not a faculty member, that the Chair of the Faculty Senate bring the matter to the attention of one or more appropriate administrators.

(o)    In the event that the hearing panel concludes that no unprofessional conduct has taken place, or that only a trivial or technical violation has taken place, it shall

UM/EEOC-D. SCHMICH - 0877

Faculty Government Bylaws

prepare a report to the Chair of the Faculty Senate briefly explaining its conclusions.  At its discretion, the hearing panel may comment on matters it believes should be rectified or reformed, and may request that these comments be forwarded to the Senate, the President, and/or other appropriate administrative officials.  The Chair of the Faculty Senate shall then dismiss the case and make a report to the Committee on General Welfare, taking care to protect privacy and confidentiality.

(p)    If the hearing panel determines that unprofessional conduct has taken place, and that the conduct was not merely a trivial or technical violation, it shall prepare a report to the Chair of the Faculty Senate and to the President.  It shall recommend one or more of the following as sanctions:

    (i)    *Censure by the Senate*.  If the Senate concurs with the recommendation of censure, it shall decide on the text of the censure resolution, on the means and extent of publication of the resolution, on whether the censure resolution shall be made a part of the faculty member's personnel records, and on whether the member shall be barred or suspended from service on the Senate.

    (ii)    *Dismissal*, in accordance with the procedures specified in section C15 of the Faculty Manual.

    (iii)    *Sanctions by the President other than dismissal*.  The President may take one or more of the following actions:  restrictions on pay increases for a period of years; a one-time reduction in pay not to exceed 10% of base pay; required counseling or training; loss of rights to have graduate Research Assistants or Teaching Assistants; and/or termination of appointment to an Administrative position.  The President is not required to impose the sanctions recommended by the hearing panel, but shall explain in writing to the Senate the reasons for imposing sanctions that differ from the hearing panel's recommended sanction(s).

(q)    Nothing in this section shall be interpreted to preclude a mutually satisfactory settlement between the complainant and the accused (for a case filed under paragraph (c)(ii)).  A mutually satisfactory settlement may also be reached between the university and the accused (for a case filed under (c)(i)), provided, that such a settlement may not adversely affect the interests of third parties.  Any settlement must be reached prior to the time the hearing committee files its report to the Senate.  If a settlement is reached, the Chair of the Faculty Senate shall dismiss the case.

(r)    The Senate shall adopt and publish written procedures as Class D legislation for[98]:

    (i)    Filing and processing complaints;

    (ii)    Appointment of investigators and hearing panel members;

    (iii)    The conduct of hearings; and

    (iv)    Consideration of censure and related matters by the Senate.

---

[98] #2011-23(D) – procedures

UM/EEOC-D. SCHMICH - 0878

Faculty Government Bylaws

In the event of a conflict between those procedures and this section, this section shall prevail.

B4.10    The COMMITTEE ON RANK, SALARY, AND CONDITIONS OF EMPLOYMENT[99] shall: (1) upon appeal by a member of the faculty from an unfavorable decision on promotion or salary, certify to the President whether or not, in its opinion, an unjust decision has been made; (2) report to the Committee on General Welfare any evidence of gross injustice or favoritism; (3) recommend to the Senate legislation on these matters. The committee will not participate in the annual decisions on promotions or merit salary increases. The Chair of the Senate shall insure that, over a period of time, the membership of the committee reflects the social and professional diversity of the faculty.  Only tenured full professors are eligible to serve on the Committee[100].   A Vice-Chair of the Faculty Senate shall serve as an *ex officio* non-voting member. [101]

The committee shall, upon the request of a faculty member or the President, hear faculty-administrative problems relating to a faculty member's rights and duties under an employment contract. The committee's jurisdiction shall include the powers to hear and to recommend to the Senate and to advise the President. The committee shall have the power after argument on a request to assume jurisdiction, or to refuse jurisdiction when the petition's resolution is not significant to the general welfare of the University or to the professional career of the affected faculty member.

The procedures the committee follows shall be written and public, and shall include the following requirements:

(a)  the committee's jurisdiction may only be invoked upon a written, factual request and [102]only if four conditions have been satisfied, namely

   i)    all reasonable attempts at administrative resolution have failed as determined by the Chair of the Faculty Senate or the Chair of the Committee or by appeal of that determination to the General Welfare Committee filed with the Secretary of the Faculty Senate;

   ii)   the appeal is filed within 80 academic days of the action being appealed or within   60 academic[103] days of the petitioner's reasonably being expected to have become aware of it, whichever is later. The time limit can be stayed if the petitioner has been making reasonable efforts to resolve the issues, where the reasonableness of these efforts shall be determined by the Chair of the Faculty Senate or the Chair of the Committee or by

---

[99] #93002(B)
[100] #2003-15(B)
[101] #2003-04(B)
[102] #2002-01(B)
[103] #2011-35(B)

UM/EEOC-D. SCHMICH - 0879

Faculty Government Bylaws

appeal of that determination to the General Welfare Committee filed with the Secretary of the Faculty Senate;

iii) the petitioner is not currently represented before the University by legal counsel regarding the same matter; and

iv) the petitioner is not currently pursuing an action before a court or non-university administrative body against the University regarding the same matter.

(b) any petitioner may be advised by academic counsel;

(c) the committee, or one of its members, shall take the responsibility of developing the facts of the situation;

(d) any person affected by the situation may be given an opportunity to make an oral or written statement to the entire committee;

(e) the committee shall receive relevant oral or written statements upon the request of any petitioner; and

(f) The appropriate administrators shall make known to petitioners the basis of the adverse administrative decision so that petitioners can fairly present their position to the committee.

The Committee shall forward to the Chair of the Faculty Senate a copy of its recommendation to the President. The President shall communicate the decision on each recommendation to the faculty member concerned, to the Chair of the Committee, and to the Chair of the Faculty Senate.

The Committee may, but need not, communicate directly to the Petitioner regarding its recommendation. This power should ordinarily be used only where the recommendation to the President will not urge a change in the administrative action that was the subject of the petition. Any such communication will be forwarded to the Chair of the Faculty Senate, who must concur before it is sent to the petitioner. [104]

B4.11   The STUDENT AFFAIRS COMMITTEE deals with student conduct and activities, including: social, service, and religious organizations; student government; student publications; student services; student orientation, and the Honor Council. In addition, the committee shall receive and act upon appeals from decisions affecting undergraduate student academic status. It shall consist of one faculty member from each undergraduate school, and two non-voting, *ex officio* student representatives, one undergraduate and one graduate, which students will act as liaisons with the relevant student governments[105]. It also includes the University ombudsperson as a non-voting, *ex officio* member. The committee

---

[104] #2009-16(B)
[105] #2005-17(B)

UM/EEOC-D. SCHMICH - 0880

may for good cause hold executive sessions without *ex officio* members present as determined by the chair of the committee.

A majority of the committee's voting membership shall constitute a quorum, and decisions of the committee on appeals shall be by a majority of those present. In addition to appeals by individual undergraduate students the committee shall act upon an appeal for an interpretation of matters within its sphere of interest by a member of the faculty or administration. The committee shall report its actions to the Provost, who shall in turn report the decision on the matter to the appellant(s), to interested persons, and to the committee[106].

When requested by the Provost, this committee may examine and make recommendations regarding the appeal of an academic grade by an undergraduate student[107] (without re-evaluating the student's performance) if the student has exhausted all avenues available within the school. The committee's findings on the appeal of a grade will be provided in writing to the Office of the Provost with a copy to the Secretary of the Faculty Senate; findings and recommendations will not be furnished to the appellant from the Committee or from the Secretary. The full procedure for such appeals is detailed in the Faculty Senate Student Affairs Committee Standard Academic Appeal Process (click here).[108] [109]

B4.12    The TENURE REVIEW BOARD shall (1) upon request by a member of the faculty within two calendar weeks[110] from receipt of notice of a denial of tenure award by the Executive Vice President and Provost communicate to the President by May 31, if practicable, whether in its opinion an incorrect decision has been made and provide written reasons for such opinion either for or against the award of tenure based upon criteria and requirements of the *Faculty Manual* and upon the proposition that tenure is to be granted on the basis of the professional qualifications described in Section C9 of the Faculty Policies and is not to be limited by artificial restrictions such as quotas in its deliberations (in cases where the Tenure Review Board is unable to make its decision by May 31, the decision shall be made by October 15); (2) determine the rules and procedures for such hearings; (3) report to the Committee on General Welfare any evidence of gross injustice in matters pertaining to the award or denial of tenure[111]; (4) recommend to the Senate legislation on matters pertaining to tenure; and (5) submit an annual report of its activities to the Senate. The Committee shall forward to the Chair of the Faculty Senate a copy of its recommendation to the President. The President shall communicate his/her decision on each recommendation to the faculty member concerned, to the chair of the committee and to the Chair of the Faculty

---

[106] #2001-01(B)
[107] 2013-35(C)
[108] #2009-14(B)
[109] #2011-61(D) - Legislation passed after the Bulletin was published amended the process on non-grade appeals.  To see the text of the legislation, click HERE.
[110] 2013-04(B)
[111] #2003-04(B)

UM/EEOC-D. SCHMICH - 0881

Faculty Government Bylaws

Senate.[112]  Board members shall consist of tenured faculty and shall serve staggered 3-year terms.[113] [114] [115]

B4.13   The UNIVERSITY CURRICULUM COMMITTEE evaluates curricular changes that duplicate or parallel offerings in different schools.  Each school council or curriculum committee shall notify the University Curriculum Committee of any new undergraduate courses.  When the Committee determines that a course appears either to conflict with an established course elsewhere in the University or to raise some other serious academic concern, the Committee shall notify and consult with interested schools and departments.  Unresolved conflicts shall be referred to the Faculty Senate.  The Committee also sets standards for the exemption of required courses and for the certification of courses and course sections that will satisfy the various General Education Requirements.  It also reviews and certifies the specific courses and course sections that will satisfy the various requirements.  The Committee shall include at least one representative from each undergraduate school.  Members of the Committee shall serve staggered three-year terms.  [116] A representative from the Richter Library and the Senior Vice Provost and Dean of Undergraduate Education shall be *ex officio* non-voting members[117].  The Committee shall make an annual report to the Faculty Senate on its activities as well as on curricular developments within the University.  At least every five years the Committee shall conduct a review of the General Education Requirements and recommend to the Senate whatever changes may be appropriate.

B4.14   The COMMITTEE ON WOMEN AND MINORITIES reviews the conditions of employment and academic opportunities of female and minority faculty members, including recruitment and hiring practices, teaching responsibilities, research opportunities, promotion, tenure and appointment to significant administrative posts and committees. The committee is concerned with any general problems affecting female or minority faculty. Individual grievances are to be referred to the appropriate committees or administrative offices. If an individual complaint reveals a more general problem, the committee will recommend appropriate action or legislation to the Faculty Senate. The committee will be composed of male and female faculty members, including representatives from each of the major faculty minority groups. The Provost, or his designee, shall be an *ex officio* non-voting member of the Committee.[118]

## B5       Consultative Committees

---

[112] #93003(B)
[113] #2002-20(B)
[114] #2008-19(B)
[115] #2008-21(B)
[116] #2005-18(B)
[117] #2006-12(B)
[118] #2012-05(D)

UM/EEOC-D. SCHMICH - 0882

Faculty Government Bylaws

B5.1   Consultative Committees shall vote on the nominees by each committee member indicating the order of preference, if there is more than one nominee, and the disapproval of individual nominees. The numerical results of each member's ordered preferences, recorded anonymously, shall be reported to the appointing agent.

B5.2   The Graduate School shall be considered a departmentalized school for the purposes of appointment and retention of administrative officers, and the regular Consultative Committee shall be the chairs of all departments offering graduate degrees.

B5.3   When a regular Consultative Committee is considered too large, a standing Sub-Committee of appropriate size may be elected by the regular Consultative Committee to carry out the major duties for the Consultative Committee. The sub-committee may either be instructed to report back to the entire Consultative Committee where the formal vote will be taken, or it may be empowered to vote directly for the Consultative Committee.

## B6        Academic Organizational Structure

B6.1   A COLLEGE is a departmentalized instructional and research unit of the University offering two or more Bachelor's degrees, and one or more different first level professional or graduate degrees, under the primary authority and responsibility of a designated tenured and tenure-track faculty that meets on a regular basis.

B6.2   A SCHOOL is an instructional and research unit of the University offering curricula leading to a Bachelor's degree, or professional or specialized graduate degrees, under the primary authority and responsibility of a designated tenured and tenure-track faculty that meets on a regular basis.

B6.3   A DEPARTMENT is a component of a school or college offering instruction and conducting research, in a defined subject matter area or major, under the primary authority and responsibility of a designated tenured and tenure-track faculty that meets on a regular basis.

B6.4   An INTERDISCIPLINARY PROGRAM is a specified group of courses offered by the faculties of two or more departments or undepartmentalized schools. Tenure may not be granted within or by an Interdisciplinary Program. The Program curriculum shall consist primarily of courses offered under the authority of the faculty of the cooperating units. The Program may offer a small independent core of courses that are not in conflict with existing course offerings and are inappropriate for cross-listing, and are required of all students in the Program. All students in the Program shall be enrolled in one of the cooperating departments or undepartmentalized schools.

UM/EEOC-D. SCHMICH - 0883

B6.5   [119]A University Center or Institute is an independent academic unit of the University with its primary mission being multidisciplinary or interdisciplinary research in an area specified in its charter. It involves faculty from different schools or different departments of a single school.  A University Center or Institute, or any other such academic unit, however named or titled, shall not award tenure, confer degrees, offer certificates for credit[120], or offer primary faculty appointments.  Creation of a University Center or Institute may be proposed by the cooperating units upon recommendation of the faculties of the cooperating departments and schools.  Such a proposal shall include a charter that describes the mission, funding sources, organization, and administration, including reporting relationships of the director and any other appropriate aspects of governance.  The proposal shall also describe the procedures for ongoing evaluation, for faculty affiliation, for amending the charter, and for the appointment and review of the director. The creation of a University Center or Institute and its charter must be approved by the Academic Deans' Policy Council, the Faculty Senate, and the President.  A copy of its charter and any amendments thereto shall be maintained in the files of the Faculty Senate.  The policies regarding names, provisions for a temporary name, the terms for which approval may be granted, and for periodic reviews are specified in section C18.

B6.6   [121]Other Named or Titled Academic Units may be established within and by approval of the faculty of a single school to coordinate and promote research, instruction, conferences, seminars, workshops, etc., within a specified area.  No such unit may award tenure, confer degrees, offer certificates for credit[122], or offer primary faculty appointments independent of a department. The Faculty Senate and the President may approve the name, the establishment, and the operating rules of such units upon approval and recommendation by the faculty of the sponsoring department(s), the host school, and the Dean of the school as well as the submission of a brief description of the unit, including its operating rules.  A copy of the rules shall be maintained in the files of the Faculty Senate. Approval of the Faculty Senate and the President is not required for the name, establishment, and operating rules of a unit which is only a physical location, or is overwhelmingly engaged in the provision of clinical services to patients. The Faculty Senate is likely to require approval if a portion of the unit's activities comprise instruction, research, fundraising, or a combination of these activities. Submission to the Faculty Senate Office of a brief description of the unit and its activities is required to determine if approval is necessary.[123] The policies regarding names, provisions for a temporary name, the terms for which approval may be granted, and for periodic reviews are specified in section C18.

---

[119] #2003-23(B)
[120] 2014-09(B)
[121] #2003-23(B)
[122] 2014-09(B)
[123] #2012-11(C)

UM/EEOC-D. SCHMICH - 0884

B6.7    An OFFICE or SERVICE is a unit established to provide support for the instructional and research activities of departments, schools, colleges, institutes and centers. After December 31, 1983, all tenured faculty members assigned duties in an Office or Service shall have tenure in an academic department or undepartmentalized school.

B6.8    TITLES AND AFFILIATION OF TENURED FACULTY. Primary appointments and titles (e.g., Professor of [Department]) shall be made only in departments or undepartmentalized schools, and voting for promotion and tenure shall be by the tenured faculty of the primary department or undepartmentalized school. Joint or secondary appointments and titles may be in another department, undepartmentalized school, program, center or institute upon nomination by the appropriate faculty in accordance with section C4.4 or C4.5.[124]

B6.9    ADMINISTRATION AND LEVELS OF AUTONOMY. A college or school shall be administered by a dean who is responsible to the President (see Section A11.2 of the Faculty Government Charter), via the Executive Vice President and Provost. A department shall be administered by a chair who is responsible to the dean. A program in a school or college shall be administered by a director who is responsible to the dean. A UNIVERSITY CENTER or INSTITUTE shall be administered by a director who is responsible to the Executive Vice President and Provost.  Other NAMED or TITLED ACADEMIC UNITS shall be administered by a director who is responsible to the administration of the sponsoring unit.

---

[124] #2013-25(B)

UM/EEOC-D. SCHMICH - 0885

**POLICIES**

**C1    Effective Date of Changes to the Faculty Manual**

> Legislation that is part of the Faculty Manual takes effect on the first day of June next following unless otherwise provided.

**C2        Definitions[125] [126]**

C2.1    **See Section A2.1 for the definitions** of the following terms: The General Faculty, University Faculty, Regular Faculty, Research Faculty, Educator Faculty, Librarian Faculty, Associated Faculty, and the University Faculty of Each School.

C2.2    The Graduate Faculty shall consist of the Regular Faculty of the University.  Faculty in other categories may become members of the Graduate Faculty upon approval by the Graduate Faculty in a doctoral degree program or by the Graduate Council.[127] Once approved as a member of the Graduate Faculty, a faculty member retains that status while a member of the faculty. [128] [129]

C2.3    Instructor. Appointment to the rank of Instructor ordinarily identifies faculty engaged in teaching who have not completed the requirements for a terminal degree in their field or have not completed their professional education and training. Some of these faculty members may provide clinical services. Appointments at this rank other than licensed health practitioners are limited to three years of service.   The Executive Vice President and Provost shall make the final determination of what constitutes a "terminal degree" in any field or discipline.[130] Instructors appointed before June 1, 2013[131] are members of the University Faculty; Instructors appointed on or after June 1, 2013 are members of the Associated Faculty. [132]

---

[125] The definitions of faculty groups reiterate those in Section A2 of the Faculty government Charter.

[126] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.

[127] #2009-06(C)

[128] #2008-20(B)

[129] #95009(B)

[130] #99027(B)

[131] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University. See also A2.1(e), which specifies that faculty members with professorial titles engaged primarily in professional practice and in teaching associated with that practice, such as physicians who are in the clinical departments of the Miller School of Medicine, are also members of the UNIVERSITY FACULTY.

[132] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.

UM/EEOC-D. SCHMICH - 0886

C2.4 Titles of ASSOCIATED FACULTY [133]

(a) ADJUNCT FACULTY. The term ADJUNCT is prefixed to the title of persons who collaborate in some special way in the academic work of the University. ADJUNCT FACULTY may be paid or unpaid, but shall not be full-time. [134] [135]

(b) AFFILIATED FACULTY. Qualified staff members of hospitals and medical research institutions with which the University has an affiliation agreement may receive appointments as AFFILIATED FACULTY in the Miller School of Medicine or the School of Nursing and Health Studies. These appointments may be continued until normal retirement, subject to annual renewal by the University and continuing employment in the affiliated institution. AFFILIATED FACULTY are not paid by the University, although the University may provide compensation to the institution for the services of such individuals.

(c) INSTRUCTORS appointed on or after June 1, 2013. [136]

(d) LECTURER. [137]The title LECTURER is ordinarily assigned to a faculty member who teaches but is not expected to proceed through the professorial promotion sequence. A LECTURER is expected to have appreciable skill in a specialized field. The title SENIOR LECTURER may be awarded to full-time LECTURERS on initial appointment or as a promotion, in either case only after recommendation and approval through an appropriate evaluation process as specified in the published bylaws of[138] their school. SENIOR LECTURERS are expected to have achieved a measure of distinction as required by their school. LECTURERS who teach nine or more credit hours in a semester, or who have equivalent responsibilities, are considered to be full-time for that semester. [139]

(e) VISITING FACULTY. The term VISITING is prefixed to the title of persons who are expected to teach and/or engage in research or clinical activities at the University of Miami for a limited period of time only. Faculty members may be appointed as VISITING for no more than two consecutive one-year terms, except with the approval of the Executive Vice President and Provost.

C2.5 Scholarly and Professional Qualifications for Each Rank of the UNIVERSITY FACULTY

---

[133] For a definition of "ASSOCIATED FACULTY," see Section A2.1(g). Additional titles for ASSOCIATED FACULTY may be created by a special Bylaw defining the title (See #99026(A)).

[134] #99027(B)

[135] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.

[136] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.

[137] Contact Faculty Senate Office to view 2/26/03 Senate meeting minutes for interpretation as agreed to by the Provost and the Senate

[138] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.

[139] #2000-01(B)

UM/EEOC-D. SCHMICH - 0887

(a) INSTRUCTOR. To attain the rank of INSTRUCTOR as a member of the UNIVERSITY FACULTY, the scholarly and professional qualifications outlined in Section C2.3 must have been met, and the person must have been appointed before June 1, 2013.[140]

(b) ASSISTANT PROFESSOR. Appointment to the rank of ASSISTANT PROFESSOR requires completion of professional training, in most fields marked by the doctoral degree, and the clear promise of a successful career in teaching and scholarship. Appointment to the UNIVERSITY FACULTY requires a terminal degree. This requirement may be waived by the President upon recommendation of the Executive Vice President and Provost.

(c) ASSOCIATE PROFESSOR. Appointment to the rank of ASSOCIATE PROFESSOR normally requires a record of substantial success in both teaching and scholarship. In unusual cases an outstanding record in one of these activities and an adequate record in the other may be considered sufficient.

(d) PROFESSOR. Appointment to the rank of PROFESSOR requires national recognition in the profession, and where specified in a school's published bylaws, international recognition.[141]

C2.6   EMERITUS FACULTY. EMERITUS status is conferred at the time of retirement upon all tenured faculty[142]. The President may be petitioned for the award of emeritus status to retired members of the GENERAL FACULTY and academic administrative personnel who have not held tenure. The names of EMERITUS FACULTY are listed in a separate section of the appropriate Bulletin.

## C3   Voting Rights

C3.1   The voting rights of the UNIVERSITY FACULTY are described in Section A3 of the Faculty Government Charter.

C3.2   Members of the UNIVERSITY FACULTY may vote only once on a single question. Persons holding joint appointments must designate a school or department in which to exercise their voting rights on university matters. Persons holding appointive administrative positions may not vote on any matter that is subject to review or other action by their office.

---

[140] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University. See also A2.1(e), which specifies that faculty members with professorial titles engaged primarily in professional practice and in teaching associated with that practice, such as physicians who are in the clinical departments of the Miller School of Medicine, are also members of the UNIVERSITY FACULTY.

[141] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.

[142] #2011-37(A) – Effective June 1, 2013 as approved by the Board of Trustees and a vote of the REGULAR FACULTY of the University.

UM/EEOC-D. SCHMICH - 0888

## C4        The Faculty

### C4.1  Appointing Authorities

(a) The power to appoint and remove both administrative officers and members of the GENERAL FACULTY is vested in the Board of Trustees. The Board of Trustees shall appoint the President of the University[143].

(b) The President, by authority of the Board of Trustees, shall select the Executive Vice President and Provost, the Deans, and the administrative officers and shall appoint the GENERAL FACULTY of the University. The President is the presiding officer of the GENERAL FACULTY. [144]

(c) The Executive Vice President and Provost, as delegated by authority of the President, shall make appointments to the GENERAL FACULTY and promote members of the GENERAL FACULTY to higher ranks.

(d) All appointments to the GENERAL FACULTY and promotions to higher ranks shall be made in accordance with the procedures set forth in Section A14 of the Faculty Government Charter and in these Policies.

### C4.2  Faculty Status

(a) UNIVERSITY FACULTY may have either full-time or part-time status as established by their contracts with the University[145]. Unless on sabbatical or other approved leave, UNIVERSITY FACULTY shall be deemed to be "in residence." Members of the UNIVERSITY FACULTY may request reduced teaching, research, or professional service loads for reduced pay while retaining all rights and privileges, in accordance with applicable law and University policy.

(b) ASSOCIATED FACULTY may have either full-time or part-time status as established by their contracts with the University.

(c) While under contract all members of the UNIVERSITY FACULTY in residence shall be entitled to an average of one working day of consultation per week, either on a part-time or self-employed basis, unless a written exception allowing additional time is issued by the President. This policy does not apply to members of the University of Miami medical group practice.

(d) Members of the GENERAL FACULTY shall be compensated from University sources or from non-university sources approved by the Executive Vice President and Provost.

---

[143] See Faculty Government Charter section A13.2
[144] See Faculty Government Charter section A13.2
[145] #2004-16(B)

UM/EEOC-D. SCHMICH - 0889

(e) The fact that the salary of a member of the REGULAR FACULTY is paid from approved non-University sources does not affect the faculty member's tenure status.[146]

(f) A faculty member may occupy a tenure-earning position at the University of Miami while simultaneously holding tenure at another academic institution, provided that the institution at which tenure was originally granted has consented to the arrangement. Once tenure is awarded at the University of Miami, the recipient must resign from one of the tenured positions.[147]

(g) In unusual circumstances, an individual who wishes to retain tenure for up to one year at another institution may be offered an appointment with tenure approved but to take effect at a later time. The offer should specify a date when tenure is effective that is not later than one year after initial appointment. Before that date the individual must make a final decision either to accept the offer of tenure and relinquish tenure at the other institution or to reject the offer of tenure.[148]

## C4.3   Change of Type of Faculty Appointment

(a) Any member of the RESEARCH FACULTY, EDUCATOR FACULTY, or LIBRARIAN FACULTY may initiate a request to be considered for an appointment to the REGULAR FACULTY of the University. The decision on that request must be made in accordance with the standards and procedures applicable to initial appointment to the REGULAR FACULTY as set forth in section A14 of the Faculty Government Charter and these Policies, including Sections C9 and C11.

(b) Members of the REGULAR FACULTY of the University, during their probationary period as defined in Section C5.6 of these Policies, may initiate a request to be considered for an appointment to the RESEARCH FACULTY, EDUCATOR FACULTY, or LIBRARIAN FACULTY. The decision on that request shall be made by the President upon recommendation of the REGULAR FACULTY of the department and the dean of the school. A request for appointment to these other faculty tracks must be made before the date scheduled for the department vote during the final Special Review for tenure.[149]

(c) Members of the REGULAR FACULTY who have become members of the RESEARCH FACULTY, EDUCATOR FACULTY, LIBRARIAN FACULTY OR ASSOCIATED FACULTY (such as under the provisions of Section C4.3(b)) may not subsequently be appointed to the REGULAR FACULTY except as a tenured full Professor.

---

[146] The last sentence was moved to its own section to make it easier to locate, as approved at the 1/13/15 GWC meeting.
[147] #2001-04(B)
[148] #2001-26(B)
[149] #91011(B)

UM/EEOC-D. SCHMICH - 0890

C4.4    Joint Appointments[150] [151]

(a) Members of the UNIVERSITY FACULTY may hold appointments in two or more schools or[152]; in two or more departments within a school or in a school or department and an interdisciplinary program, center or institute approved by the Senate in accordance with B6.4, B6.5 or B6.6. Appointments shall be for a defined term not to exceed five years, but may be renewed by agreement in accordance with paragraph (c). Appointments shall entail contributions (such as allocation of teaching, financial support or collaboration on externally funded research) from both academic units, with the objective of promoting interdisciplinary or inter-professional teaching and research.

(b) An academic unit considering an offer of a joint appointment to a faculty member holding a primary appointment in another unit of the University must first consult with the chair, if any, and the dean of that other[153] unit. The unit where the joint appointment will be held must then submit a request to the Provost indicating the rationale for the joint appointment, the candidate's current primary appointment, and the length of the requested appointment. The request shall include an agreement, as specified in (c), below.

(c) There shall be an agreement, signed by the heads of each unit, the relevant dean(s) and the faculty member, specifying the faculty member's responsibilities and privileges in each unit, including the allocation of teaching loads or expected research between the two units, and the voting rights in each unit. The agreement shall also set forth the role of each unit in salary recommendations and merit increases. A program, center or institute may express its views in writing if the procedure for so doing is set forth in the agreement, but may have no other formal role in decisions regarding promotion, tenure of REGULAR FACULTY or the re-appointment of RESEARCH or EDUCATOR FACULTY. A sample agreement can be obtained from the Provost's office or by contacting the Faculty Senate office. Either unit or the faculty member may request renegotiation of the agreement at the time of a change in title of the faculty member (e.g. from Associate Professor to Professor) or at the time the faculty member receives tenure.

(d) A joint appointment requires the approval of both, and must be carried out in accordance with the procedures set forth in section C20.8.[154] The holder of a joint appointment shall be entitled to vote in each unit in accordance with the terms of the agreement, provided that the voting rights shall not extend beyond matters authorized in section A3.  The agreement shall specify the unit, which must be a school or department, through which voting rights on university matters shall be exercised. The faculty member shall not be entitled to vote twice on the same question.

---

[150] #2003-20 (B)
[151] #2011-22(B)
[152] #2013-25(B)
[153] #2013-25(B)
[154] #2013-25(B)

UM/EEOC-D. SCHMICH - 0891

(e) The 2011 amendments to this section shall have no effect on the terms and conditions of agreements governing faculty members already holding joint appointments.

C4.5   Secondary Appointments

Members of the GENERAL FACULTY may hold secondary appointments in departments or schools where they have a professional interest and in which they occasionally work. Holders of secondary appointments do not have tenure in, and they need not be compensated by, the secondary unit. The appointment requires approval by the majority of the REGULAR FACULTY in the secondary unit.[155]  Limited voting privileges may be extended by the secondary department in accordance with the provisions of Section A10.1 of the Faculty Government Charter.

C4.6   Privileges and Benefits of University Faculty, Emeritus Faculty and Associated Faculty[156] [157]

(a) UNIVERSITY FACULTY are entitled to the benefits and privileges described in the Faculty Benefits section of this Manual.

(b) EMERITUS FACULTY are entitled to the following privileges and benefits:
1.  access to the University libraries, the Faculty Club, the Lowe Museum, and the Wellness Center,
2.  continuation of UMail account,
3.  discounts that UNIVERSITY FACULTY are eligible to receive, such as bookstore purchases, tickets to sports events, and other discounts as permitted by law or contract,
4.  identification card,
5.
6.
5.  purchase of prescription medicines (cannot accept Medicare) at the University retail pharmacies, and
6.  UM parking permit at no charge valid for lots indicated on the back of the parking permit. Access to other lots may be obtained with the approval of Parking and Transportation.

(c) ASSOCIATED FACULTY are entitled to the following privileges and benefits:
1.  access to the University libraries, the Faculty Club, the Lowe Museum, and the Wellness Center,
2.  identification card,
3.  discounts that UNIVERSITY FACULTY are eligible to receive including bookstore purchases and tickets to sports events, and other discounts as permitted by law or contract,
4.  purchase of prescription medicines at the University retail pharmacies, and

---

[155] #2013-25(B)
[156] #2009-19(D)

[157] #2014-02(B)

UM/EEOC-D. SCHMICH - 0892

    5.  purchase of UM parking permit.

In addition, the following Associated Faculty categories are eligible for the benefits listed below in accordance with University policy.

(d) VISITING FACULTY who are full-time regular are eligible for the following benefits:
1. health insurance for themselves and their eligible dependents,
2. life and accidental death and dismemberment insurance,
3. tuition remission for themselves and their eligible dependents, and
4. Voluntary Retirement Plan.

VISITING FACULTY are not eligible for University contributions to the retirement plan.

(e) LECTURERS and SENIOR LECTURERS who are full-time regular are eligible for these benefits:
1. health insurance for themselves and their eligible dependents
2. life and accidental death and dismemberment insurance,
3. tuition remission for themselves and their eligible dependents
4. University contributions to the retirement plans, and
5. Voluntary Retirement Plan.

## C5  Appointments

### C5.1  General Policy

The University wishes to maintain the highest possible standards of teaching, scholarship and patient care at the University of Miami, to ensure faculty members full academic freedom, and to enable the University to rely on the continuous service of an able faculty. To ensure teaching and scholarship of high quality in an atmosphere of academic integrity and mutual confidence, it is the policy of the University to provide stability and continuity of appointment for faculty members at the University.

### C5.2  Kinds of Appointments

Each member of the GENERAL FACULTY shall be appointed to one of the following kinds of appointments:

(a) APPOINTMENTS TO THE REGULAR FACULTY provide either for tenure with initial appointment or for tenure consideration during a probationary period if the appointment is not terminated during that period.

(b) REGULAR APPOINTMENTS WITH LIMITED FINANCIAL SUPPORT may be made only in the Miller School of Medicine. "Limited financial support" is defined as the minimum level of salary support that the University is obligated to provide tenured members of the faculty. The amount of the minimum level of salary support is calculated by a formula established by the School Council and approved by the Dean of the Miller School of

UM/EEOC-D. SCHMICH - 0893

Medicine and the President. The amount of limited financial support may not be decreased except in times of declared financial exigency.

(c) APPOINTMENTS NOT INVOLVING TENURE. RESEARCH FACULTY, EDUCATOR FACULTY, LIBRARIAN FACULTY or ASSOCIATED FACULTY shall not be eligible for tenure.

(d) TERM APPOINTMENTS are issued for a defined period of time specified in the letter of appointment. An appointment to the ASSOCIATED FACULTY ends at the conclusion of the period specified in the letter of appointment. RESEARCH FACULTY, EDUCATOR FACULTY and LIBRARIAN FACULTY have term appointments. REGULAR FACULTY with probationary appointments are not considered to have term appointments.

(e) LIBRARIAN FACULTY shall be awarded annual contracts for the first six years of service, after which they shall be awarded five-year term appointments.  Alternatively, upon the recommendation of the voting faculty of the department, librarian faculty are eligible for initial probationary appointments for a term of four years and in such cases:

1. A review of the appointee shall occur in the third year, and, if the outcome is favorable, the appointment shall be renewed for a three-year term with the final review for promotion to Librarian Associate Professor occurring in the sixth year.

2. If the sixth-year review of the appointee is unfavorable, the seventh year shall be considered a terminal appointment.

Promotion to the rank of Librarian Associate Professor or[158] Librarian Professor awards a five-year appointment at the time of promotion. A faculty member initially appointed to the rank of Librarian Associate Professor or Librarian Professor is eligible for a five-year appointment at any time upon recommendation of the voting faculty of the department.[159]

C5.3   Notice of Termination of Appointment or Intention not to Reappoint for RESEARCH FACULTY, EDUCATOR FACULTY, and LIBRARIAN FACULTY.

(a) [160] If the University does not intend to reappoint a member of the RESEARCH FACULTY, EDUCATOR FACULTY, or LIBRARIAN FACULTY at the end of the current contract period or if the University intends to terminate the appointment of a member of the RESEARCH FACULTY due to loss of external funding for that position, then the University's intention shall be communicated by written notice in accordance with the provisions specified in this section below.   If a decision not to reappoint has a basis other than academic performance in the University environment not meeting expectations or, for RESEARCH FACULTY, loss of external funding, then the faculty member shall be informed of the justification.  Faculty members so informed may appeal the decision either to the Committee on Rank, Salary and Conditions of Employment or to the

---

[158] 2014-13(B)
[159] #89013(B)
[160] #2001-06(B)

UM/EEOC-D. SCHMICH - 0894

Committee on Professional Conduct as provided in Section B4.10 and B4.9 of the Bylaws, whichever is appropriate.

(b) RESEARCH FACULTY members are entitled to one month's notice with pay for each year or part of a year of full-time continuous service as a RESEARCH FACULTY member at the University up to a maximum of twelve months. The RESEARCH FACULTY member will be expected to perform normal faculty duties during the notice period and such pay will cease upon the availability of other grant support at the University or initiation of employment elsewhere. A RESEARCH FACULTY member who has received notice pay earns the right to notice pay in the future at the rate of one month per year up to the maximum of twelve months.

(c) EDUCATOR FACULTY or the LIBRARIAN FACULTY members shall be given written notice by the University of its intention not to reappoint in accordance with the following standards:

(1) No less than ninety (90) calendar days notice in the first year of academic service, if the appointment is to expire at the end of that year.

(2) No less than one hundred and eighty (180) calendar days notice in the second year of academic service, if the appointment is to expire at the end of that year.

(3) After two or more years of academic service, at least twelve calendar months notice before the expiration of the appointment.

(d) A faculty member is expected to inform the University of a decision not to accept reappointment either six months prior to the end of the current term of appointment or by the time specified for the return of salary memoranda for the following year.

(e) Faculty who change from a regular appointment to a Research, Educator, or Librarian appointment shall receive one year's notice after two years of service in the regular appointment.

C5.4   Terms in Writing

All appointments shall specify in writing whether they are Regular, Research, Educator, Librarian or Associated appointments and, in the case of untenured REGULAR FACULTY, the expiration of the probationary period. All appointments shall specify rank, salary, and full-time or part-time status.

C5.5   Probationary Period for Regular Appointments[161]

(a) Except as provided in paragraph (g) of this section, the maximum probationary period before the award of tenure is six years at the University of Miami.[162] [163]The probationary

---

[161] #2007-22(B)- applies to various portions of this section
[162] #91012(B)
[163] #2007-32(B)

UM/EEOC-D. SCHMICH - 0895

period of a faculty member may be extended, as provided for in the appropriate policies for the following reasons: child care, disability leave, unpaid leaves of absence, and personal hardship. These extensions are independent of one another. In no event may the probationary period be extended for these reasons once the final Special Review for tenure has been initiated.[164]

(b) A faculty member holding a regular appointment shall be considered for tenure in the final Special Review during the sixth year of the probationary period. A faculty member may be awarded tenure at any time during the probationary period but may request a Special Review only one time prior to the sixth year of the probationary period. In addition, the dean may initiate a second Special review during this period.  Any such consideration for the award of tenure shall have no prejudicial effect on reconsideration through the sixth year of the probationary period.[165]

(c) Untenured members of the REGULAR FACULTY may request an extension of the probationary period for reasons of extraordinary PERSONAL HARDSHIP. A written request for such an extension shall be filed with the chair no later than the fifth year of the probationary period. The request must be accompanied by a written statement by the faculty member giving a concise description of the nature and severity of the hardship. The request shall be forwarded through the chair and the dean to the Executive Vice President and Provost for final determination.

(d) Untenured members of the REGULAR FACULTY who have primary responsibility for CHILD CARE shall be entitled, upon request, to a one-year extension of their probationary period. A written request for such extension must be filed with the chair no later than the beginning of the fifth year of the probationary period. When there is a change in the faculty member's childcare responsibilities during the fifth year, a request can be made during that year. The request should be accompanied by a written statement certifying that the faculty member has primary childcare responsibility and giving a concise description of the nature and extent of these responsibilities. The request shall be forwarded through the chair and the dean to the Executive Vice President and Provost for final determination.

(e) UNPAID LEAVES OF ABSENCE may be arranged with the faculty member for the purpose of faculty exchange, advanced study, research, public service, childcare, and, in some instances, business or industrial employment, without prejudice to future promotions in rank, provided that the period of absence does not work undue hardship on the University. An untenured member of the REGULAR FACULTY may request an extension of the probationary period during unpaid leaves of absence no later than the fifth year of the probationary period.[166] A written request for such extension shall be filed with the chair at the time of the request for leave. The request shall be forwarded through the chair and the dean to the Executive Vice President and Provost for final determination.

---

[164] #91013(B)
[165] #91013(B)
[166] #2003-14(B)

UM/EEOC-D. SCHMICH - 0896

(f) Untenured members of the REGULAR FACULTY on DISABILITY LEAVE may request an extension of the probationary period. A written request for such an extension shall be filed with the chair during the period of disability leave. The request shall be forwarded through the chair and the dean to the Executive Vice President and Provost for final determination.

(g)  The maximum probationary period before the award of tenure at the Miller School of Medicine is eight years.  For personnel at the Miller School, all references in paragraphs (b) through (h) of this section to "fifth year" shall be construed as "seventh year" and to "sixth year" as "eighth year."  Tenure track personnel at the Miller School shall be assessed not later than their sixth year for promotion to Associate Professor. If the sixth year review for promotion to Associate Professor is unfavorable, the seventh year shall be considered a terminal appointment. [167]

## C5.6   Term of Probationary Appointments

Initial probationary appointments shall be for a term of four years. Whatever the date of appointment, faculty shall be considered to have been appointed June 1 for the purpose of this section. A review of the appointee shall occur as provided in Section C13.4, and, if the outcome is favorable, the appointment shall be renewed for a three-year term with the final review for tenure occurring in the sixth year. If the sixth-year review is unfavorable, the seventh year shall be considered a terminal appointment. [168]

## C5.7 [169]   Notice of Intention not to Reappoint Regular Faculty [170]

At the conclusion of the special review during the initial probationary period, an appointment to the REGULAR FACULTY may be terminated by written notice from the University.  This notice shall be communicated to the faculty member at least one calendar year [171] prior to the expiration of the appointment.

(a) If a decision not to reappoint has a basis other than unsatisfactory academic performance, the faculty member shall be informed of the justification.  Faculty members so informed may appeal a decision not to reappoint either to the Committee on Rank, Salary and Conditions of Employment or to the Committee on Professional Conduct as provided in Section B4.10 of the Bylaws, whichever is appropriate.

(b) A faculty member is expected to inform the University of a decision not to accept reappointment six calendar [172] months prior to the end of the current term of appointment. [173]

---

[167] #2007-32(B)
[168] #2007-22(B)
[169] #2010-17(B)
[170] #2001-06(B)
[171] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[172] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[173] #2007-22(B)

UM/EEOC-D. SCHMICH - 0897

C5.8    Term Appointments Following Retirement[174]

Faculty members who are reemployed within 30 calendar[175] days of retirement will continue to accrue benefits in the same retirement plan in which they participated prior to retirement.  Faculty members who are reemployed within 30 calendar[176] days are not eligible to begin receiving pension benefits.

Faculty members who are reemployed after 30 calendar[177] days will participate in the Retirement Savings Plan.

**C6     Administrative Appointments[178]**

C6.1    General Policy

The Faculty Government Charter in Section A13 calls for faculty participation in the appointment and retention of administrative officers. Such appointments shall be made in accordance with these policies.

C6.2    Regular Appointments from Outside the Academic Unit

An academic administrative officer should be a regular full-time faculty member with a primary appointment in the unit (department, division, or school) of administrative authority. Should a candidate's primary appointment be in a different unit at the time of the consultative process involved in appointing a new officer, a vote shall be taken in the usual fashion for new primary appointments. An individual accepting the new position is then deemed to have accepted a new primary appointment and to have resigned the former one. The former department may elect to offer the former member a secondary or joint appointment.

C6.3    Interim Appointments

(a) In the case of a vacancy due to resignation, death, incapacity or other similar unforeseen circumstance, the appointing authority may, after appropriate consultation, make an INTERIM APPOINTMENT of a REGULAR FACULTY[179] member with a primary appointment within the unit to be an administrative officer. The term of such an appointment shall be limited to the duration of a timely search to fill the position in a regular manner. If such a search should exceed two years, the appointing authority may, after appropriate consultation, make another Interim Appointment.

---

[174] #2009-19(D)
[175] #2011-35(B)
[176] #2011-35(B)
[177] #2011-35(B)
[178] #94010(B)
[179] #2000-09(B)

UM/EEOC-D. SCHMICH - 0898

(b) If rare circumstances make it in the general University interests, the appointing authority may, after appropriate consultation, make an INTERIM APPOINTMENT of a REGULAR FACULTY[180] member from one academic unit to be an administrative officer in another unit while retaining a primary appointment in the former unit. During the period of any such INTERIM APPOINTMENT the individual may not exercise voting rights in the primary unit, but may be extended limited voting rights in the new unit as provided for in A10.1 and C4.5. Such appointments are temporary and should not exceed one year. If the situation requires such an appointment be made for an additional year, the appointing authority may, after appropriate consultation, make another such INTERIM APPOINTMENT.

C6.4   Acting for Temporarily Absent Officers

An administrative officer, in consultation with the appointing authority and the faculty, should select a faculty member who will regularly act in place of the officer when a temporary absence so requires. This individual should be from the academic unit; exceptions may be made only after consultation with the appropriate faculty.

C6.5   Senate Officers

1. The Chair and Vice-Chairs of the Faculty Senate are elected officers and not appointed administrators.

2. The annual terms of Senate Officers normally begin on the 1st of June following their election, unless otherwise approved by the Senate[181].

**C7   Tenure**

C7.1   Administrators and Tenure

(a) Tenure at the University of Miami shall be awarded to persons only in their capacities as faculty members in academic departments. In no case is tenure applicable to persons in their administrative capacities.

(b) Academic deans and academic directors are eligible for the award of tenure as faculty members in the academic departments of their specialization, but not in their administrative posts. No other persons engaged in administrative duties are eligible for the award of tenure nor shall the period of time during which such persons are employed in positions with administrative duties be counted toward the completion of the probationary period for tenure, unless each of the following conditions is satisfied:

(1) During the period of employment in question these persons must devote more than fifty percent of their total work time to teaching, research, patient care or other activities of an academically-related nature.

---

[180] #2000-09(B)
[181] as approved by the Senate on 1/29/03

UM/EEOC-D. SCHMICH - 0899

(2) The division of effort of these persons between administrative duties and teaching, research, patient care or other activities of an academically-related nature must be specifically documented each semester and must be certified by the appropriate academic dean, who shall make such documentation part of the faculty personnel records of these persons.

C7.2   Attainment of Tenure

(a) Tenure shall not be awarded to faculty members serving in any type of RESEARCH, EDUCATOR, LIBRARIAN or ASSOCIATED appointment. Regular appointments not accompanied by an initial award of tenure shall specify the expiration date of the probationary period.

(b) By the end of the academic year in which the probationary period would normally expire, the process of tenure consideration should culminate in either a decision by the Provost not to forward a recommendation for the award of tenure to the Board of Trustees or a tenure decision by the Board of Trustees, which is the final authority for the award of tenure. If the process has not been completed by this date, the faculty member may ask the President, in writing, to direct that the process be completed immediately.

(c) Tenure shall not be awarded at the rank of assistant professor.[182]

(d) Promotion to the rank of full professor awards tenure at the time of promotion. A member of the REGULAR FACULTY initially appointed to the rank of associate professor or professor is eligible for tenure at any time upon recommendation of the voting faculty of the department.[183]

C7.3   Standards and Procedures for Attaining Tenure

Faculty members shall be advised in writing at the time of initial appointment of the substantive standards and procedures generally employed in decisions affecting reappointment and tenure. Any special standards adopted by a faculty member's department or school under the provisions of Section C13.1(b) shall also be communicated to the faculty member in writing by the chair or the dean.  A candidate for tenure shall not be evaluated in comparison to faculty members in other Schools or Colleges, as there are often significant differences in teaching requirements; administrative, service or clinical responsibilities; the circumstances under which research and scholarship are performed; and the length of the probationary period.[184]

---

[182] #2007-22(B)

[183] This paragraph was inadvertently and incorrectly left out of a prior version, but the policy has never changed (8/22/2011).

[184] #2007-32(B)

UM/EEOC-D. SCHMICH - 0900

C7.4   Meaning of Tenure

(a) Faculty members having tenure shall have appointments continued from year to year without necessity for annual or other renewal.

(b) Tenure implies that the faculty member shall accede to reasonable requests to redistribute efforts among various duties including teaching, research and, clinical service where appropriate, to accept classes assigned, whether in day or evening hours, and, in an emergency and for the period thereof, to accept such other reasonable assignments as may be deemed necessary by the University.

(c) Tenure does not imply any promise of promotion or any regular increase in salary, but it does assure the faculty member of participation in any general change in the salary scale. It also assures the faculty member of provisions for general working conditions on the same basis as other faculty members in the same academic areas who have similar professional activities and duties.

C7.5   Termination of Tenure Because of Declared Financial Exigency or Reorganization

(a) If it appears that a tenure appointment may need to be terminated because of financial exigency or because of reorganization brought about by decline in enrollment, lack of funds to support an activity, or change of course offerings, the President shall consult with the Faculty Senate.

(b) The purposes of such consultation shall be to explain the reasons why reduction is necessary, to explore the equities of the situation, including consideration of the best interests of the University and due consideration for the faculty members involved, and to attempt to arrive at an alternative solution. If no alternative is practicable and a position must be discontinued, the position shall not be filled for a period of two years unless the released faculty member has been offered reappointment and has declined.

(c) If the appointment of a faculty member with tenure is terminated by the University, one year's notice shall be given except in cases of termination for cause involving serious immediate injury to the University.

C7.6   Obligations of Tenure

A faculty member having the rights and privileges of tenure shall in turn have the continuing obligation to maintain and improve professional competence to render efficient service to the University. Faculty members may accept an assignment to administrative duties and position without interrupting or impairing their tenure, but tenure shall apply only to their rank and service on the faculty, an administrative assignment being subject to change at any time by authority of the President.

C7.7   Retention of Existing Rights

UM/EEOC-D. SCHMICH - 0901

Nothing stated herein shall be interpreted to affect adversely rights acquired by faculty members under previously existing tenure policies at the University of Miami.

## C8    Academic Freedom

**Principles**

Faculty members shall have full freedom of expression as teachers, researchers, scholars, and/or artists; this includes freedom to present their work, to advocate solutions to human problems, and to criticize existing institutions. This freedom does not abrogate faculty members' responsibility to perform their academic duties or obligations they may have assumed in accepting support for research.  Research activities are also subject to University policies such as those on patents, copyrights, and inventions as set forth in the *Faculty Manual.*

Faculty members shall have freedom in the classroom in discussing the subject but should avoid persistently introducing material that has no relation to that subject.

When speaking or writing as members of society, faculty members retain all the rights shared with other members of society and shall be free from University censorship or discipline. It should be remembered that the public may judge a profession and the University by public utterances by faculty members. Faculty members thus should make every effort to indicate whether they are acting as spokespersons for the University or are speaking in a private capacity. [185]

## C9    Scholarly and Professional Qualifications of the Faculty

C9.1    Mission of the Faculty

> The basic functions of a university are to preserve, augment, criticize and transmit knowledge and to foster creative capacities. Its chief instrument for performing these functions is the faculty, and its success in doing so depends on the quality of the faculty. The policy of this University is to enlist, develop and retain distinguished faculty members with outstanding qualifications.

C9.2    Scholarship

> Scholarship embraces inquiry, research, and creative professional performance and activity. Scholarship is required for effective teaching and is the obligation of all members of the faculty. Scholarship may be judged by the character of the advanced degree, by contributions to knowledge in the form of publication and instruction, by reputation among other scholars and professionals, and by the performance of students.

> The scholarly function of a university requires the appointment of faculty members devoted to inquiry and research. Among the criteria for evaluating research are the

---

[185] #2007-35(B)

UM/EEOC-D. SCHMICH - 0902

publication of books by nationally recognized presses and of articles and reviews of a scholarly nature in books, periodicals, technical reports, and other forms of publication[186] nationally recognized in the profession; the direction of scholarly work by students working on advanced degrees; professional awards and fellowships; membership on boards and commissions devoted to inquiry; and the judgment of professional colleagues.

Scholarship may be demonstrated by significant achievement in an art related to a faculty member's discipline, such as creative works, original designs, or original procedures. National recognition of such activities is demonstrated by: commissions, awards and prizes from nationally recognized bodies; performances with nationally recognized companies; invited presentations, exhibitions, lectures and performances before nationally recognized bodies; invitations to teach master classes or lead intensive workshops at nationally recognized institutions; and reviews of performance and creative works in nationally recognized journals, magazines and newspapers.
Promotion, tenure, and merit salary increases should recognize these scholarly achievements. Whenever possible, chairs shall reduce other duties for faculty engaged in these activities.

C9.3   Teaching

The educational function of a university requires the appointment of faculty who are effective teachers. The means of evaluating teaching effectiveness include: (1) the informed judgment of colleagues; (2) the performance of students; and (3) student opinion of teaching effectiveness[187]. Promotion, tenure, and merit salary increases should recognize outstanding achievements in teaching.

C9.4   University Service and Administration

Contributions to committee and administrative activities are recognized as furthering the University's educational function.

C9.5   Service in the Libraries

Service responsibilities in the libraries includes; reference and research assistance to the University community; selection, acquisition, and evaluation of library resources; bibliographical control of library materials; instruction in the use of the library and its resources; and management of library services.[188]

C9.6   Recognition of Degrees

To ensure that faculty members are appropriately qualified, the University of Miami recognizes degrees from universities that are accredited within the United States by appropriate accrediting associations. Other degrees will be individually evaluated.

---

[186] #89013(B)
[187] 2013-35(C)
[188] #89013(B)

UM/EEOC-D. SCHMICH - 0903

**C10     Consultation on Appointment, Reappointment, Promotion, and Award of Tenure**

C10.1     The Faculty Government Charter in Section A14 calls for consultation with the voting faculty of departments on faculty appointments, reappointments, promotions and the award of tenure. These consultations shall be conducted in accordance with this Policy.

C10.2     For purposes of Sections C11-C13 of these Policies, the following definitions shall apply:

> (a) The term DEPARTMENT means either a department or a school in the case of an undepartmentalized school.

> (b) In an undepartmentalized school the term DEAN encompasses the role of the chair.

> (c) The term APPROPRIATE FACULTY means the REGULAR FACULTY of the department in which the appointment is made, except as provided in Section A3 of the Faculty Government Charter.

> (d) The VOTING FACULTY for tenure are those tenured faculty equal or superior in rank to the candidate and for promotion those tenured faculty superior in rank to the candidate.

> (e) A person under consideration for appointment, reappointment, promotion or tenure is termed a CANDIDATE.

C10.3     Voting Rights

> (a) No person may vote at more than one level of review on questions of appointment, reappointment, promotion or tenure.

> (b) Faculty members who devote more than fifty percent of their personal effort to administrative duties other than departmental and whose duties may involve the review of candidates shall not participate in the vote of a department with regard to any recommendation for promotion or the award of tenure.

**C11     Initial Appointment**

C11.1     The entire REGULAR FACULTY of a department are entitled to vote on each new appointment. In periods of recess, in summer sessions, and in departments with thirty-five or more members a committee of at least five members of the voting faculty shall be appointed, at the discretion of the chair and in accordance with department bylaws, to vote on the candidate.

C11.2     The voting faculty shall have an opportunity to review supporting materials of the candidate. In addition, when candidates are brought to campus, the voting faculty shall have a

UM/EEOC-D. SCHMICH - 0904

reasonable opportunity to interview and to attend a professional presentation by the candidate.

**C12   Annual Salary and Performance Review**[189] **[190]**

In accordance with Section A14.5 of the Faculty Government Charter, chairs of each department or deans of non-departmentalized schools shall review annually each member of the University Faculty in that department or school. Such reviews shall be based upon a systematic evaluation of the faculty member's performance in the past year, and shall include counseling to the faculty member on correcting any deficiencies identified. Unless the faculty member prefers otherwise, the chair shall discuss the evaluation with each faculty member[191]. For faculty members with tenure-earning appointments, the review shall also be provided to the faculty member in writing. All other members of the University Faculty shall receive on request a written summary of their own review and of any available previous years' written[192] reviews. Each dean shall report annually to the Executive Vice President and Provost when the review of all members of the faculty under the dean's purview has been completed consistent with established University procedures. The Annual Salary and Performance Review is complete when the dean advises the Executive Vice President and Provost of the recommendations concerning salary.

**C13   Review of the Faculty for Reappointment, Promotion, and the Award of Tenure**[193]

C13.1   Notification of Standards and Procedures

(a) At the time of initial appointment, each faculty member shall be advised in writing by the Executive Vice President and Provost of the substantive standards outlined in Section C9 of these Policies and of the procedures generally employed in decisions affecting reappointment, promotion, and tenure as outlined in Section C13 of these Policies.

(b) Special additional standards may be adopted in departments by the appropriate voting faculty and with the approval of the school faculty, and in schools by the appropriate voting faculty. Such additional standards shall not conflict with the Faculty Manual. Departments and schools shall consult with the Faculty Senate to determine whether such additional standards conform to the Faculty Manual. Following certification by the Faculty Senate of non-conflict, copies of such special additional standards shall be provided to the dean and the President.

---

[189] #2002-17(B)
[190] #2011-60(B)
[191] #2011-60(B)
[192] #2011-60(B)
[193] #2002-17(B)

UM/EEOC-D. SCHMICH - 0905

(c) Each faculty member shall be advised in writing by the chair of any additional standards applicable to that faculty member at the time of initial appointment and at the time of their adoption.

## C13.2   Types of Review

The REGULAR FACULTY of each school and department undertakes SPECIAL REVIEWS for the purposes of promotion, tenure, or reappointment of individuals holding tenure-earning appointments. The RESEARCH FACULTY, the EDUCATOR FACULTY, the LIBRARIAN FACULTY and the ASSOCIATED FACULTY of each school are subject to Special Reviews for the purposes of reappointment and promotion. Such reviews shall be undertaken by the REGULAR FACULTY, except as provided in Section A3 of the Faculty Government Charter. Such reviews shall be carried out by the processes set forth in this section.[194]

## C13.3   Faculty Files

The file of the candidate shall be the basis for the deliberations at each stage of the reviews. Faculty members shall be responsible for maintaining a current statement of professional activities, arranged according to customary practices and university requirements. This file shall include evidence of: (1) educational attainments; (2) awards and fellowships; (3) funded research projects; (4) publications, papers, performances and other scholarly contributions to the profession; (5) outstanding achievement in teaching; (6) services to the profession in scholarly bodies and in university activities; and (7) public service to the community related to scholarship and the profession as appropriate[195]. Specific requirements for candidate's files for SPECIAL REVIEWS are described in Section C13.4 (a) of these Policies. Prior to any faculty review or vote, candidates shall have an opportunity to make current their files in the office of the chair, as provided in Section A14.4 of the Faculty Government Charter. The chair shall make available to the voting faculty all relevant materials in the file of each candidate.

## C13.4[196]   Special Reviews[197]

A Special Review shall be completed (1) during the candidate's third year for a faculty member holding a tenure-earning appointment; (2) when promotion to associate professor or professor is to be considered later in that same academic year; (3) in the year prior to the end of the probationary period; and (4) in the next-to-last year prior to reappointment of a faculty member holding a multi-year appointment.[198] Individuals holding tenure-earning appointments shall be evaluated by the voting faculty for the purpose of assessment of progress toward tenure and individuals appointed as RESEARCH FACULTY, EDUCATOR FACULTY, and LIBRARIAN FACULTY shall be evaluated by the voting faculty for the

---

[194] #2007-22(B)
[195] #2012-25(B)
[196] Section C13.4 deleted, #2011-60(B)
[197] See section C10.2(d) for voting criteria
[198] #89013(B)

UM/EEOC-D. SCHMICH - 0906

purposes of reappointment.[199] Each Special Review shall be conducted as described below.

(a) CANDIDATE'S FILE. The file of a candidate being reviewed for mid-career reappointment, promotion or tenure will ordinarily include the following:

(i) TEACHING EVALUATION. The file of a candidate for reappointment, promotion, and tenure who has any teaching duties shall contain an assessment of teaching performance. For promotion to associate professor and for tenure, except for initial appointments, the file shall include an assessment of teaching made by the appropriate voting faculty on the basis of observation, and a summary and interpretation of the results of student evaluations. Student includes individuals in professional training programs who are formally or informally instructed by the candidate.[200] The faculty of each school and college is authorized to develop procedures governing the peer review and classroom visits by tenured faculty who are evaluating the teaching of non-tenured faculty members.

(ii) EXTERNAL EVALUATIONS[201]. The file of a candidate for tenure or for promotion shall include at least five[202] written evaluations of the scholarly work of the candidate solicited from individuals specializing in the candidate's field who hold positions at major universities or research institutions of comparable or higher rank to that for which the candidate is being considered. [203]These letters are solicited by the chair following consultation with the candidate and the appropriate voting faculty. Candidates shall not be informed of the names of potential external reviewers suggested by the voting faculty but shall be permitted to submit a memorandum for inclusion in the file identifying persons who are thought to be unsuitable external reviewers and the reasons for that judgment; they may not, however, exclude specific external reviewers. If outside evaluations are solicited from reviewers recommended by the candidate, the nature of any relationship shall be indicated. The chair shall supply the voting faculty and the dean with a list of the external reviewers, indicating how and why each was selected.  The content of the request for written evaluations shall be prepared with the approval of the appropriate voting faculty and shall be shown to the candidate, with the names of the addressees removed. A copy of each such request soliciting an external evaluation shall be included in the candidate's file. The external evaluations are confidential, but they may be seen by anyone directly involved in making the promotion or tenure decision. In the case of LIBRARIAN FACULTY exceptions to the need for written external evaluations of the candidate's scholarly work may be made when they would not add materially to the candidate's file. The file of a candidate being reviewed for mid-career reappointment may include written external evaluations of the scholarly work of the candidate.[204]

---

[199] #2011-60(B)
[200] #2011-60(B)
[201] #2012-25
[202] #2011-60(B)
[203] #2012-25
[204] #2012-25

UM/EEOC-D. SCHMICH - 0907

(iii) CANDIDATE'S STATEMENT. Candidates for reappointment, promotion, or tenure are encouraged to present a written career assessment providing the general context of and rationale for their work and describing the significance of their contribution to knowledge and the profession.[205]

(iv) EVALUATION OF SERVICE IN THE LIBRARIES. The file of each candidate in the Libraries for promotion, tenure, or the award of a five-year term appointment shall contain an assessment of service in the Libraries.[206]

(v) REPORTER'S SUMMARY AND STATEMENT OF THE CHAIR'S VIEWS. Copies of the approved written summary of the recommendation of the voting faculty, as prepared by the faculty member elected as reporter and approved by the voting faculty according to Section C13.4(b)(iv) of these Policies, and of the written statement of the chair's views, as outlined in Section C13.4(b)(v) of these Policies, shall be placed in the faculty member's file. The faculty member may request from the chair of the department or the dean of the non-departmentalized school an oral characterization of the approved reporter's summary and of the chair's written views. All candidates, upon receipt of this characterization, may prepare a written response for the file.[207]

(b) REVIEW PROCESS. The review process shall proceed as follows:

(i) REQUEST FOR REVIEW. In accordance with Section A14.3 of the Faculty Government Charter, any faculty member wishing to be considered for promotion must make this request in writing. A written request is not required for reappointment or for consideration for tenure or tenure and promotion, as appropriate,[208] during the last year of the probationary period.

(ii) AD HOC REVIEW COMMITTEE. In the case of departments with fewer than five faculty members eligible to vote on a candidate, *Ad Hoc* Review Committees shall be established for each candidate in the department and be composed of individuals who would be eligible to vote in the candidate's department if they held an appointment in that department.[209] The Committees shall be appointed in the manner provided for in the School's bylaws but in all events shall have five members consisting of (1) such voting faculty in the department as the bylaws provide and (2) up to five faculty from related disciplines, preferably from within the School but, otherwise from the University, whose research and scholarly activities will enable them to assist in evaluating the candidate. The dean shall appoint *Ad Hoc* Review Committees and shall advise the candidates, the Senate, and the Executive Vice President and Provost of the appointment of all such Committees. *Ad Hoc* Review Committees shall be chaired, wherever possible, by a member of the department. If it is likely that an *Ad Hoc* Review Committee will be needed when a member of the department becomes a candidate for reappointment, promotion, or tenure,

---

[205] #2007-22(B)
[206] #89013(B)
[207] 2011-60(B)
[208] 2011-60(B)
[209] 2011-60(B)

UM/EEOC-D. SCHMICH - 0908

the Committee should be established at the time of the candidate's appointment or as far in advance of the evaluation as is practicable. The Ad Hoc Review Committee shall perform the function of the voting faculty as outlined below.

(iii) EVALUATION COMMITTEE. Each School may provide, through a bylaw, for the establishment of an Evaluation Committee in each department of the School with ten or more faculty eligible to vote on candidates for reappointment, promotion or tenure. Each Committee shall consist of no less than five members[210].  A School may delegate to each department the decision whether to establish such a Committee. The Committee shall assist the voting faculty of the department in assessing the qualifications of the candidate. The Evaluation Committee shall examine the complete work of the candidate. On the basis of this examination, the Committee shall prepare a detailed written evaluation of the candidate's contribution to knowledge and to the profession. The Committee shall then state whether, in its judgment, reappointment, promotion, or award of tenure is justified. The candidate, the appropriate voting faculty, the chair, and the dean shall be entitled to examine the report. If in the judgment of the Committee or the department faculty any of these persons can show good cause why the Committee should reconsider its decision, the Committee shall promptly do so. Prior to any vote by the faculty of the department the candidate shall have the right to submit a written statement in response to the Committee's report and that statement shall be part of the candidate's file available to the voting faculty.

(iv) FACULTY VOTE. The appropriate voting faculty,[211] or the Ad Hoc Review Committee when one is required, shall be assembled to consult on the candidate. Notice of the meeting shall be in writing and shall include the names of candidates under consideration. The meeting shall be noticed at least five academic days in advance to provide faculty members adequate time to review the candidates' files. After systematic examination of the file, including any Evaluation Committee report, and after deliberation, the voting faculty shall vote on whether to recommend reappointment, promotion or tenure. A reporter, who shall be elected[212] from the appropriate voting faculty but who shall be someone other than the chair or dean, shall prepare a written summary of the recommendation of the voting faculty which shall be circulated to the voting faculty for concurrence on its accuracy prior to its transmission to the dean.[213] The vote shall be conducted in accordance with the provisions of C20.8.[214] The result of the vote  shall be announced to the electorate as soon as possible, but in any event before the reporter's summary is submitted.[215],[216] While all voting members of the faculty are encouraged to express their views at the time of the vote, should a voting member of the faculty choose to write a letter of explanation of that vote for the benefit of the process, such letter must go directly to the Chair of the department or directly to the Dean in the case of non-departmental schools. The Chair or Dean is obligated to address any properly submitted explanatory letter in her or his own letter regarding the candidate.  The Chair

---

[210] #2011-60(B)
[211] See section C10.2(d) for voting criteria
[212] #2011-60(B)
[213] #2012-26(B)
[214] #2012-26(B)
[215] 2014-43(B)
[216] #2012-26(B)

UM/EEOC-D. SCHMICH - 0909

or Dean must inform the voting faculty of the deadline for submission of explanatory letters so that she or he may comment on the substance of any such letters.  The Chair or Dean must then include explanatory letters for reference in the file.   Letters of explanation, appropriately submitted by the deadline, are the only extraneous material permitted in the file, after the faculty vote.[217]

(v) ROLE OF THE CHAIR. The chair shall not participate in the ballot of the voting faculty, but shall provide a separate recommendation supported by a written evaluation of each candidate. The chair should make reference to the performance of the candidate in terms of the Annual Salary Reviews and any prior Special Reviews. The chair shall forward with the file of the candidate all materials that were considered in the Special Review, the written recommendation of the chair, the approved written summary of the recommendation of the voting faculty, and the numerical tally of the ballot. Subsequent to the meeting of the voting faculty, the voting faculty and each candidate shall be informed promptly by the chair of the relevant recommendations of the voting faculty and of the chair.

(vi) SCHOOL ADVISORY BOARDS. In departmentalized schools where deans do not perform the role of chair in the Annual Salary and Performance Reviews and Special Reviews, the faculty of the school may enact a bylaw establishing a school faculty Advisory Board to assist in the review of all candidates for reappointment, promotion, and tenure. The bylaw shall prescribe the number, composition, and method of selecting the members of the Board. No non-tenured member may vote on a tenure question. Advisory Boards shall examine all the material forwarded by the department and the chair and shall prepare a written report indicating their recommendation and explaining the reasons. This report shall be included in each candidate's file along with all materials received by the Board and forwarded to the dean. Recommendations of any advisory group not established in accordance with this provision may not be cited or placed in the file of the candidate.

(vii) ACTIONS BY THE DEAN. In a departmentalized school, the dean shall, after reviewing the file of each candidate, make a recommendation and prepare a written statement with regard to each candidate. The dean shall forward to the Executive Vice President and Provost the files of all candidates together with the recommendations of the chair, the voting faculty, and the report of any Advisory Board. The dean's written statement and recommendation shall be included in each candidate's file and forwarded to the Executive Vice President and Provost together with all materials considered in the Special Review. Each candidate shall be informed promptly of the Dean's recommendation.

 (viii) ACTIONS BY THE PROVOST. The Provost, as authorized by the President, makes all decisions regarding reappointments and promotions. After reviewing each candidate's file,

---

[217] #2014-01(B) * Extraneous material does not include direct information or further evidence substantiating the candidate's relevant accomplishments.  Nothing should preclude inclusion of such additional information, after the faculty vote, of such things like acceptance of scholarly work in a prestigious journal, a book published, or other relevant examples.[217] [effective 6/1/2015]

UM/EEOC-D. SCHMICH - 0910

the Provost shall notify each candidate of a decision regarding reappointment or promotion. When the decision is against promotion and there is a positive recommendation from the voting faculty, the Provost shall explain the reasons for this decision in writing to the dean. The Provost makes recommendations to the President regarding tenure decisions. When the recommendation is negative, the Provost shall inform the faculty member in writing no later than May 1. The faculty member may, within two calendar weeks[218] request a review of this recommendation by the Tenure Review Board (B4.12).[219] A faculty member may request such a review, even if that faculty member had requested the review of a prior denial of tenure.

(ix) COUNSELING OF THE CANDIDATE. In the event of an adverse decision on promotion or a denial of a multi-year reappointment (except in the case of a denial of tenure at the end of the probationary period), based on the discussions by the voting faculty, the evaluations by external reviewers, and the recommendations by the chair, dean, and Provost, the chair shall counsel the candidate on what might be done to secure multi-year reappointment or [220]promotion.[221]

(x) ACTIONS BY THE PRESIDENT. With regard to tenure decisions, after reviewing each candidate's file, the President makes recommendations to the Board of Trustees. Following a decision by the President not to recommend a candidate for tenure in the final Special Review, the voting faculty of the department, the Dean of the school, the Provost or the Tenure Review Board may recommend to the President that the decision be reconsidered during the notice year. Such a further Special Review may be conducted only when there is a significant indication that the candidate's record will improve sufficiently during the notice year that a different recommendation might be forthcoming[222]. Upon the agreement of the President, the Provost shall ask the appropriate Dean, Chair and department faculty to conduct a further Special Review of the candidate in the notice year.[223]

## C14   Trustee Authority in Tenure

Tenure may be earned only by a considered action of the University. The Board of Trustees is the final authority for the award of tenure. The award or denial of tenure shall be directly communicated to the candidate by the Executive Vice President and Provost immediately following the completion of the tenure process. If tenure is denied to a faculty member in the final calendar[224] year of the probationary period, the faculty member shall receive at least twelve (12) calendar[225] months' notice prior to the expiration of the appointment.

---

[218] 2013-04(B)
[219] #2004-15(B)
[220] #2011-60(B)
[221] #2007-22(B)
[222] #2011-60(B)
[223] #91010(B)
[224] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[225] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0911

**C15**      **Termination of Appointment for Cause**

C15.1    Definition of Cause

Adequate cause for the termination of a faculty member who has tenure or whose non-tenured appointment is being terminated without the notice normally required is restricted to:

(a) Demonstrated incompetence or dishonesty in teaching, research or clinical practice;

(b) Substantial and manifest neglect of duty;

(c) Personal conduct that substantially impairs the individual's fulfillment of institutional responsibilities.

The burden of proof in establishing cause for dismissal rests with the University.

C15.2    Preliminary Proceedings Concerning the Fitness of a Faculty Member

When reason arises to question the fitness of a faculty member who has tenure or whose non-tenured appointment has not expired, the following preliminary procedure shall be followed:

(a) DISCUSSION WITH THE FACULTY MEMBER. The appropriate administrative officers should ordinarily discuss the matter with the faculty member in personal conference. The matter may be resolved by mutual consent at this point.

(b) COMMITTEE ON PROFESSIONAL CONDUCT. If the discussion does not result in a satisfactory adjustment in the judgment of the appropriate administrators, they may ask the President to proceed further. If the President desires to proceed further, the President shall send the Chair of the Faculty Senate a written request that the Senate convene the Committee on Professional Conduct.

(c) COMMITTEE RECOMMENDATIONS. The Committee should make recommendations to the President in accordance with the procedures and within the time limits specified in Section B4.9 of the Bylaws. If the Committee recommends that termination proceedings should begin, the President may commence the action under the following procedures. If the Committee fails to submit its recommendation within 30 academic[226] days, or if the Committee's recommendation is favorable to the faculty member, the President may nonetheless go forward with the following proceedings if the President is convinced that formal termination for cause proceedings should be initiated.

---

[226] #2009-28(B)

UM/EEOC-D. SCHMICH - 0912

C15.3    Formal Proceedings: Purpose and Nature

The purpose of the formal proceedings is to give the faculty member notice of the charges against the faculty member and a reasonable opportunity to be heard. The proceedings shall not be conducted with the strictness of a court of law. The Rules of Civil Procedures and the Rules of Evidence shall not apply, except that documents must be adequately identified in order to be received as evidence. All witnesses shall affirm the truth of their testimony, and all testimony shall be transcribed by a court reporter provided by the University.

C15.4    Parties

The parties to the formal termination for cause proceedings shall consist of the faculty member and the President or a designee. The parties may appear and be represented by counsel during the formal proceedings.

C15.5    Suspension of the Faculty Member

Suspension of the faculty member involved during the proceedings is justified only if the President believes that immediate harm to the faculty member or others is threatened by continuance. Such suspension should be with pay.

C15.6    Filing of Documents

The originals of all documents that are to be mailed to either party shall be filed with the Chair of the Faculty Hearing Committee.

C15.7    Notice of Commencement: Grounds for Termination and Bill of Particulars

The President shall commence the formal termination for cause proceedings by sending the faculty member a notice of commencement, a statement of the grounds asserted for termination, and a Bill of the Particulars. The President shall also send to the faculty member a copy of these rules. All of these items will be sent to the faculty member by registered mail, return receipt requested. Grounds for termination shall be confined to one or more of those listed in paragraph C15.1 above. A Bill of Particulars shall consist of detailed allegations of those facts believed to give rise to the grounds advanced for termination. Except where there is disagreement, the grounds for termination and the Bill of Particulars should be jointly formulated by the President and the Committee on Professional Conduct. If the Committee did not recommend the institution of formal termination proceedings, or if the Committee and the President do not promptly agree on the formulation of the grounds for termination and Bill of Particulars, the President or the representatives of the President should formulate the statement.

C15.8    Right to Hearing: Response by Faculty Member

UM/EEOC-D. SCHMICH - 0913

(a) Within twenty academic working days from the date of the notice of commencement, the faculty member shall send to the President a written response. Upon written request, the President shall grant ten additional academic[227] days and may, for good[228] cause, grant additional time thereafter. The response of the faculty member shall state whether a hearing is desired. If the faculty member desires a hearing, one must be requested in the response and the faculty member must state in the response whether each of the allegations of the Bill of Particulars is admitted or denied. If the faculty member does not in good faith have sufficient information to admit or deny the truth of a particular allegation, the faculty member may so state and the allegation will be deemed to have been denied. Allegations of fact not denied in the response shall be deemed admitted.

(b) The response shall contain any additional factual allegations the faculty member wishes to assert, but a reply to the response shall not be required.

(c) If the faculty member fails to respond or to request a hearing, a Hearing Committee shall be selected as hereinafter described for the limited purpose of considering the allegations and making a recommendation to the Board of Trustees as to whether the facts set forth in the Bill of Particulars constitute adequate grounds based upon one or more of the causes set forth in paragraph C15.1 above. In making such a recommendation, the Hearing Committee shall adhere to the schedule established by paragraphs C15.15 and C15.16 below.

C15.9    Faculty Hearing Committee

If the faculty member responds, a faculty Hearing Committee consisting of five members and one alternate shall be selected as follows. The Committee shall be drawn from a standing panel of twenty tenured faculty members elected each year in a manner determined by the Faculty Senate and approved by the President. Members of this panel should be chosen on the basis of their objectivity and competence and of the regard in which they are held in the academic community. No member of the Committee shall be a member of the Faculty Senate.[229]The President shall instruct the appropriate deans and chairs to schedule the classes and other duties of these twenty faculty members so as to allow for daily sessions. The functioning Hearing Committee shall be selected as described below from and by those panel members not disqualifying themselves on the basis of prejudice in respect to the particular case. The President shall send notice to the faculty member and to the twenty members of the standing panel of the time and place of the selection meeting and direct them to be present. At the selection meeting, the members of the standing panel shall elect a chair *pro tempore* from their ranks. The chair *pro tempore* shall conduct the Committee selection as follows:

(a) Those wishing to disqualify themselves on the basis of prejudice shall be given an opportunity to do so.

---

[227] #2011-35(B)
[228] #95001(B)
[229] #95001(B)

UM/EEOC-D. SCHMICH - 0914

(b) The remaining members of the panel shall agree among themselves, outside the presence of the parties, the numerical order in which they shall be eligible for selection and the parties shall then be advised of the order of eligibility.

(c) The first five members of the panel shall preliminarily assume the regular seats of the Hearing Committee and the sixth member shall be the preliminary alternate.

(d) The parties shall be entitled to question each member of the preliminary Hearing Committee regarding fitness to serve on the Committee and may then request, one member at a time, that members of the Committee be excused for cause. Such requests shall be decided, one at a time, by a majority of the preliminary Hearing Committee. The member being challenged shall not vote. The decision shall be based upon the ability of the challenged member to fairly determine the issues. If a member or alternate member is excused, such a member shall be replaced by the next eligible member of the panel before the selection process proceeds.

(e) Each party shall be entitled to two[230] peremptory challenges exercisable at any time during the selection process.

(f) If the panel is exhausted before five Committee members and one alternate are selected, those persons who have been provisionally selected shall choose from the tenured faculty additional persons for the panel who shall assign an order of eligibility and the selection process shall continue as before.

(g) The selection process shall continue from day to day, until it is completed. When completed, the five regular members of the Committee shall elect a chair who shall preside and be responsible for keeping a chronological file of all documents filed with the Hearing Committee.

(h) When the Hearing Committee is convened the Chair of the Faculty Senate shall arrange for the members of the Committee to be briefed on the nature of the proceedings[231].

C15.10   Attendance by Panel Members

(a) Service on the faculty Hearing Committee may conflict with the scheduled activities of the members of the Committee. The Office of the Executive Vice President and Provost shall make such arrangements as are necessary to cover the teaching and other University assignments of such faculty members if they are selected to serve on the Hearing Committee so that the proceedings may be conducted from day to day until they are concluded.

(b) In order to comply with the requirement that the proceedings continue from day to day until they are concluded, the Committee members shall serve after the close of the academic year, if necessary, and the Executive Vice President and Provost shall

---

[230] #95001(B)
[231] #95001(B)

UM/EEOC-D. SCHMICH - 0915

compensate Committee members who are not on twelve-month contracts for the additional days of summer service on a *pro rata* basis.

C15.11   Discovery

(a) At any time after notice of the commencement of formal termination for cause proceedings, the parties may send to each other requests for copies of specific documents relevant to the issues that the parties cannot otherwise obtain. Any documents that constitute communications between the parties and their counsel or the University and its counsel shall be absolutely privileged and not subject to discovery under any circumstances. Copies of the documents requested shall be sent to the requesting party within ten academic days following receipt of the request. Documents so produced need not be filed with the Committee. If a party believes a request for documents to be unduly burdensome or irrelevant to the issues, the objecting party shall send to the requesting party an objection within ten academic days after the request. The Committee shall meet and decide by majority vote the issues raised by the objection.

(b) The parties shall send to each other lists of the names and addresses of all witnesses they expect to call and copies of all documents they intend to offer as evidence within ten academic[232] days after the faculty Hearing Committee is selected.

C15.12   Hearing

The hearing shall begin no later than  twenty academic[233] days after the selection of the Hearing Committee. The President shall serve the faculty member and the members of the Hearing Committee with notice of the time and place of the hearing. Once commenced, the hearing shall continue from day to day until completed. In order to assure continuity, the Hearing Committee shall schedule no less than four hours per day for the proceedings.  All portions of the hearing shall be closed, unless the parties, in consultation with the Hearing Committee determine otherwise.[234]

C15.13   Attendance of Witnesses

The University does not have the power to issue subpoenas. The faculty member may, however, request that the President direct any person then employed by the University or students in residence to appear and give testimony. Such a request shall be granted if it is made in writing and a copy thereof sent to the President at the time the faculty member sends the list of witnesses in accordance with paragraph 11 above. Such a request shall specify those employees or students of the University who are to be directed to appear.

C15.14  Order of Proof; Conduct of Proceedings

---

[232] #2011-35(B)
[233] #2011-35(B)
[234] #95001(B)

UM/EEOC-D. SCHMICH - 0916

The parties may make opening statements summarizing the facts they expect to prove. The President, or a designee, shall then go forward with the presentation of evidence in support of the Bill of Particulars and grounds for termination. When the President, or designee, has finished presenting the case, the faculty member shall present evidence. The parties shall be entitled to present evidence in rebuttal if necessary. Each party shall have the right to cross-examine witnesses presented by the other. All evidence shall be presented through witnesses appearing before the Committee in regular session. Written and oral statements uttered outside the hearing shall be viewed with caution by the Hearing Committee, particularly when the declarant of a statement is not subject to examination at the hearing. If a witness cannot appear before the Committee, the party seeking to introduce the testimony of that witness shall arrange to have the witness appear before a court reporter to give testimony. The other party shall be sent reasonable notice of the time and place that the testimony shall be taken and shall have the right to appear and cross-examine the witness. Transcripts of testimony so taken shall be admitted into evidence. All procedural issues that arise during the course of the proceedings shall be decided by the regular members of the Committee by majority vote.  The Committee, in order to ensure reasonably expeditious proceedings, may refuse to receive evidence whose substantial relevance to the matters before the Committee is not made apparent.[235] The burden rests upon the University to prove, by a greater weight of the evidence, the truth of the charges against the faculty member.

C15.15   Consideration and Recommendation by the Hearing Committee

Upon the close of all the evidence, the Committee shall give the parties the opportunity to argue before it. If written briefs would be helpful, the Committee may request them. The Committee may proceed with its deliberations without awaiting a transcription of the hearing where it feels a just decision can be reached by this means; or it may await the availability of a full transcript of the hearing if its decision would be aided thereby. The alternate member shall sit through all the proceedings but shall not participate in the deliberations or any decisions of the Committee unless it is necessary to replace a regular member who has left the Committee. The recommendation shall be based upon the cumulative effect of all the relevant evidence and all the proven grounds for dismissal when considered together and shall be supported by a reasoned opinion stating whether and why the Committee believes the stated grounds for termination have or have not been proven by the greater weight of the evidence.[236] If the recommendation of the Committee is not unanimous, the dissenting members of the Committee shall prepare their own opinion and their own recommendation.[237] The recommendation for sanction must be consistent with the severity of any misconduct found to exist. The sanction of dismissal should be recommended only when the facts proven by the greater weight of the evidence clearly justify such action. Copies of the full report of the Committee, including any minority opinions and recommendations, shall be sent to the parties within fifteen academic[238] days after the close of the evidence. After the conclusion of the hearing, the

---

[235] #95001(B)
[236] #95001(B)
[237] #95001(B)
[238] #2011-35(B)

UM/EEOC-D. SCHMICH - 0917

transcript and all official documents of the hearing shall be maintained in confidence under the custody of the General Counsel and a copy shall be released upon request only to the accused, or as required by Section C15.16. The confidentiality of the transcript and all the official documents shall be protected at all times by all persons with access to the records.[239]

C15.16   Consideration by Board of Trustees

The President shall transmit to the Board of Trustees the full report of the Hearing Committee including any minority findings and recommendations. Acceptance of the Hearing Committee's recommendations would normally be expected. If the Board of Trustees chooses to review the case, its review should be based on the record of the previous hearing, accompanied by the opportunity for argument, oral, written, or both, by the parties or their counsel at the hearing. The President and the Chair of the Faculty Senate shall be given the opportunity to be present when the Trustees consider the report of the Hearing Committee and they shall have access to all documents submitted to the Trustees in this regard.[240]  The recommendation of the Hearing Committee should either be sustained or the proceedings be returned to the Committee by sending to its chair specific questions and when necessary, directions to receive additional evidence on specified issues. If the Board of Trustees returns the proceeding to the Committee with questions, the Chair of the Committee, within ten academic days after receipt of the questions, shall send copies of the questions to the parties. If the Board of Trustees directs that additional evidence be received on specified issues, the Chair of the Committee shall at the same time advise the parties of the issues and direct them to produce for consideration by the Committee any additional evidence they may have relevant to the specified issues. Within ten academic days after sending copies of the questions to the parties, the Hearing Committee shall meet and hear argument from the parties and receive any additional evidence that may be offered on issues specified by the Board. The Committee proceedings shall continue from day to day until they are completed. Upon the receipt of any additional evidence and argument offered by the parties, the Committee should reconsider, taking into account the stated questions and any new evidence received. Within fifteen academic[241] days after the conclusion of the additional hearing, the Committee should frame its recommendation and send it directly to the Board of Trustees. Only after carefully studying any recommendation that may be sent by the Committee in accordance with this paragraph should the Board of Trustees make a final decision contrary to the recommendation of the Committee.

C15.17   Publicity

Any public statements about the case should be avoided so far as possible until all proceedings have been completed. Any statements during the proceedings, aside from such simple announcements as may be required concerning the time of the hearing and such

---

[239] #95001(B)
[240] #95001(B)
[241] #2011-35(B)

UM/EEOC-D. SCHMICH - 0918

matters, are to be released only through the President's Office, and only with the approval of the faculty member and the Hearing Committee.

**C16      Sabbatical Leave**

C16.1      Purpose

The University of Miami sabbatical leave program is intended, insofar as University resources are available, to provide regular sabbaticals every seven years for eligible faculty to engage in research, writing, or other sustained activity of an academic nature. Every effort is made within each department to provide sabbaticals by temporary reassignment of a sabbatical applicant's courses to colleagues for the requested period of leave. Sabbatical leaves, are, therefore, provided by collegial arrangements rather than by budget resources. All proposals for sabbatical leave must be approved by the Dean and the Executive Vice President and Provost.

C16.2      Eligibility

To be eligible for sabbatical leave, a faculty member must (1) hold tenure; and (2) have had at least six years of full-time service to the University of Miami.

C16.3      Terms of Sabbatical Leave

Sabbatical leave may be granted for one semester at full salary, or for one academic year or two consecutive semesters at two-thirds salary. (A one-year period of leave must be in the same pattern as that of previous employment; that is, nine-month or twelve-month.) Faculty members must serve at least one year at the University after they return from sabbatical leave. Retirement and fringe benefits are continued during leave, and persons on leave are considered in the usual fashion for promotion and/or salary increase. Faculty members on sabbatical leave or other paid leave have the same retirement benefits as if they had not been on leave.

**C17      Faculty Benefits**

C17.1      Administration of Benefits

University benefits are administered by Benefits Administration. Faculty members are encouraged to consult with this office to obtain current information and details on benefits.

C17.2      Retirement Plans[242]

(a) Retirement Savings Plan (RSP)
Faculty who begin work on or after June 1, 2007, and meet the eligibility requirements will participate in the Retirement Savings Plan, a defined contribution retirement plan. Upon

---

[242] #2009-19(D)

UM/EEOC-D. SCHMICH - 0919

completion of a required one-year service period, the Retirement Savings Plan provides for monthly core contributions by the University of 5% of compensation/pay as defined in the Plan Document (subject to federal limits).  In addition, after the one-year waiting period, the University will contribute up to an additional 5% of compensation on a dollar-for-dollar match of voluntary pre-tax contributions made by the faculty member.

Upon employment faculty members may elect to make voluntary pre-tax contributions (subject to federal limits.)  However, if a faculty member fails to make an election after the one-year waiting period, then a default contribution of 1.5% will automatically be deducted from the faculty members pay and the contribution will be matched dollar-for-dollar by the University. If no investment fund is designated by the faculty member, these funds will be directed to a default account as provided under the terms of the plan. The faculty member will be notified of the established default account and the options available under the contract.

University core contributions are vested after three years; matching University contributions and the faculty member's voluntary contributions are vested immediately. Retirement income under the plan is based on the funds accumulated in the faculty member's account at the time of receipt of retirement income.

Faculty members who are eligible to participate in the Retirement Savings Plan must make their contribution and investment elections on-line at www.plan.fidelity.com/um .

(b)   Faculty Retirement Plan (FRP)

Faculty who began work on or before May 31, 2007, and met the eligibility requirements participate in the Faculty Retirement Plan, a defined contribution retirement plan, unless the Faculty member elected to transfer to the Retirement Savings Plan effective June 1, 2007. The Faculty Retirement Plan provides a monthly University contribution of 7% of compensation/pay or 11% of compensation/pay after 7 years of service or attainment of tenure, whichever comes first.

(c)   Employees Retirement Plan (ERP)

Faculty who begin work on or before June 1, 1977, and met the eligibility requirements participate in the Employees Retirement Plan, a defined benefit retirement plan, unless the Faculty member elected to transfer to the Faculty Retirement Plan or the Retirement Savings Plan.

(d)   Voluntary Supplemental Retirement Annuity Plan (SRA)

Faculty who participate in the Faculty Retirement Plan and the Employees Retirement Plan may make voluntary pre-tax contributions to this plan (subject to federal limits.)

(e)   Faculty with Appointments prior to June 1, 2010, should contact Human Resources-Benefits Administration as additional provisions apply.

UM/EEOC-D. SCHMICH - 0920

Further information about these plans may be found in the University's Summary Plan Description available online at the Benefits section of the University's website.[243]

C17.3    Group Life Insurance and Long-term Disability Plans[244]

Basic life insurance and long-term disability coverage are provided to eligible faculty from the first complete working day as described in the Benefits Administration website as agreed between the University and Faculty Senate. Enrollment is not required. Faculty may also purchase additional voluntary life insurance. Some of the plans include provisions for spouses and dependents. A complete list of optional benefits is available at the Benefits Administration website. Enrollment in most of the optional plans must take place within ninety calendar days of the effective date of employment. Immediately upon acceptance of an appointment faculty members should contact Benefits Administration.

C17.4    Health Plans[245]

The University offers medical and dental insurance plans for faculty as well as providing optional coverage for the faculty's spouse, same-sex domestic partner and dependents.  For a description of benefits please follow the links from http://www.miami.edu/index.php/hr/

C17.5    Degree Enrollment and Tuition Benefits[246]

Full-time members of the faculty (including those retired because of age and/or disability) and their dependents are eligible to participate in tuition benefit plans of the University as described below:

(a) Faculty

A full-time member of the faculty may attend undergraduate and graduate classes without payment of tuition provided such a person does not enroll for more than two courses per semester and not more than 15 credits per calendar year.  In addition, a full-time member of the faculty accepted into the regular MBA program is eligible for a maximum of twenty-four credits per calendar year. [247]   Faculty must submit a signed form, generated by human resources, of approval of their Dean to participate in this program.

Faculty would be expected to reimburse the university the cost of the course if they drop a course after the 100% drop date as published in the Student Accounts Tuition Refund Schedule each semester or if the course is failed.

Tuition benefits do not apply for:
(1)  The School of Law or the Miller School of Medicine.

---

[243] #2006-07(B)
[244] #2009-19(D)
[245] #2009-19(D)
[246] #2009-19(D)
[247] #2003-03(B)

UM/EEOC-D. SCHMICH - 0921

(2) Any Doctoral level program in the Graduate School unless the employee was participating in such a program by May 31, 2010.
(3) The Master of International Business
(4) Either the Executive or the Working Professional MBA programs
(5) private music lessons or other private lessons;
(6) hobby or sports courses;
(7) in-service courses in Dade County schools;
(8) courses required for certification or licensure that are conducted in whole or in part by outside vendors,
(9) auditing of courses and
(10)  non-credit courses

Full-time faculty members may enroll with tuition benefit in any program leading to any degree offered by the University (with the exceptions noted above), provided they meet the prerequisites for the courses and have been admitted by the appropriate administrative offices and screening committees.

(b) Dependents of Faculty

1.  Dependents of  Faculty with Appointments Commencing On or After September 1, 2002:

A spouse, same sex domestic partner or "dependent child" of a faculty member with an appointment commencing on or after September 1, 2002 is eligible for tuition remission at the University of Miami after completion of one full year of full-time regular service at the rate of 70% during years two through five, 85% during years six through ten and 100% thereafter.  The one year waiting period before commencement of tuition remission is waived for Faculty who were continuously employed as a faculty member for twelve calendar[248] months or one academic year at another accredited institution prior to appointment at the University.

2.  Dependents of Faculty with Appointments Prior to September 1, 2002:

A spouse, same sex domestic partner or "dependent child" of a faculty member with an appointment prior to September 1, 2002 is eligible for tuition remission at the University of Miami at the rate of 75% during the first five years of the faculty member's full-time service at the University, and 100% thereafter.

3.  Dependents of Faculty with Appointments Prior to 1972 or attainment of tenure by June 1, 1975 should contact Human Resources-Benefits Administration as additional provisions apply.

---

[248] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0922

4.  Dependents of Faculty who die after five or more full years of service to the University are eligible for benefits on the same basis as set forth above.

(c) Dependent Tuition Remission Benefit

This benefit is available for spouses, same sex domestic partner and dependent children of faculty members exclusively at the University of Miami for a total of 128 semester credits or such other higher credit number as meets the minimum requirement of the undergraduate degree, whichever is greater. The 128 credit tuition remission benefit applies to all undergraduate and graduate courses at the University of Miami with the exceptions noted in Section C17.5 (a), above.

Dependents enrolled in UM courses during the 2009/2010 Fall and Spring semesters should contact Human Resources-Benefits Administration as additional provisions apply.

(d) Dependent Eligibility for Tuition Remission Benefits

The "dependent child" must make normal progress toward graduation, as evidenced by continuous enrollment in a degree-seeking program, enrollment in a minimum of six credits per semester both Spring and Fall and earning twelve credits per calendar year. "Dependent child" is defined as a natural, adopted, or step-child receiving 50% or more support from the faculty member. Certification of dependency normally requires a copy of the employee's most recent IRS tax return (1040 U.S. Individual Income Tax Return); exceptions will be made in certain circumstances, however, such as divorce.  To be eligible for this benefit, the "dependent child" must begin an undergraduate degree-seeking program before reaching the age of 23. For graduate study, the "dependent child" must begin a graduate degree-seeking program within two years of the date of the completion of an undergraduate degree. The dependent child will not be eligible for tuition remission for any semester that begins after reaching 27 years of age.

All full-time undergraduate dependents receiving 100% tuition remission are required to apply for the Florida Resident Access Grant, if eligible. For students who qualify for this grant the amount of the grant will be applied to tuition and fees.

C17.6[249] Part-time Faculty in the Categories of Clinical, Research, Librarian, Educator and Associated [250]

Part-time defined:
A part-time appointment to the faculty as Clinical, Research, Librarian, Educator or Associated shall specify the percentage of effort for the position but assumes that the persons' full professional efforts occur in their University employment.  Only positions of 50% effort or greater are entitled to benefits.  Benefit eligibility for Associated Faculty are listed in Section C4.6 (b).

---

[249] #2004-20(B)
[250] #2009-19(D)

UM/EEOC-D. SCHMICH - 0923

Policies related to appointments, qualifications, the processes for transition from full-time to part-time status and from part-time to full-time status, tracks and rank, voting rights and the process for reappointment/non-reappointment may be created by individual schools and should be created insofar as they differ from those applicable to full-time faculty.  These policies shall be approved by the School Council and Dean and submitted to the Faculty Senate, which shall review them to ensure that they are compatible with the Faculty Manual.

(a)  Appointment to part-time status:
    (i) Faculty may be appointed to a part-time position on any of the eligible tracks. Such appointments shall be made by the same procedures as for full-time positions on the same tracks.

    (ii) Faculty currently on any of these tracks with full-time appointments who wish to reduce their effort at the University may apply to transfer to part-time status. Such transition is not an entitlement but requires approval of the appropriate Chair and Dean. No full-time faculty can be involuntarily transferred to part-time.

(b)  Transfer to full-time status:
    (i)  Faculty originally appointed to a part-time position may apply to transfer to full-time status. Such transition is not an entitlement but requires approval of the appropriate Chair and Dean.

    (ii) Faculty who have transitioned from full-time to part-time may not transfer back to full-time status as of right unless there was an agreement to that effect at the time of the original transition. In other cases, they may apply to transfer back to full-time status. Such transition is not an entitlement, but requires approval of the appropriate Chair and Dean.

(c)  Benefits:
    In addition to the benefits to which they are already entitled such as library privilege and rights to purchase faculty parking permits, they shall be eligible for the following:  retirement, life insurance, disability, health insurance and tuition remission.

    Part-time faculty members are entitled to receive a prorated tuition remission benefit after 90 calendar[251] days of continuous employment determined by the full-time equivalent (FTE) of the employees' position. Thus a person who is working 70% time would receive 70% of the tuition remission benefit the person would have received if working full- time.

    Health insurance benefits are also pro-rated. For any particular health insurance plan and coverage level (i.e. employee only, employee plus spouse, etc.) there is a set

---

[251] #2011-35(B)

UM/EEOC-D. SCHMICH - 0924

level of employee contribution (premium) and employer (University) contribution. For a person working 70% the University would contribute 70% of what it would contribute for a full-time employee choosing the same plan. The 70% employee would then be liable for the employee contribution plus 30% of the University contribution.

C17.7 [252]    Faculty Parental Leave and Workload Relief [253]

1. This policy is intended to provide additional benefits (paid and unpaid), beyond those set forth in the FMLA as described below, and does not in any way diminish any rights or benefits to which a faculty member may be entitled under the FMLA.

2. Under the Family and Medical Leave Act ("FMLA"), an eligible faculty member may take unpaid leave of up to 12 calendar [254] weeks for the birth of the faculty member's child and/or in order to care for the infant child or for a child who has been placed with the faculty member for adoption or foster care. If both parents are employed by the University, FMLA leave is a combined 12 calendar [255] week leave between both parents. Detailed information regarding rights and obligations under the FMLA is available in the Office of Faculty Affairs.

3. Members of the REGULAR, LIBRARIAN and EDUCATOR FACULTY (with the exception of those at the rank of Instructor and UMMG members) who hold appointments of at least .50 FTE, and full-time Senior Lecturers are eligible for additional benefits (beyond those provided by the FMLA) upon employment. Members of the RESEARCH FACULTY and the University of Miami Medical Group (UMMG), and faculty at the rank of Instructor who hold appointments of at least .50 FTE, and full-time Lecturers are eligible upon completion of 24 consecutive calendar [256] months of employment. These benefits are set out in the following paragraphs.

4. Eligible faculty members of either sex who certify, on a form provided by the Office of Faculty Affairs, that they have primary responsibility for the care of their newly born, adopted or foster child are authorized to take up to 8 calendar [257] weeks of *paid* parental leave to run concurrently with the leave provided by the FMLA. The pay rate calculated for the purpose of this paragraph will be 1) for UMMG faculty members: a monthly rate equal to the average of the previous 12 calendar [258] months of compensation, excluding bonuses and/or other allowances, or 2) for all other faculty members: the monthly rate as reflected in the faculty member's salary letter.

---

[252] #2001-27(B)
[253] #2006-02(B)
[254] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[255] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[256] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[257] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[258] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0925

5.  Eligible faculty members taking parental leave as described in paragraph four who have accrued sick time or vacation time may elect to apply their accrued sick time, in accordance with University policy for the use of sick time and/or their vacation time for up to 4 additional calendar[259] weeks of paid parental leave.  Eligible faculty members, other than members of the RESEARCH FACULTY, may borrow against future accruals of sick or vacation days.

6.  Tenure earning members of the REGULAR FACULTY may request an extension of the probationary period following the birth, adoption or placement of a child in accordance with section C5.5 of the Faculty Manual, "Probationary Period for Regular Appointments."

7.  With the exception of UMMG and RESEARCH faculty, eligible faculty may opt for up to one semester of workload relief from teaching and administrative duties.  Responsibilities for research and research advising remain unchanged.  Since workload relief is not a leave, faculty members are expected to fulfill certain duties and will receive their regular salary.  Faculty may apply instead for two semesters of half relief from teaching and administrative duties; the approval of such half relief by the department chair or dean is required and may depend on the needs of the department.

8.  To qualify for workload relief under paragraph seven, the faculty member must certify, on a form provided by the Office of Faculty Affairs, that he/she has primary responsibility for the care of an infant or newly adopted or placed child.  Workload relief will be granted for the semester in which a birth, adoption or placement occurs, or a parental leave expires. Should the triggering event occur or the leave expire between semesters, workload relief will be granted for the following semester.  Faculty members are expected to work for at least one year at the University following workload relief, in accordance with the University's faculty policies.

## C18[260]  Centers, Institutes and Other Named or Titled Academic Units

C18.1  Naming

C18.1.1  UNIVERSITY CENTERS and INSTITUTES shall be named with "University of Miami" preceding their title and are the only academic units in addition to schools and departments that ordinarily may use the unqualified prefix "University of Miami."

C18.1.2  Other NAMED or TITLED ACADEMIC UNITS are administrative and academic components of a department or school and must use the name of the department or school as an immediate prefix to the name of the unit except as provided for below.  These units may be referred to by a designation such as consortium, clinic, program, laboratory, project, center, institute, or other appropriate name.  At the time of the establishment of any such unit under Bylaw 6.6, the unqualified prefix "University of Miami" may be approved if

---

[259] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[260] #2003-23(B)

UM/EEOC-D. SCHMICH - 0926

the unit is a cooperative venture with an entity outside of the University and its mission is justified as being of university-wide significance or if there are other special circumstances.

C18.1.3  Nonacademic units such as geographical sites and buildings may also use "Center" or "Institute" in their name only when it is clear that the names designate locations of service.

C18.1.4  To the extent practical, the expectation is that these conventions will be applied retroactively.

C18.1.5  For the purposes of pursuing specific funding opportunities, such as sponsored awards or gifts, a provisional name consistent with these policies may be used prior to the name and unit being approved under Bylaw 6.5 or Bylaw 6.6.  For development to proceed with use of a provisional name, approval must be obtained from the faculty or school council, if so delegated, of the units or departments, and of the host school(s), sponsoring [261] the proposal, the deans of the schools involved, and the Executive Vice-President and Provost, and the Chair of the Faculty Senate[262].  The Senate Chair is to be informed at the earliest opportunity that such planning is underway and the date by which a formal proposal may be expected for review.[263]

Any such provisional name may not be used for more than one year, except as provided in this paragraph.  If the Provost requests additional time beyond one year for any reason, including the need for additional time for the Center or Institute to secure funding, the Provost shall explain in detail the reasons. An extension for a time lasting no longer than an additional year may then be granted by the Senate Chair if approved by the Committee on General Welfare.  Thereafter, if the Provost wishes to continue without the funding obtained, the procedures in Section B6.5 or B6.6 must be utilized. In that case, the Senate may require a review sooner than the five-year period specified in C18.2.

C18.2   Terms of Approval and Periodic Reviews

C18.2.1 If the Faculty Senate approves a UNIVERSITY CENTER OR INSTITUTE under Bylaw 6.5, it may do so for an initial term of up to five years.  Continued approval by the Faculty Senate for a defined term of up to ten years requires a review of the unit upon receiving such a recommendation, forwarded by the Executive Vice-President and Provost after consultation with the cooperating departments and schools. [264]

---

[261] 2014-15(B)
[262] #2011-32(B)
[263] #2011-07(B) – deleting last sentence.
[264] #2007-17(B)

UM/EEOC-D. SCHMICH - 0927

C18.2.2 Other NAMED or TITLED ACADEMIC UNITS established under Bylaw 6.6 may be approved by the Faculty Senate and the President.  For each such approved unit, the Executive Vice-President and Provost shall consult with the dean of the host school at five year intervals to determine whether the unit remains active and shall report to the Faculty Senate the names of those that should be disestablished.

C18.2.3  Periodic five year reviews may be conducted on all programs, centers, institutes and similar academic units as deemed appropriate by the Faculty Senate or the Executive Vice-President and Provost.

## C19    Faculty Senate Awards[265]

C19.1  James W. McLamore Outstanding Service Award

On the occasion of the twenty-fifth anniversary of the Faculty Charter, the Faculty Senate established an annual award to recognize service above and beyond the call of duty by a member of the University Community.

Members of the faculty will be invited annually to nominate persons for this award.  The awardee will be selected by the Faculty Senate after considering the recommendation of the General Welfare Committee.

Each nomination will require a) the curriculum vitae of the nominee; b) a letter giving the details of the nominee's activities that demonstrate "service above and beyond the call of duty"; and c) three support letters from people who know the contributions of the nominee that make him/her worthy of the award.

The Senate will host a special ceremony at which the award will be presented.  The ceremony will be followed by a reception.[266]

Visit https://umshare.miami.edu/web/wda/facultysenate/Awards/McLamorelist-web.pdf to view a list of the past awardees.

C19.2  Distinguished Faculty Scholar Award

On the occasion of the twenty-fifth anniversary of the Faculty Charter, the Faculty Senate established an annual award to recognize outstanding contributions to scholarship by individual faculty members at the University of Miami.  The award is given to acknowledge either a single outstanding scholarly achievement or a lifetime of distinguished accomplishment in any area of research or creative activity.

Members of the faculty will be invited annually to nominate colleagues for the award.  The nominations will be reviewed by a special Nominating Committing consisting of the last five

---

[265] #2003-08(B)
[266] #2006-14(D)

UM/EEOC-D. SCHMICH - 0928

awardees and the Provost and Faculty Senate Chair serving as *ex-officio* non-voting members. The Committee will report and make a recommendation* to the Senate for selection.

For each nomination received the Committee will require a) the curriculum vitae of the faculty member; b) a short statement describing the contribution that occasions the nomination; and c) the names and addresses of four persons of eminence in the field who can comment on the achievements of the nominee.

The Senate will host a special meeting for all members of the faculty at which the award will be presented.  The awardee will present a report on their research at this meeting.  The meeting will be followed by a reception.

Visit https://umshare.miami.edu/web/wda/facultysenate/Awards/DFSAlist-web.pdf   to view a list of the past awardees.

C19.3 Outstanding Teaching Award[267]

The Faculty Senate established this annual award to recognize a distinguished record of teaching by individual faculty members at the University of Miami. The award is given to acknowledge either small setting teaching (e.g., clinical, field classes, or workshops) or large setting teaching (e.g., regular lectures).

Members of the full-time faculty will be invited each fall to nominate any member of the full-time faculty for this award. Other members of the University Community may recommend a candidate for this award through a member of the full-time faculty.  A committee consisting of the last five awardees, together with the Provost and Faculty Senate Chair serving as *ex-officio* non-voting members, will review the nominations.  The Committee will report and make a recommendation* to the Senate for selection.

For each nomination received, the Committee will require a) a brief letter of nomination from the nominator regarding the candidate's qualifications for the award; b) a current academic curriculum vitae in standard professional format; c) a completed "Faculty Senate Outstanding Teaching Award Nomination Form."

The Committee will review the nominations and select a set of finalists. Each finalist's nominator will be asked to submit student evaluations of courses taught within the past five years and four letters from colleagues or alumni describing the contributions that make the nominee worthy of this teaching award. The Committee may ask the nominators for additional information, including examples of the nominee's teaching materials, if necessary. Nominators may work with members of the University Community to assemble materials such as student evaluations and letters from other members of the University Community including alumni. If possible, nominees should not be told they are finalists. The awardee should have a substantial record of teaching students of the University of Miami and will ordinarily be a member of the Regular Faculty.[268]

---

[267] #2005-07(D)
[268] #2008-26(D)

UM/EEOC-D. SCHMICH - 0929

The Senate will host a special ceremony for all members of the faculty at which the award will be presented.  The ceremony will be followed by a reception.

Visit https://umshare.miami.edu/web/wda/facultysenate/Awards/OTAlist-web.pdf  to view a list of the past awardees.

*The names of the nominees should not be revealed, but the following information should be included in the report to the General Welfare Committee and the Senate: the number of new nominations received; the number of nominations from previous years that were reconsidered; the affiliation (Department, School, or discipline, as appropriate) of the nominees to whom serious consideration was given; the name of the recommended recipient; and a short summary of the individual's credentials.

**C20   Miscellaneous Provisions** [269]

C20.1  Use of Academic Counsel and Legal Counsel

    (a) Members of the UNIVERSITY FACULTY have a right to be represented by Academic Counsel whenever there is an issue regarding a right provided by the *Faculty Manual* or an alleged violation of the *Faculty Manual*. Specifically, representation is available in, but is not limited to, cases where allegations of professional misconduct are brought before the Committee on Professional Conduct by or against a member of the UNIVERSITY FACULTY under Section B4.9; a member of the UNIVERSITY FACULTY appeals an unfavorable administrative decision before the Committee on Rank, Salary, and Conditions of Employment under Section B4.10; or a recommendation is made under the procedures of C15 to terminate a tenured faculty member or to reduce the term of a contract of a member of the UNIVERSITY FACULTY. Representation is also available in cases where attempts are being made to resolve informally a matter that could be brought before one of the listed committees in this paragraph. In the case of allegations brought under Section B4.9, representation by Academic Counsel is available to both the complainant and accused, but the same Academic Counsel may not represent both parties. Representation should ideally only be provided by Academic Counsel who is not also a faculty member of the same school or college as any of the involved parties. [270]

    (b) Except as provided in paragraph (a) [271], no Academic or Legal Counsel may make an appearance in that capacity before the Senate, its committees, or its hearing panels except:

        (i)  as agreed by all interested parties and authorized by the Senate; or
        (ii) by the committee or hearing panel concerned.

---

[269] #2010-05 (C)
[270] #2012-16(B) – effective June 1, 2013
[271] #2012-16(B) – effective June 1, 2013

UM/EEOC-D. SCHMICH - 0930

(c) The provisions above do not preclude any member of the UNIVERSITY FACULTY[272] from seeking the advice of an attorney or having an attorney prepare legal documents in connection with any matter before the Senate, its committees, or its hearing panels.

C20.2   Eligibility to Serve as Counsel

(a) Subject to the two restrictions noted below, any current member of the UNIVERSITY FACULTY or any Emeritus Faculty member may serve as Academic Counsel, without regard to whether or not the person serving as Academic Counsel is a member of the bar of any American jurisdiction or otherwise has legal training.

    (1) No faculty member who is compensated for his or her services regarding a particular matter may serve as Academic Counsel in that matter.

    (2) No faculty member who has represented another faculty member before any court, arbitral tribunal, or non-university administrative body may serve as Academic Counsel in the same or substantially the same matter.

(b) Any member of the bar of any American jurisdiction may serve as Legal Counsel, without regard to whether or not the person serving as Legal Counsel is a member of the UNIVERSITY FACULTY. Any issue concerning the unauthorized practice of law under Florida Law is a matter to be dealt with solely by the attorney.

    (1) Legal Counsel representing a member of the faculty before the Senate or any of its entities shall provide notice of appearance to any adverse party, to the Secretary of the Faculty Senate, and to the office of the General Counsel.  The notice shall specify the person being represented, the jurisdiction(s) in which the attorney is licensed, the number(s) of the attorney's license(s), and the attorney's address and other contact information.  Notice to the Senate shall be sent to the Faculty Senate Office by Certified Mail or hand delivery.

    (2) An attorney acting as Legal Counsel under this Faculty Manual shall sign the established form pledging[273] to abide by reasonable rules concerning confidentiality, decorum at hearings, the need to follow the direction of any hearing panel chair, provision of documents only through the Faculty Senate office except as provided in this Faculty Manual, and other relevant matters.  Attorneys who engage in a single serious violation of such rules, or repeated violations of a lesser character may be warned, reprimanded or precluded from future practice before any entity of the Senate by the Chair of the Faculty Senate.   In particularly severe cases, the violations may be reported to the bar of the jurisdiction(s) in which the attorney is licensed.

    (3) An attorney acting as Legal Counsel who has had an adverse action taken by the Chair of the Faculty Senate under sub-paragraph (b) may appeal the decision to the

---

[272] #2012-16(B) – effective June 1, 2013
[273] Click HERE for current version of the legal counsel form.

UM/EEOC-D. SCHMICH - 0931

Committee on General Welfare.  Such an appeal is timely only if made within 15 academic working days after notice of the action is provided to the attorney.

(4) Provisions of sub-paragraphs (a) and (b) above shall not apply to representations begun before the adoption of these provisions.

C20.3  Lists of Academic Counsel

(a) The Secretary of the Senate shall maintain a list of UNIVERSITY FACULTY members who are willing in principle to serve as Academic Counsel.  Persons named on the list are not obliged to serve in any particular case. Academic Counsel on the list specified in this paragraph may not represent faculty members who are in their department or their undepartmentalized school.[274]

(b) No officer of the Senate may recommend the use of any particular Academic Counsel or Legal Counsel to handle a matter before the Senate or any of its committees or hearing panels.  This restriction does not apply to other members of the Senate.  Any recommendation they make is personal, and is not the recommendation of the Senate.

C20.4   Lists of Mediators

1.    The Secretary of the Senate shall maintain a list of university employees with relevant training or experience who are willing in principle to serve on a *pro bono* basis as mediators of a dispute between a faculty member and a unit of the university, or between two faculty members. No mediation may take place under this section between a student and a faculty member.

2.    No officer of the Senate, no holder of any administrative position specified in section A7.1(f) or (g), and no member of the Committee on Professional Conduct, the Committee on Rank, Salary and Conditions of Employment, the Tenure Review Board, or the Faculty Hearing Committee specified in C15.9 may serve as mediator under this section. This paragraph does not preclude Officers of the Senate or administrators from engaging in informal mediation efforts.

3.    Use of a mediator pursuant to this section requires the written consent of all parties to the dispute.  Persons named on the list are not obliged to serve as mediator in any particular case.

4.    A mediator serving under this section shall be bound by the ethical standards and the requirements of confidentiality, and is entitled to hold matters in confidence from the university and all its employees, as if the mediation were taking place under judicial auspices in Florida.

---

[274] #2012-16(B) – effective June 1, 2013

UM/EEOC-D. SCHMICH - 0932

C20.5   Academic Days

1.      For all purposes under this Faculty Manual, the terms "academic day" and "academic working day" are synonymous.

2.      Weekend days, University holidays, days from the last day of undergraduate examinations in the Fall Semester to the first day of classes in the Spring Semester, weekdays during inter-sessions, and any days during fall and spring breaks are not considered academic days, even if some classes are held on those days.  Days designated by the University as major religious holidays, but which are not university holidays, are considered academic days.  Meetings of any Senate panel hearing a complaint or dispute will not, however, be scheduled on such a holiday if any party makes a request based on religious observance.  Such requests must be submitted to the Faculty Senate Office at least 10 academic days before the religious holiday.

3.      Except as provided in paragraph 2 above, an academic day shall be any day taking place from the first day of undergraduate classes in the Fall Semester until the last day of scheduled final undergraduate examinations of the Spring Semester.

4.      Any interested party may petition the Chair of the Faculty Senate to construe weekdays during the first or second summer sessions (or both) as academic days for purposes of that matter if:

          a. All interested parties agree; or
          b. The petitioner can demonstrate that the interests of the petitioner would be severely harmed by delay over the summer months.  The Chair of the Faculty Senate shall grant such a request unless the harm to the interests of other parties from moving forward during the summer sessions would exceed the harm to the petitioner from a delay until the Fall Semester.

C20.6   Discretionary Authority of Senate Officers During Academic Breaks [275]

If a matter requires timely attention from the Committee on Rank, Salary and Conditions of Employment, Tenure Review Board, Committee on Professional Conduct or the Hearing Panel during an academic break such as the summer period, and a sufficient number of appropriate elected members is not available, the officers may agree by majority vote to add other appropriate individuals to the Committee having jurisdiction over the matter. A report of any such temporary addition will be made to the Senate at its next meeting following the academic break.

---

[275] #2000-25(C)

UM/EEOC-D. SCHMICH - 0933

C20.7 Form and Effective Date of Required Notices[276]

In any matter arising under the *Faculty Manual* where a member of the UNIVERSITY FACULTY must provide notice to the Senate, to the Administration or both, or where the Administration or the Senate must provide notice to a faculty member, such notice must be accomplished by one of the following means:

(a) <u>Notices to Individuals:</u>  It is vital that there be a high degree of reliability that the faculty member will receive the notice, and accordingly that except for registered mail, each notification method requires both initial notice and a means of confirming documentation.  Allowable methods and the effective date of the notice are shown in the following chart.

| Initial Notice | Confirmation | Effective Date* |
|---|---|---|
| In writing by Registered Mail** | None necessary | When mailed |
| Orally, in person | Written Witness Statement | Date of witness statement |
| Orally, in person | In writing at the same time | When provided |
| Orally, in person or by phone | In writing via USPS*** | When dated |
| By electronic means**** | In writing via USPS*** | When dated |

NOTES:
\*    Failure to accept notice has no effect on its validity or effective date
\*\*   Restricted Delivery
\*\*\*  Ordinary First-class mail, with additional Certificate of Mailing.
\*\*\*\* University e-mail, fax

In the case of hard-copy delivery of initial notice or confirmation to a faculty member by mail, the notice shall be addressed to the home address on file with Human Resources.

(b) <u>Notices from Individuals to the Senate:</u>  All notices must be in writing, and be delivered in person to the Senate Office (325 Ashe Administration Building, Coral Gables) during normal business hours, or be sent by inter-office mail (325 Ashe Administration Building, Locator Code 4634), or U.S. Mail (PO Box 248106, Coral Gables 33124).  The Senate Office will acknowledge receipt.  If no such acknowledgement is received, it is incumbent on the sender to contact the office (305-284-3721).

(c) <u>Notices from Individuals to the Administration on Matters Involving the Senate</u>. All notices shall be in writing, and addressed and delivered to the Office of the Vice Provost for Faculty Affairs, 140 Ashe Administration Building, Coral Gables.

The fact that a notice could be revoked by the sender, or in the case of the Administration that there is the possibility of a reversal of the decision by a more senior authority shall

---

[276] #2011-26(B)

UM/EEOC-D. SCHMICH - 0934

not change the effective date of the notice unless such revocation or reversal actually transpires.

This section shall not apply to notices required to be provided to a substantial number of faculty members, such as notice of meetings of a School or Department faculty, meetings of a School Council, or Senate meetings.[277]

C20.8   Voting Procedures for Departments and Schools/Colleges[278] [279]

1.   The following formal voting procedures shall be followed when conducting a Special Review under C13.4 or an immediate award of tenure under A14.2; before appointing a new chair or dean under A13.2 or A13.3[280]; when establishing or disestablishing a department or school/college or a new degree under A4.1; prior to the adoption by a department or school of special additional standards for reappointment, promotion and tenure under C13.1; and before the adoption or amendment of departmental or school bylaws or the initial advisory vote of new appointments under section A14.1[281].

2.    The appropriate voting faculty, or the Ad hoc Review Committee when one is required, shall be assembled to consult on the matter. Notice shall be sent in writing not less than five academic days prior to the meeting and shall include a brief description of the matter under consideration, or the names of the candidates if voting on candidates to serve as a new chair or dean. The voting faculty shall then vote by secret ballot, which shall be counted by two designated members of the voting faculty, and the results announced to the electorate. In an effort to encourage transparency and emphasize anonymity in the case of a Special Review, there shall be an announcement of the numerical breakdown of the votes.  A Department or School, in a written Bylaw, may provide for announcement of the result without a numerical breakdown if a Department has six or fewer eligible voting faculty members, or there are other circumstances where a voter's anonymity will be jeopardized.[282] Absentee ballots shall not be counted unless they are authorized in writing by a school's  Bylaws and have been submitted prior to the balloting. Voting by proxy at the meeting is not permitted[283].

3.   A School or College may, by written bylaw, provide for other means of obtaining assent or advice from the faculty, as required by paragraph 1 of this subsection, provided those means accord an equivalent degree of notice, opportunity for interactive discussion, voting anonymity, and verification of results, which would be obtained if the procedures in paragraph 2 of this section had been followed.  A bylaw provision authorizing these procedures becomes effective upon the approval of the Faculty Senate.

---

[277] Meetings which do not require notice with the formalities of this section as of June 1, 2012 include B4.12; C13.4(b)(iv)-(x); C14 (favorable notice from the Provost); and C15.3.

[278] #2012-26(B)

[279] 2013-46(B)

[280] Section A13.3 requires that the Search Committee consult with the school faculty prior to making its recommendation to the appointing authority, and section 20.8 provides that this consultation shall incorporate the formal voting procedures

[281] Section A14.1 requires that the chair consult with the department or appointed committee to obtain recommendation on appointments, and section C20.8 provides  that this consultation shall incorporate the formal voting procedures

[282] 2014-43(B)

[283] #2011-60(B)

UM/EEOC-D. SCHMICH - 0935

# FACULTY HANDBOOK
## OF
## ADDITIONAL POLICIES, PROCEDURES, ADMINISTRATION, AND GOVERNANCE INFORMATION

**UM/EEOC-D. SCHMICH - 0936**

**ETHICAL MATTERS**

**Statement on Professors and Political Activity**

*The "Statement on Professors and Political Activity" that follows was published in the 1969 Spring issue of the AAUP Bulletin, adopted by the Faculty Senate as Class D advisory action on October 27, 1969, and approved by the President on November 13, 1969.*

(1) College or university faculty members are citizens and, like other citizens, they should be free to engage in political activities so far as they are able to do so consistent with their obligations as teachers and scholars.

(2) Many kinds of political activity (e.g., holding part-time office in a political party, seeking election to any office under circumstances that do not require extensive campaigning, or serving by appointment or election in a part-time political office) are consistent with effective service as a member of a faculty. Other kinds of political activity (e.g., intensive campaigning for elective office, serving in a state legislature, or serving a limited term in a full-time position) may require that the professor seek a leave of absence from a college or university.

(3) In recognition of the legitimacy and social importance of political activity by faculty members, universities and colleges should provide institutional arrangements to permit it, similar to those applicable to other public or private extramural service. Such arrangements may include the reduction of the faculty member's work load or leave of absence for the duration of an election campaign or a term of office, accompanied by equitable adjustment of compensation when necessary.

(4) Faculty members seeking leave should recognize that they have a primary obligation to their institution and to their growth as an educator and scholar; they should be mindful of the problem that a leave of absence can create for the administration, their colleagues, and their students; and they should not abuse the privilege by too frequent or too late application or too extended a leave. If adjustments in their favor are made, such as a reduction of work load, they should expect them to be limited to a reasonable period.

(5) A leave of absence incident to political activity should come under the institution's normal rules and regulations for leaves of absence. Such a leave should not affect unfavorably the tenure status of a faculty member, except that time spent on such leave from academic duties need not count as probationary service. The terms of a leave and its effect on the professor's status should be set forth in writing.

**Consulting and Compensation for Non-University Activities**

*This policy on consulting does not apply to faculty members who are participants in the Miller School of Medicine's professional practice group.*

UM/EEOC-D. SCHMICH - 0937

*Ethical Matters*

Opportunities for outside consulting are normally looked on with favor when they (1) contribute to the professional development of a faculty member, (2) contribute expertise not commonly available for the solution of a problem of society or industry, or (3) provide carry-over into the instructional program of the professor involved. The following general guidelines apply to consulting activities. (See also the Conflict of Interest Policy following this section.)

(1) Time spent on such consulting must be in addition to rather than a part of the normal full-time effort expected of the members of the faculty for University responsibilities. If a faculty member is engaged in any work for which extra compensation is received from the University, the number of hours devoted to outside professional activities shall be correspondingly reduced.

(2) A faculty member shall keep the department chair and the dean of the college or school, through the department chair, informed of the nature and extent of consulting and related activities by annual submission of a report as required by the Executive Vice President and Provost. The Office of the Executive Vice President and Provost provides forms for annual reporting of consulting activities.

## Conflict of Interest Policy

The following four-part policy addresses itself to potential conflict of interest involving the University, its Officers, employees and agents. The four broad areas covered are business matters, academic matters, sponsored research, and consulting. (See also the Patent and Copyright Policy of the University, elsewhere in this Manual.)

I.  Business Matters

A. Purchases

> The University of Miami does not purchase goods or services directly or indirectly* from its employees, other than those that are specified in the conditions of employment. If an unusual situation arises that might warrant consideration of such a transaction, it must be reviewed and approved by the Vice President for Business and Finance or a designee.

B. Sales

> The University of Miami does not sell goods, materials, or services to its employees for their personal use except for items that are normally sold or services provided by the University Bookstore, Food Services, or activities that require an admission fee. The sale of library books is handled by the Director of Libraries, and coordinated by the Vice President for Business and Finance or a designee. Occasional sales of surplus property are advertised through local newspapers and are handled by the Property Control Office. Exceptions to the above must be approved by the Vice President for Business and Finance or a designee.

C. Gifts

UM/EEOC-D. SCHMICH - 0938

*Ethical Matters*

The association between suppliers and employees of the University of Miami should always be on a professional and business-like basis. Gratuities from suppliers are not to be accepted for personal use by employees of the University of Miami.

*"Indirectly" is defined as occurring when an officer or employee who is considered to have a proprietary interest in any supplier of goods or services from which the employee or officer or any member of the immediate family received any kind of compensation or has any financial interest. (Note: an investment in a publicly held company of less than 1% of its outstanding stock will not be regarded as an indirect or significant interest).

II.  Academic Matters

A. Tutoring

No member of the faculty shall accept payment for tutoring any University of Miami student. When it is desirable to recommend that a student seek the help of a tutor, the student may be referred to the chair of the department offering the work in which help is needed. The chair of the department can recommend a qualified tutor who is not a member of the faculty. An exception to this general policy is possible in that a teacher in one school may tutor a student taking a course in another, provided approval of both deans involved is obtained.

B. Teaching

Full-time faculty members are not permitted to teach for additional compensation at other institutions during the academic year, except with the approval of the Executive Vice President and Provost.

C. Faculty Produced Teaching Materials

The University encourages faculty to produce text materials, experimental textbooks, and laboratory manuals designed for the University courses. Whenever it is possible to absorb the production costs of University printed material in the department's budget, the material should be given to the student without charge. When the production costs of University printed material are greater than funds normally provided in a department budget, it is permissible to sell these materials to students through the University Bookstore or Copy Center at a price designed to recover only the cost. The author(s) or department may not receive royalties or other compensation from the sale of these materials to University students.

Another method of production is the assumption of initial full publication costs by the University and sale through the University Bookstore. If this is done, the author shall receive through the University no royalties or other compensation from the sale. The cost of manuscript preparation may be recovered as part of the publication cost.

UM/EEOC-D. SCHMICH - 0939

Private printings are permissible provided these neither obligate the University financially, nor require the University Bookstore to order more than an anticipated one year's supply, nor result in excessive costs to the student. The Bookstore will play no role in arranging for the manufacture of such materials. The Manager of the Bookstore will identify overpriced text material and report these to the Executive Vice President and Provost.

Decisions to use faculty-produced material in University courses shall be made by the usual academic procedures. If it is material for a single section class, the decision shall be made by the instructor or by the department and approved by the department chair; if for a multiple-section class, by the department and approved by the chair. If the chair of a department is the author of the text material, the decision should be approved by the academic dean.

III. Sponsored Research

Faculty members of the University may not participate in sponsored activity arrangements that may lead to any of the following conflict of interest situations:

A. Soliciting and Accepting Sponsored Research

Soliciting or accepting funding for privately-conducted research when the research to be performed could be accomplished through the use of available University resources, or when the research to be performed places the University member in competition with the University, its personnel, or facilities.

B. Favoring of Outside Interests

University faculty members undertaking or engaging in sponsored work, who have a significant financial interest in, or a consulting arrangement with, a private business concern, must avoid conflicts of interest between their sponsored University research obligations and their outside interests and other obligations. Situations of this type, in or from which conflicts of interest may arise, include but are not limited to the following:

(1) Undertaking or orientation of University research to serve the research or other needs of the private firm without disclosure of such undertaking or orientation to the University and to the sponsoring agency;

(2) Purchase of major equipment, instruments, materials, or other items for University research from a private firm in which the faculty member has an interest, without approval. (See Section IA of this Policy);

(3) Transmission to the private firm or other use for personal gain of work products from sponsored programs, as well as results, materials, records, or information that are not made generally available. (This would not preclude appropriate licensing arrangements for inventions or consulting work on the basis of sponsored research results where there

UM/EEOC-D. SCHMICH - 0940

*Ethical Matters*

is significant additional work by the faculty member independent of their sponsored research);

(4) Use for personal gain or other unauthorized use of privileged information acquired in connection with the faculty member's sponsored activities. (The term "privileged information" includes, but is not limited to: medical, personal, or security records of individuals; anticipated material requirements or price actions; possible new sites for a sponsor's operations; knowledge of forthcoming programs or of selection of contractors or subcontractors in advance of official announcements; and academic principles, ideas, or processes discovered or improved upon as a result of sponsored activity);

(5) Negotiation or influence upon the negotiation of contracts relating to the faculty member's sponsored research between the University and private organizations in which there is a consulting or other significant relationship;

(6) Acceptance of gratuities or special favors from private organizations with which the University conducts, or may conduct, business in connection with a sponsored research project, or extension of gratuities or special favors to employees of the sponsoring agency under circumstances that might reasonably be interpreted as an attempt to influence the recipients in the conduct of their duties.

C.  Distribution of Effort

There are competing demands on the energies of a University faculty member (for example, research, teaching, administering, committee work, and outside consulting). The way in which employees divide their effort among these various functions does not raise ethical questions unless the agency supporting research is misled in its understanding of the amount of professional effort actually devoted to the research in question. If the research agreement contemplates that a faculty member will devote a certain fraction of effort to sponsored research or agrees to assume a responsibility in relation to this research, a demonstrable relationship between the indicated effort or responsibility and the actual extent of involvement is to be expected. The University, therefore, through joint consultation of administration and faculty, has developed procedures to assure responsible compliance with the terms of these agreements.

D.  Consulting for Government Agencies or Other Contractors

When University members engaged in Government sponsored-research also serve as consultants to a Federal agency, their conduct is subject to the provisions of the federal Conflict of Interest Statutes and the President's memorandum of May 2, 1963, Preventing Conflicts of Interest on the Part of Special Government Employees. When members consult for one or more Government agencies or other contractors, or prospective contractors, in the same technical field as their research projects, care must be taken to avoid giving advice that may be of questionable objectivity because of its possible bearing on their other interests. In undertaking and performing consulting services, members should make full disclosure of these interests to the University and to the

UM/EEOC-D. SCHMICH - 0941

contractor insofar as they may appear to relate to the work at the University or for the contractor. Conflict of interest problems could arise, for example, in the participation by members of the University in an evaluation for the Government or other agency of its contractor of some technical aspect of the work of another organization with which they have a consulting or employment relationship or a significant financial interest, or in an evaluation of a competitor to that other organization.

E.  Interpretations

Questions concerning the interpretation of Section III of this Policy may be referred to the Research Council. (See "Administration and Procedures," in the Research and Sponsored Programs Section of this Manual.)

IV.  Consulting

A.  Outside Consulting

Faculty may accept opportunities for outside consulting and similar services in their fields of specialization provided this work does not interfere or conflict with their teaching, research, examining, counseling, and other University responsibilities. No faculty member may profit from private services while receiving monies from the University for the performance of these same services. The receipt of honoraria, lecture fees, and monies for expert testimony is permitted provided the services performed for such fees do not interfere or conflict with University responsibilities and the University has not provided or agreed to provide funds to the faculty member for performing those same services. The time involved in consulting activities shall not amount to more than an average of one day a week during the faculty member's period of appointment.

B. Intra-University Consulting

When intra-University consulting is permitted under established University policy, University faculty members may not be paid a retainer fee. Compensation is to be based upon regular daily rates established by University policy. Any variation from these rates requires authorization from the appropriate vice-president. Intra-university consulting requires the prior approval of the immediate supervisor of the faculty member undertaking the consulting.

C.  Private Professional Services

The University assumes no responsibility for private professional services rendered by members of the faculty. When faculty members do work in a private capacity, they must make it clear to those who employ them or may use the results that their work is not performed as agents of the University.

D. Use of University Facilities, Staff or Equipment

UM/EEOC-D. SCHMICH - 0942

*Ethical Matters*

If University facilities, staff, or equipment are used in any activity, the activity must be a University-authorized function and must be conducted either (1) under contract with the University or (2) under an agreement that provides for reimbursement to the University for facilities, staff, or equipment used by the faculty member in the conduct of this activity.

E. Relationships with Private Enterprises

Faculty members should not acquire a relationship with private enterprise that either (1) requires in excess of one day per week of their time during their period of appointment, or (2) presents the possibility of competition between the private enterprise and the University in terms of the services each could provide.

F. Use of the Name of the University of Miami

University faculty members should not use the University of Miami name in any manner when advertising for consulting work.

G. Settlement of Disputes

Any challenge by a faculty member of a ruling by a chair or dean on the substance or extent of the faculty member's consulting should be made through the Faculty Senate Committee on Rank, Salary and Conditions of Employment. This committee should report its findings and recommendations to the President.

H. General Policy Statement

The University subscribes to the Statement on Conflict of Interest issued jointly by the American Council on Education and the American Association of University Professors in December, 1964.

## Personal Relationships[284]

The basic criteria for appointment, tenure, promotion, salary or other conditions of employment of faculty shall be appropriate qualifications and performance. Close personal relationships, whether through family, marriage or other basis, shall constitute neither an advantage nor a deterrent to appointment or advancement at the University, provided the individual meets and fulfills the appropriate University standards. When factors of a personal nature might influence an evaluator in a review of progress or performance, the evaluator shall withdraw from that review.  This policy should be read in conjunction with the Policy Statement on Consensual Amorous, Romantic or Sexual Relationships Policy.

---

[284] #81011(B)

UM/EEOC-D. SCHMICH - 0943

*Ethical Matters*

**UM Policy Statement on Consensual Amorous, Romantic or Sexual Relationships**[285] [286]

**Introduction**

Amorous, romantic or sexual relationships ("amorous relationships") between members of the University community, where one of the parties has academic, administrative or other evaluative authority over the other are highly problematic, even when entirely consensual. Such relationships may create, or be perceived as creating, a conflict of interest that undermines the objectivity of evaluations. Others may perceive that the relationship creates favoritism. There is a risk of exploitation and coercion. Furthermore, the line between consensual and non-consensual relationships may be blurred, particularly in regard to the freedom of an individual to end an amorous relationship without fear of negative repercussions. Power asymmetries make the other party, and the University itself, vulnerable to charges of potentially unlawful conduct. These issues are particularly problematic when one of the parties is an undergraduate student who maybe especially vulnerable or when one party is a graduate student who may be beholden to a particular professor.

There are a variety of contexts in which problematic relationships may arise when one of the parties is a student, including those between counselors and counselees; program directors and those under their supervision; coaches and student athletes; Residence Coordinators or Masters and students under their supervision; and General Faculty as well as research/teaching assistants with students over whom they have evaluative authority. Examples of the latter may occur when:

> (1) a student currently participates in a course, recitation, or lab section overseen or administered by a member of the General Faculty or by a teaching/research assistant;

> (2) a student for whom the General Faculty member and/or teaching/research assistant serves as an advisor on a project such as a thesis or an independent project or internship;

> (3) the General Faculty member evaluates the student outside of a course by, for example, serving on defense committees or grading qualifying examinations;

> (4) a student serves as the General Faculty member's research assistant, teaching assistant, or work study student;

> (5) the member of the General Faculty takes part in decisions directly affecting the student with respect to admissions, financial aid, or access to any institutional resources;

> (6) the General Faculty member and student work collaboratively on a project (internship; club activity; co-authoring papers; etc.); or
> (7) the General Faculty member provides (or will be needed to provide) a recommendation for a job, internship, clerkship, prize, award, or other such honor.

The examples given above are not meant to be comprehensive in illustrating all of the potential relationships that may be problematic due to an imbalance in professional power. Therefore, it is

---

[285] #2002-02(B)
[286] #2015-06(B)

UM/EEOC-D. SCHMICH - 0944

incumbent on every member of the university community to be sensitive to and aware of conduct that violates a culture where the rights and dignity of each person is valued.

## Article 1. Prohibited Relationships with Undergraduate Students

Undergraduate students are particularly vulnerable to potential abuse due to power differentials, whether or not there is a current evaluative role. Therefore, no member of the General Faculty, whether full or part time, shall have an amorous relationship with a University of Miami undergraduate student regardless of whether or not the member of the General Faculty currently exercises or may exercise any pedagogical, evaluative, or administrative authority over that student. If such relationships do occur, the person in the position of greater authority will be held responsible for unprofessional and possibly unlawful conduct. Marriage and pre-existing relationships are obvious exceptions to this policy. Other exceptions can be approved by the Provost.

## Article 2. Prohibited Relationships with Graduate Students

Members of the General Faculty shall not engage in amorous relationships with any graduate student within or outside their respective department, undepartmentalized school, or graduate degree program, where the faculty member has or may have any administrative or evaluative authority over the student. If such relationships do occur, the person in the position of greater authority will be held responsible for unprofessional and possibly unlawful conduct. Marriage and pre-existing relationships are obvious exceptions to this policy. Other exceptions can be approved by the Provost.

For the purposes of this Article, graduate students include students in all professional degree programs beyond the Bachelor's degree. However, the school or college offering the professional program may modify the requirements of this article through a written bylaw adopted by the voting faculty of the school and approved by the Faculty Senate.

## Article 3. Relationships Between Individuals Involving Evaluative Responsibilities or other Power Differences

Even in cases of relationships not precluded by Articles 1 and 2, members of the General Faculty, (including for these purposes research and teaching assistants) regardless of their rank, title or full or partial pay status, shall not enter into or continue amorous relationships with any individuals, over whom they have evaluative authority. When such amorous relationships already exist or develop it is the responsibility of the General Faculty member to immediately recuse themselves from all evaluative responsibilities concerning the other individual, whether student, faculty member, or employee. In the case of a General Faculty member who has an otherwise permissible amorous relationship with a graduate student, the faculty member must cease all academic, professional, and other activities affecting the student. These steps should be taken in a way that does not disadvantage the affected student. Furthermore, the more powerful individual shall promptly report the situation to their Dean or other supervisory authority, who will act to help determine the best means of resolving such actual, apparent, or potential conflicts while maintaining the confidentiality of the information reported.

UM/EEOC-D. SCHMICH - 0945

*Ethical Matters*

**Article 4.  Consequences of Violating this Policy**

A member of the General Faculty who engages in an amorous relationship contrary to Articles 1, 2, or 3, will be subject to disciplinary action. In the case of a member of the University Faculty, the matter shall be referred to the Committee on Professional Conduct pursuant to Section B4.9 of the *Faculty Manual*. Members of the General Faculty who violate these policies and who are not members of the University Faculty are subject to termination. Teaching or research assistants who violate this policy are subject to termination of their position and their case will be referred for possible additional action under the appropriate Honor Code.

Enforcement action under this Article does not preclude action also being taken under the Faculty Policy on Sexual Harassment contained in the Faculty Handbook section of the *Faculty Manual*.

**Nondiscrimination Policy of the University**[287]

Members of the UNIVERSITY FACULTY shall abide by the Non-discrimination Policy of the University. It is the policy of the University of Miami that no person shall be excluded from participation in, denied the benefits of, or subjected to discrimination or harassment (including all forms of sexual harassment and sexual violence) on the basis of race, religion, color, sex, age, disability, sexual orientation, gender identity or expression, veteran status, or national origin, under any program or activity of the University. This applies to an act of any kind, taking place on University property, utilizing University resources, or involving any University activity or program taking place off campus.[288]

**Faculty Policy on Sexual Harassment**[289]

Sexual Harassment by any member of the university community is prohibited.  The University and its faculty are committed to a work environment free of sexual harassment, and violations of the University policies against sexual harassment are regarded as grounds for sanctions as defined in this policy.  Serious cases of sexual harassment by a member of the university community may result in dismissal in accord with the appropriate policy.[290]  The Faculty Policy on Sexual Harassment applies to all cases in which charges of sexual harassment are made by a member of the University community against a member of the UNIVERSITY FACULTY (as defined in the Faculty Manual).  Charges of sexual harassment against members of the University community other than the UNIVERSITY FACULTY are dealt with under other applicable policies.

DEFINITION

Sexual harassment is defined as unwelcome sexual conduct, such as unwelcome advances, requests for sexual favors, or other conduct of a sexual nature when:

---

[287] #94001(B)

[288] #2014-23(B)

[289] #2001-19(B)

[290] This policy is designed to recognize and protect the rights of all parties.  Insofar as applicable state or federal law, now or in the future, may provide greater substantive and procedural rights within the university context to any party, this policy should be read as incorporating any and all such rights, in addition to those specifically set out herein.

UM/EEOC-D. SCHMICH - 0946

1.  Such conduct is engaged in under circumstances implying that one's response might affect academic or personnel decisions that are subject to the influence of the person engaging in that conduct; or

2.  Such conduct is directed at an individual or a group and (a) is either abusive or would be considered severely humiliating by a reasonable person at whom it was directed, or persists despite the objection of the person(s) targeted by the conduct; or (b) is so clearly unprofessional that it creates a hostile environment that may substantially impair the work or academic performance of colleagues, coworkers or students.

The first kind of sexual harassment, often referred to as "quid pro quo" includes implied or overt threats or pressure for sexual favors.  Such sexual harassment is engaged in when (1) sexual advances  are a condition of employment, work status, promotion, grades, or letters of recommendation or (2) unwelcome propositions of a sexual nature are made by a supervisor or individual with authority at the University over the status of the complainant.

Examples of the second kind of sexual harassment, often referred to as "hostile environment," may include:

Verbal conduct, such as unwelcome sexual propositions which are made by a supervisor, coworker, or individual with authority at the University over the status of the complainant, and persist despite the objections of the person to whom they are made.  It also includes sexually explicit statements, innuendoes, comments, questions and jokes, as well as remarks of a sexual nature about a person's clothing or body or remarks about a person's sexual activity or speculations about the previous sexual experience of that person.

Physical contact, such as outright assault, other forms of inappropriate or embarrassing touching, such as brushing up against another's body, unwanted hugging, pinching or patting.

Conduct, other than physical conduct, such as suggestive or insulting sounds, gestures, leers or stares.

In any event, to constitute sexual harassment, the conduct must be severe, or persist despite the fact that the faculty member knew or should have known that the conduct was unwelcome.

This list is intended to be illustrative, not exhaustive; sexual harassment is established by determining whether the particular facts and circumstances of each case meet the definitions of this policy.

Important differences exist between the classroom and the ordinary workplace, and the academic functions of teaching and scholarship must take place in an environment of academic freedom. Nothing in this policy censures the content, method, or language of academic courses that deal with sexual topics in an explicit fashion and examine in detail such issues as gender, sexuality and sexual beliefs, feelings, actions, and practices.  The University protects the academic freedom and First Amendment rights of all members of the University community.  Faculty members are expected not to introduce into their teaching sexual material that has no relation to their subject, to avoid any exploitation, harassment, or discriminatory treatment of students, and to respect students as individuals.  Students are entitled to an atmosphere conducive to learning and to even-handed

UM/EEOC-D. SCHMICH - 0947

*Ethical Matters*

treatment in all aspects of the teacher-student relationship.  Evaluation of students is to be based on academic performance professionally judged and not on matters irrelevant to that performance.

PROCEDURES
I.  General Matters

A.   Responsibility of Deans, Chairs, and Faculty

Each Dean and Chair is responsible for pursuing sexual harassment complaints immediately upon becoming knowledgeable of their existence.  Faculty members should report complaints of sexual harassment to the appropriate office. (see *Informal Procedures* below). A complaint of sexual harassment against a member of the UNIVERSITY FACULTY should be made to the department Chair or Dean who is the faculty member's immediate supervisor.[291]

B.   Confidentiality

To the extent possible, the investigation and proceedings under this policy shall be conducted in a manner to ensure the confidentiality of all parties.

C.   Archive of Records

At the conclusion of informal or formal procedures all records of proceedings and actions of the Faculty Sexual Harassment Officer and the Committee on Professional Conduct shall be placed in an archive maintained by the Provost's Office.  In an informal procedure, the record shall include only a description of the complaint, any response to the complaint by the faculty member, and any action or agreement in response to the complaint.  In a formal procedure, the record shall include only the findings of the Faculty Sexual Harassment Officer and the conclusions of the Committee on Professional Conduct.  Access to the records shall be restricted to the Faculty Sexual Harassment Officer in the context of a subsequent complaint.  Records shall be kept for a maximum of seven years after the conclusion of the investigation and then sealed.  Such records may not be used in any subsequent proceeding except when they are incorporated in an intervening (i.e., less than seven year old) proceeding, or when, after investigation, the Provost determines that the new allegations, if true, are serious enough to warrant initiation of dismissal for cause proceedings.  The Office of General Counsel may keep appropriate records, and these records shall be sealed after seven years under the same terms.  No other record of proceedings or actions may be kept, except that a Chair or Dean may keep a record of any action, agreement, or sanction.  These limitations do not apply, however, when it is necessary to comply with applicable law or, court order, or valid subpoena or request for production.

D.   Right to Resist and Report

No faculty member or University official shall retaliate or take any other adverse action against any person because that person resists sexual harassment, plans to report acts of harassment in

---

[291] In cases where a Dean or Chair is accused of sexual harassment, a person's immediate supervisor is responsible for pursuing the complaint.

UM/EEOC-D. SCHMICH - 0948

accordance with the procedures of this Policy, or reports acts of sexual harassment in accordance with those procedures. However, persons who knowingly make false claims of sexual harassment are subject to disciplinary action.

E.    Time Limits

Complaints of sexual harassment, both formal and informal, should be filed within 30 calendar days from the date the most recent incident occurred. A complaint that is not filed within 30 days but that is filed within four years of the incident may still be subject to University action.

II.  Types of Procedures

Any individual who believes that he or she has been subjected to sexual harassment has available two methods for resolving the matter within the University:

1.    through an informal procedure, or
2.    through a formal procedure. A formal procedure requires the complainant to submit a written statement of the complaint.

The Human Resources Office is available to assist the complainant at any point during these procedures. The complainant may choose another University employee to provide assistance. In all proceedings, formal and informal, every effort shall be made to ensure due process and to protect the rights of both the complainant and the accused.

III.  Informal Procedures

    A.    *Making a Complaint*

Any individual who encounters sexual harassment is encouraged to seek an informal resolution of the problem at the department or school level. Instances of sexual harassment may be reported to the appropriate Chair or Dean or to any of the following individuals or offices:

        1.    Faculty Sexual Harassment Officer (appointed by the Provost)

        2.    Human Resources Office

        3.    University Student Ombudsperson

        4.    Designated School or College counselor (a list of counselors may be obtained through the Provost, Dean of Students, or the Human Resources Office)

        5.    Provost

Complaints received by these individuals or offices shall be reported to the appropriate Chair or Dean.

    B.  *Actions of the Chair or Dean*

updated through 1 June 16                    105

UM/EEOC-D. SCHMICH - 0949

Each Chair or Dean is responsible for resolving sexual harassment complaints promptly upon becoming knowledgeable of their existence[292].

If the Chair or Dean, after consultation with the Faculty Sexual Harassment Officer, determines that the facts described in the complaint would not, in the meaning of the law or policy, constitute sexual harassment, the Officer shall so advise the complainant.

The Chair or Dean shall make every reasonable effort to inquire into the facts regarding the complaint including: speaking with the complainant; speaking with other persons identified by the complainant; speaking with the faculty member; and speaking with other persons identified by the faculty member.  This inquiry should be completed as soon as practicable, usually in ten academic days.  When the inquiry is complete, the accused faculty member shall immediately be provided with a description of the complaint, including the name of the complainant, where appropriate, the time and circumstances of the conduct, and other material facts.

In all cases of sexual harassment, the Chair or Dean is to notify the Faculty Sexual Harassment Officer of the complaint and the action taken to resolve the matter.  This notification normally will be submitted at the end of the inquiry.  The Faculty Sexual Harassment Officer may inform the Provost that a complaint has been made where the circumstances warrant this action to protect the University and its personnel.

C.  *Resolution by Action or Agreement*

At the conclusion of the inquiry, the Chair or Dean, in consultation with the Sexual Harassment Officer, may take appropriate administrative action to resolve the complaint or may attempt to resolve the complaint informally and by voluntary means.  If administrative action is taken or an agreement satisfactory to all persons involved is reached, the terms of the action or agreement shall be summarized by the Chair or Dean and placed in the Archives by the Faculty Sexual Harassment Officer, together with a record of the complaint.  Where no agreement is reached, the complainant may file a formal complaint within 20 academic days of the termination of the informal procedures. In cases where the Chair or Dean in consultation with the Sexual Harassment Officer concludes that the allegations are without foundation, the material placed in the Archives should clearly reflect this judgment.

IV.  Formal Procedures

A.  Making a Complaint

The formal complaint shall be in writing and shall set forth: the facts and circumstances pertaining to the alleged harassment; the name of the complainant and the accused; the date, time and place of the incident(s); the names of other persons with knowledge of the incident(s); and the desired resolution.  The formal complaint shall be filed with the Faculty Sexual Harassment Officer.  If the Faculty Sexual Harassment Officer determines that the facts described in the complaint would not, in the meaning of the law or policy, constitute sexual harassment, the Officer shall so advise the

---

[292] In cases where a Dean or Chair is accused of sexual harassment, a person's immediate supervisor is responsible for pursuing the complaint.

UM/EEOC-D. SCHMICH - 0950

complainant.  If the Officer determines that an investigation is warranted the Officer shall notify the accused faculty member, the appropriate Dean or Chair, and the complainant.

B. Investigation

The Faculty Sexual Harassment Officer shall conduct the investigation, shall make every reasonable effort to interview the complainant, the faculty member, and other persons identified by the complainant or the faculty member as having direct knowledge of the matters, and shall examine appropriate records.

C.  Hearing

Upon completion of the investigation, the Faculty Sexual Harassment Officer shall report the results of the investigation in writing to the Committee on Professional Conduct and recommend whether or not a hearing should be held.  The Committee shall determine whether or not a hearing shall be held and shall conduct any such hearing in accordance with Committee policies and procedures.

The Faculty Sexual Harassment Officer shall inform the complainant, the faculty member, the Provost, the Chair of the Senate, and the appropriate Chair or Dean of the outcome of the hearing of the Committee on Professional Conduct.

V.  Reports

Each year the Faculty Sexual Harassment Officer and the Committee on Professional Conduct shall separately submit written reports on all actions taken or findings made.  These reports shall be made to the Provost and the Chair of the Senate and shall briefly describe the nature of the harassment and the outcomes in each case without identifying individuals.

### [293]Employment of Relatives (Nepotism)

PURPOSE:

To provide guidelines designed to avoid conflict of interest and favoritism toward employees and consultants employed or supervised by a Relative or Domestic Partner in any employment-related activity.

DEFINITIONS:

For purposes of this policy, a "Relative" means spouses, children or stepchildren, parents, step-parents, grandparents, brothers and sisters, half-brothers, half-sisters, step-brothers and step-sisters, grandchildren, uncles**,** aunts, nieces, nephews, first cousins**,** and the following in-laws: mother, father, sister, brother, son and daughter.  Foster children and other family members living in the same household are also included in the definition.

A "Domestic Partner" means (1) an individual who has a signed declaration on file at the University certifying an emotionally committed and affectionate relationship with someone of the same sex or (2) an individual who is cohabiting with another.

---

[293] #2004-02(B)

UM/EEOC-D. SCHMICH - 0951

*Ethical Matters*

A "Consultant" means an individual hired by the University, through established procedures, to give professional advice or service.

A "Unit" means an organized working group of individuals in which the head of the Unit is in a position to influence, directly or indirectly, employment-related decisions affecting a Relative or Domestic Partner.  Examples of Units include a school, college, division, department, center, work group, etc.

A "Supervisor" means an individual who is responsible for directly overseeing another employee's work performance.

POLICY:

    I.      Employment and Consulting Contracts:

An individual cannot be employed as an employee in, or retained as a Consultant by a Unit that is supervised by a Relative or Domestic Partner, nor can he or she be directly supervised by a Relative or Domestic Partner.  Faculty members who are married to or Domestic Partners of another faculty member may be employed or retained as a Consultant in a Unit that is supervised by a Relative or Domestic Partner, but only if approved in writing by the Dean and Provost, who shall give consideration, among other things, as to whether there is another reasonable employment opportunity within the University.

    II.     Disclosure:

       (a)  Seeking Employment

Individuals seeking employment with or retention as a Consultant by the University must disclose in writing the existence of any Relative or Domestic Partner working at the University whether or not the Relative or Domestic Partner is in the same unit in the University in which the individual is seeking employment.

       (b)  Transfer or Employment in a Unit

An individual who is a Supervisor of or head of a Unit in which a Relative or Domestic Partner is seeking to be employed or to transfer must disclose the relationship in writing to his or her supervisor prior to the date of appointment or transfer into the Unit.   An individual who seeks to transfer or be employed as a Supervisor of or head of a Unit in which a Relative or Domestic Partner is employed must disclose the relationship in writing to his or her supervisor prior to the date of appointment or transfer to the Unit. Transfer to or employment in that Unit will not be allowed unless an exception is granted under Section IV.

Faculty who are or will be in a position to vote on or evaluate a Relative or Domestic Partner must disclose that relationship in writing to their Chair or Dean prior to the appointment of their Relative or Domestic Partner to the Unit.  Failure to disclose the relationship may lead to disciplinary action in accordance with the applicable provisions of the Faculty Manual or University personnel policies.

    III.     Change of Circumstance:

UM/EEOC-D. SCHMICH - 0952

In cases where a Supervisor or head of a Unit marries or becomes a Domestic Partner or Relative of another individual in the same Unit, those employees will be given the option of electing who will seek another position within or outside the University. The individual who is the Supervisor or head of the Unit must notify his or her supervisor in writing prior to the change in circumstances if possible and in any event within thirty (30) calendar days after the change in circumstances. If no election is made within thirty (30) calendar days of notification of the change in circumstances, the individual with less seniority within that Unit must find employment in another Unit within the University or must find employment outside of the University. In such cases, a transitional period of up to one year will be granted.

IV.    Exceptions:
The President, Executive Vice President and Provost, Senior Vice President for Business and Finance or the Senior Vice President for Medical Affairs and Dean of the Miller School of Medicine may make an exception to this policy in their respective areas only in unusual cases where the hiring of a Relative or Domestic Partner as an employee or Consultant is considered essential to the function of the Unit. The Vice President for Human Resources will be notified of these exceptions for record-keeping purposes.

V.    Employment related decisions:
In the event (1) an exception is made pursuant to Section IV to allow an employee to be hired in the Unit supervised by a Relative or Domestic Partner, or (2) the Supervisor or head of the Unit and employee who are married or Domestic Partners are both Faculty Members and the arrangement was approved by the Dean and Provost pursuant to Section I, or (3) the individuals are "grandfathered" pursuant to Section VI, the Unit head or Supervisor may not be involved in decisions relating to the employment of the Relative or Domestic Partner.    In the case of Faculty, this includes voting or recommending for appointment, reappointment, promotion, or granting of tenure to a faculty member by another faculty member who is a Relative or Domestic Partner. Appropriate alternative arrangements must be made with the approval of the Vice President for Human Resources (for evaluation of non-faculty employees) or Executive Vice President and Provost of the University (for evaluation of faculty members).

VI.    Effective Date:
This policy is effective December 31, 2004. In Units where a supervisory relationship between Relatives or Domestic Partners existed prior to the effective date of this policy, the individuals will be "grandfathered" but encouraged to sever the supervisory relationship in accordance with this policy. The person who is the supervisor or head of a Unit where a Relative or Domestic Partner is employed must notify his or her supervisor in writing within ninety (90) calendar[294] days of the effective date of this policy. Failure to disclose the relationship may lead to disciplinary action in accordance with the applicable provisions of the Faculty Manual or University personnel policies, as appropriate.

VII.    Responsible Office:

---

[294] #2011-35(B)

UM/EEOC-D. SCHMICH - 0953

*Ethical Matters*

The appropriate Human Resources and Faculty Affairs Offices have the responsibility for implementation of this policy.  Appropriate notifications will be distributed periodically to faculty and staff reminding them of this policy.

VIII.       Disputes:

Any dispute concerning the interpretation, application or enforcement of this policy to non-faculty employees shall be brought to the Executive Vice President and Provost for resolution and that determination shall be deemed final. Any dispute involving faculty shall be governed by the Faculty Manual.

IX.     In the event of a conflict between this policy and the Policy Statement on Consensual Amorous Romantic or Sexual Relationships, this policy shall govern.

UM/EEOC-D. SCHMICH - 0954

*Ethical Matters*

**Communication with Trustees**

*The following resolution respecting procedures to be followed in communication between the Board of Trustees and administrators, faculty members and staff personnel of the University was adopted by the Board May 1, 1962*:

Whereas the Board of Trustees of the University of Miami recognizes the necessity for appropriate communications with the academic, administrative, and service personnel of the University and also recognizes that appropriate channels exist for these communications that promote academic freedom, sound administrative procedures, and mutual confidence of all concerned:

Now, therefore, be it resolved, That this Board invites all members of the staff of the University to communicate with it regarding matters that are properly within its sphere of responsibility through appropriate channels established by the table of organization of the University. In the case of communications transmitted outside these channels, the Board will in all cases refer such communications to the appropriate administrative officials in order to preserve the policy-making function of the Board and the operating responsibilities of the administration.

Be it further resolved, That this Board requests each of its members, individually and jointly, to communicate with employees of the University, on official and unofficial matters relating to the University, through the procedures described above.

The above resolution should be read together with the following discussion of its effect:

At a Faculty Senate meeting on September 27, 2000 questions that have been raised about the Board of Trustees' policy appearing in the Faculty Manual concerning communication between faculty and trustees were aired.

President Foote voiced his opinion that faculty are not restricted by this policy from direct communication with any trustee.  The policy statement is intended only to indicate it is the Board's policy that communications sent directly from faculty to trustees will be forwarded by the trustees to the administration.  Comments from the floor of the Senate and from the President clarified that communication through the Senate and through the administration is normally the most orderly way to do business, but there is no intention to sanction or inhibit a direct approach.

UM/EEOC-D. SCHMICH - 0955

*Academic Matters*

## ACADEMIC MATTERS

### Faculty Produced Teaching Materials

It is the policy of the University to encourage the faculty to produce text materials, experimental textbooks, and laboratory manuals designed for the University's laboratories, etc. Decisions to use faculty-produced material in University courses shall be made by the usual academic procedures. If it is material for a single section class, the decision shall be made by the instructor or by the department and with the concurrence of the department chair; if for a multiple section class, by the department and concurrence of the chair. If the chair of a department is the author of the text material, the decision should be approved by the academic dean. (See also Section IIC of the Conflict of Interest Policy)

### Graduate Study by Faculty Members and Spouses

Ordinarily, faculty members at the rank of assistant professor and above may not apply for study for the doctoral degree at the University of Miami. In rare cases, exceptions to this rule may be granted by the Dean of the Graduate School, but in no case will applicants be allowed to study for a doctoral degree in their own department.

Spouses of faculty members may apply for admission to doctoral programs (on the same basis as other students) provided that admission is not in the department or under the supervision of the faculty member.

### Guest Speakers

Any full-time member of the faculty may invite any person to speak in class on subjects relevant to the course. Any recognized faculty organization may invite any outside person to speak on campus. The primary criterion for the suitability of a speaker should be the belief that the speaker may enhance the intellectual development of the audience. It should be understood that inviting a speaker to the campus is in no way an endorsement of the speaker's views or background.

### Illness or Other Emergency

Any emergency that would prevent a faculty member from meeting a class or other appointment should be reported to dean or department chair immediately so that a substitute can be provided or notice given to the class at the beginning of the period. Whenever possible, the faculty member should arrange for a substitute before reporting to the department chair.

### Leaves of Absence

Leave of absence without salary may be arranged with the faculty member for the purpose of faculty exchange, advanced study, research, public service, and, in some instances, business or industrial employment, without prejudice to future promotions in rank, provided that the period

UM/EEOC-D. SCHMICH - 0956

of absence does not work undue hardship on the University. Normally, permission will not be granted for more than two consecutive semesters of leave. [295]Unless otherwise determined by the voting faculty of the department concerned, after such a leave of absence has exceeded one calendar year[296], the voting rights of faculty members on leave will be suspended and will be reinstated upon their return.  Requests for leave of absence must be made in writing to the appropriate academic dean and referred to the Executive Vice President and Provost.

Faculty members on academic leave, including sabbatical leave, may arrange for continuing coverage under certain benefit programs as provided by University policy during such periods of absence. The period of leave may be counted as credited service under the Employee Retirement Plan as provided by that Plan.

## Libraries

All University libraries are open to all faculty members. Upon showing faculty identification cards, faculty members have stack privileges and may borrow books. The administrative staff and families of faculty members are invited to use library facilities. Loans to them are made under the regulations that apply to students.

## Non-classroom Duties

Certain non-classroom duties are a normal part of the obligation of every member of the faculty. These duties include committee work and advising of students. Faculty are expected to perform these duties and to undertake other necessary assignments between semesters, preceding the fall semester, or following the spring semester as well as at other times within the limits of the contract school year, as assigned by their dean.

## Overload and Special Arrangements

For overloads and special arrangements in Continuing Studies, except as provided below, it is the policy of the University to permit faculty members to receive compensation for services in support of the courses, programs and activities of Continuing Studies, provided such services are voluntary, approved by the department chairs and deans concerned, and considered to be beyond their normal assignments. Similarly, overloads for Continuing Medical Education are permitted within the Miller School of Medicine.  Full-time faculty members may not teach regularly scheduled (14-week) AE-designated non-credit courses unless these courses are taught as part of a normal teaching load with the special permission of the dean of the school and the chair of the department concerned.

(1) CONFERENCES, SEMINARS, INSTITUTES. Faculty members responsible for special short-time (normally not over one week) seminars, conferences, and institutes that cannot be incorporated into the regular teaching load will receive compensation consistent with the amount of work involved and with the income and expenditures of the conference. Should more than one faculty member be involved, these fees will be paid out of the lump sum allotted and based upon the

---

[295] #2004-06(B)

[296] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0957

recommendations of the dean, department chair, or responsible faculty member. All such programs are contracted in writing and signed by the responsible faculty member(s) with the approval of the dean or director concerned.

(2) LECTURES FOR PROFESSIONAL GROUPS AND CLUBS. Faculty members may be paid for single lecture appearances as part of planned courses and workshops (for which registration and/or tuition fees are charged) sponsored by professional groups and clubs and coordinated by the division. These arrangements are to be confirmed by letter from the Vice President of Enrollments to the instructor concerned with a copy to the appropriate department chair and dean.

(3) SPECIAL PROGRAMS. In the case of clinics, programs for industry, and other similar activities, arrangements are negotiated in advance by Continuing Studies and the faculty member(s) concerned and contracted for in writing with the approval of department chairs and deans concerned.

It should be noted that faculty members under government research or performance contracts may not qualify for additional pay without administrative permission and without making appropriate arrangements with the sponsoring agency.

**Personnel Files**

Access to and disclosure of information contained in official faculty personnel files are governed by the policy entitled "Confidentiality of University Personnel Records and Correspondence," available in the Office of the Executive Vice President and Provost. The policy provides faculty members with the right to review and inspect their personnel files in the offices of their chairs, deans, and the Office of the Executive Vice President and Provost. Letters of recommendation solicited or received in confidence, department votes on any personnel action, and attorney-client correspondence must be removed from personnel files prior to access. With limited exceptions, the contents of faculty personnel files may not be disclosed without the faculty member's consent.

**Resignation**

A resignation should be made in writing through the department chair and academic dean. The dean will forward the resignation to the Executive Vice President and Provost. Notice of termination by a faculty member shall be given either six months prior to the termination of the appointment or by the time specified for the return of salary memoranda for the following year.

**Summer Teaching**

Faculty appointments on a nine-month basis imply no commitments concerning summer teaching. The selection of summer courses and the faculty members engaged to teach them originates within the department or school under general policies for the summer sessions.

UM/EEOC-D. SCHMICH - 0958

**Vacation**

Faculty members holding nine-month appointments earn no vacation privileges beyond the usual holidays and vacations of the school year including the free period between semesters. Members of the faculty appointed on a twelve-month full-time basis are entitled to a one-month vacation, including regular student vacation periods if taken as part of this time. (Different arrangements are provided in some of the professional schools.) Individuals on a twelve-month basis appointed late in the academic year are entitled to partial vacations on the plan indicated above, proportionate to the fraction of the year served. Faculty members whose annual contract is issued for a twelve-month period may not accumulate vacation in excess of one month except in unusual cases with the approval of the Executive Vice President and Provost. The normal time for taking vacations must be arranged with and approved by the immediate supervisor before the vacation begins.

UM/EEOC-D. SCHMICH - 0959

**Research and Sponsored Programs**

RESEARCH COORDINATION

The Vice Provost for Research is responsible to the Executive Vice President and Provost for the overall coordination of research and sponsored programs in the academic division. The Vice Provost for Research is the chief administrative officer of the Office for Research and Sponsored Programs and is Chair of the Research Council. This office is a source of information and a resource for program development for individual faculty and subunits within the academic division of the University. Available resources include reference materials on funding sources, agency and university policies and procedures, proposal guidelines and application forms. Assistance with formats and budgets is also available. Coordination of academic research or other sponsored programs is effected through research coordinators appointed by the deans of the various schools or divisions; in the Miller School of Medicine this function is assigned to the Deputy Dean for Research and Graduate Studies.  Visit http://www.miami.edu/index.php/research/  to view other available resources.

Research proposals, training grant proposals, or special proposals for institutes, equipment, etc., if they pertain to academic programs, must be approved by department chairpersons or directors of centers or programs and the appropriate dean or deans and processed through the appropriate academic research office (Office of Research and Sponsored Programs, Coral Gables Campus; Office for Research Administration, Miller School of Medicine; or the Business Office, Rosenstiel School of Marine and Atmospheric Science). This rule applies regardless of the source of funds, private, governmental or commercial. Final approval and signature must be obtained from an authorized official.  For the current business operations related to implementing the policies, follow the links from http://www.miami.edu/controller/policies/text/toc.htm .

The Vice Provost for Research acts as deputy to the Executive Vice President and Provost in establishing liaison between the University and federal granting agencies. Other functions include coordination of research programs where more than one division or discipline is involved, and providing assistance in establishing new research activities. The Research Council has the responsibility for developing University research policy.


RESEARCH COUNCIL

The Research Council was chartered by the administration and faculty government to foster, encourage and promote research by members of the faculty and students. Specific policy recommendations are referred to the Executive Vice President and Provost. The functions of the Council fall within four categories:

(1) RESEARCH POLICY. The Council is responsible for the development and review of the University's policy on sponsored programs which exists to assure the orderly conduct and growth of research and other sponsored activities within the framework of the educational objectives of the University.

UM/EEOC-D. SCHMICH - 0960

(2) RESEARCH PLANNING. It is a function of the Council to guide the development and growth of research activities through its advisory role to the Faculty Senate.

(3) ALLOCATION OF FUNDS. When requested, the Council assists in providing equitable distribution of funds for the support of research when such funds are made available from University resources or, in certain cases, from extramural grants to the institution as a whole.

(4) COMMUNICATION. The Council is responsible for bringing to the attention of the various other functional units of both the faculty and the administration any matters that properly concern the faculty engaged in research activity.

The Research Council consists of members of the graduate faculty, each with a three-year term, selected by the Executive Vice President and Provost from candidates nominated by the school councils. The schools to be represented and the number of representatives from each are designated by the Executive Vice President and Provost in consultation with the Faculty Senate. The Vice Provost for Research is the chair of the Council and an *ex officio* member.  Visit http://www.miami.edu/index.php/research/  to view other available resources.

## ADMINISTRATION AND PROCEDURES

The Research Council's functions include recommending policy for such aspects of sponsored research as the solicitation, acceptance, and administration of projects, and the general supervision over the implementation of such policies.

(1) The Council's administrative responsibilities are carried out through the Vice Provost for Research.

(2) It is the Council's function to determine that sponsored research is conducted according to established policies. This function is accomplished by means of review of proposals, grants, or contracts, where questions of research policy are involved.

(3) The Research Council will receive appeals or recommendations from faculty in matters concerning policy or execution of sponsored research. Matters that the Council considers beyond its scope of decision will be referred to the President or a designee through usual administrative channels.

## STATEMENT OF POLICY ON SPONSORED PROGRAMS

Sponsored programs at the University will be governed by the following specific policy statement and objectives.

## A. OBJECTIVES

UM/EEOC-D. SCHMICH - 0961

*Research and Sponsored Programs*

This statement of policy on sponsored programs is intended to encourage and foster research activities and the development of academic programs at the University and to maintain the highest standards of scholarship and research. No part of the following policy should be implemented in a way that will restrict the conventions of academic freedom. While standards of quality for academic functions cannot be precisely defined, the overall goal of sponsored programs is to better humanity through advancement and dissemination of knowledge. In achieving this goal, these programs must be conducted ethically and for the enrichment of the academic environment.

B. DEFINITIONS

This statement of policy applies to SPONSORED PROGRAMS undertaken within the institutional framework of the University. SPONSORED PROGRAMS shall be understood to mean projects supported by funds obtained from the following categories:

(1) GRANTS, CONTRACTS OR AGREEMENTS extended to an individual and funded internally or externally to carry out a specific project;

(2) INSTITUTIONAL GRANTS (funds obtained from extramural sources but allocated internally);

(3) MULTI-INVESTIGATOR GRANTS OR CONTRACTS administered either by a single academic division or a combination of divisions.

C. RESPONSIBILITY OF THE UNIVERSITY TO THE SPONSORING AGENCY

In accepting a grant or contract for a sponsored program, the University assumes all obligations specified or referred to in the award document. In addition, the University accepts the following general obligations to a sponsoring agency:

(1) A staff will be maintained to provide adequate control over expenditures of grant or contract funds and property; this staff will also prepare and submit the necessary fiscal reports as required by the sponsor;

(2) The University will not discriminate in its policies and administrative controls between its own funds and those obtained from a sponsor. This will include (but is not limited to) maintenance of records and fiscal controls, purchasing procedures, provision of facilities, and property control;

(3) Personnel compensation and employee benefits paid from extramural funds will conform to University rates and standards and to the policies of the granting agency involved;

(4) The University will establish and maintain administrative mechanisms for compliance with specific agency and University requirements such as non-discrimination in employment, the protection of human subjects in research, safety, and animal care;

UM/EEOC-D. SCHMICH - 0962

*Research and Sponsored Programs*

(5) University approval of an application for sponsored program funds constitutes a commitment to provide such items as facilities, space, professional assistance or an appropriate portion of personnel time if these are specified in the proposal or otherwise documented at the time of submittal. The University will not cancel or withdraw any such commitments unless agreed to by the investigator or project director and, where advisable or required, by the sponsoring agency;

(6) Questions or complaints relating to failure of the University to meet its obligations in paragraphs (1) through (5) may be initiated by investigators or project directors through appropriate academic channels and then through the Research Council and its designated channels to the President of the University. If upon written approval of the academic officials whose approval was required for submitting the grant or contract application it is determined that the conditions specified to the funding agency for acceptance of that grant or contract are not being met, the University may re-evaluate its responsibility to continue the project under University sponsorship.

D.   RESPONSIBILITY OF THE UNIVERSITY TO THE INVESTIGATOR OR PROJECT DIRECTOR

When a proposal by a faculty member to undertake a sponsored program has been approved by the department chair and academic dean or director (or their designee) and signed by an officer of the institution, the University is understood to have assumed certain general and specific obligations to the investigator or project director as follows:

(1) When permitted by the circumstances, an appropriate and reasonable adjustment in teaching requirements will be made to permit a faculty member to carry out a program for which sponsorship is being sought;

(2) The University will provide all administrative assistance available to aid faculty in the conduct of approved sponsored projects. This includes, but is not limited to, assistance with proposals, negotiations with agencies, maintenance of adequate fiscal or property records and controls, purchasing services, and submission of administrative reports as required;

(3) Under no circumstances will an individual's rights as a faculty member such as contracted salary, advancement, promotion, and tenure privileges be affected adversely by reason of involvement in approved sponsored programs;

(4) Appeals on questions of failure to meet the obligations specified in paragraphs (1) through (3) above will be first through prescribed academic administrative channels and then through the Research Council and its designated channels to the President of the University;

(5) The University has the right to terminate or refuse to accept or renew a research grant or contract, as outlined in section C.6., above; however, principal investigators on individual research grants or contracts with only one principal investigator shall not be replaced during the term of the grant unless required by the conditions of the grant or contract or if requested by the principal investigator. The investigator or project director who basically serves as an

UM/EEOC-D. SCHMICH - 0963

*Research and Sponsored Programs*

administrator of a grant or contract and is not significantly involved with research ideas or the direct execution of the research may not be changed without first informing the investigator or project director and without the written consent of the academic officials whose approval was required for submitting the grant or contract application. Appeals related to this action will be referred to the Research Council for recommendation to the President of the University.

E.   RESPONSIBILITY OF THE INVESTIGATOR OR PROJECT DIRECTOR TO THE UNIVERSITY AND TO THE SUPPORTING AGENCY

Investigators or project directors of approved sponsored programs will comply with the provisions of this policy and accept specific responsibilities and obligations as follows:

(1) The proposed project will be carried out within the framework of an established department or division of the University, or through the cooperation of several departments or divisions. Student projects will be directed by a member of the teaching or research faculty;

(2) A proposal for sponsored program activity will have the administrative approval of the appropriate department chair (or chairs) indicating that the proposal has been examined and in addition to academic merit, the proposed programs meet the following qualifications:

(a) The program proposed is consistent with the overall academic interests of the department;

(b) Adequate facilities have been approved and will be available for the successful conduct of the proposed project;

(c) There is reasonable assurance that the technical or student assistance specified in the proposal will be available and that time required of the investigator or project director is acceptable;

(3) The project proposal will have the approval of the appropriate dean(s), director(s), or their designee(s);

(4) The budget for the proposed program should be adequate for the work proposed, including allowances for contingencies and salary increases. Any specific University contribution, whether in the form of direct or indirect expenses, will be specifically identified as to source at the time of submitting the proposal and must be approved by appropriate University officials;

(5) The proposed grant or contract will comply fully with University administrative regulations or academic policies, such as those regarding employment and employee relations, safety, safeguards to human subjects in research, fiscal and purchasing procedures, and animal care;

(6) The grant or contract will not interfere with academic freedom and responsibilities or with the normal prerogative to publish the results of properly conducted investigations, subject to

UM/EEOC-D. SCHMICH - 0964

*Research and Sponsored Programs*

the conditions defined in the "Statement on Freedom of Communication in Sponsored Programs at the University of Miami," below, which is a part of this Policy;

(7) The acceptance of funds to support a project will be construed as evidence that the investigator or project director has agreed to comply with all policies or requirements of the supporting agency which are pertinent to the project, including the timely preparation of all necessary reports and publications;

(8) An investigator or project director will not contract for or commit the utilization of University facilities, resources, or personnel unless it is through the prescribed University channels as detailed above;

(9) An investigator who accepts funds from a Federal agency in support of research will comply with the principles set forth in the Conflict of Interest Policy in this Manual and the joint statement issued in December, 1964, by the American Council on Education and the American Association of University Professors, On Preventing Conflicts of Interest in Government-Sponsored Research at Universities (*AAUP Bulletin*, March 1965), adopted by the University as an integral part of its policy on sponsored research.

F.   RESPONSIBILITIES OF PRINCIPAL INVESTIGATOR AND CO-PRINCIPAL INVESTIGATOR

(1) Projects in which there are two or more investigators shall have one individual designated as principal investigator (or director) who will bear primary responsibility for the conduct of the program as detailed in the project proposal.

(2) The designation of a principal and co-principal investigator(s) indicates a shared responsibility for the conduct of the project, and it is presumed that this type of relationship between investigators has more precise requirements for sharing of responsibilities than a lesser cooperative arrangement (e.g., those designated by such terms as "research associate," or "coordinator,").

(3) Investigators other than the principal investigator or director may be designated as co-principal investigator, co-investigator, investigator, associate or assistant director, coordinator or other title appropriate to the agreed-upon function. Unless otherwise arranged, dictated by University policy, or required by the granting agency, investigators other than co-principal investigators serve at the pleasure of the principal investigator and co-principal investigator as appropriate. Other arrangements might be dictated by the terms of a Center grant, program, or project grant for which there is one overall principal investigator but many funded project investigators. The monies under such grants are awarded as a total amount for the center or program but in support of specific research projects. Normally the agency in such cases would not allow the principal investigator to remove funded project directors.

(4) The co-principal investigator shares responsibility for the whole project, rather than being responsible for a specific portion of the project.

UM/EEOC-D. SCHMICH - 0965

(5) In the case of disagreement between the principal investigator and a co-principal investigator that cannot be resolved by them or their respective deans the disagreement shall be referred for resolution to the Research Council.

(6) All elements of this Policy on Sponsored Programs apply equally to both principal and co-principal investigators. Such individuals may, if agreed between them, be co-signatories or alternates for purchases, reports, or other documents, subject to the requirements of the funding agency for assignment of primary responsibility for the performance of the grant or contract. Any modification of the original grant or contract requires approval of the principal investigator, co-principal investigator, and the pertinent University officials as required.

(7) When either the principal or co-principal investigator resigns, replacement approval is required from the remaining partner. Normally, if the principal investigator resigns, the co-principal investigator is appointed as successor if the respective administrative superiors (usually the deans of the schools involved) and the sponsoring agency approve.

UM/EEOC-D. SCHMICH - 0966

*Research and Sponsored Programs*

STATEMENT ON FREEDOM OF COMMUNICATION IN SPONSORED PROGRAMS AT THE UNIVERSITY OF MIAMI

1. The University reserves the right to accept only contracts or grants that permit it to disclose (a) the existence of the grant or contract, (b) the identity of the sponsor (or prime sponsor of a sub-contract), and (c) the objectives or purpose of the proposed project.

2. The University will not enter into any contract or grant that explicitly or implicitly may interfere with the disclosure of independent recommendations or objective conclusions, nor allow any outside pressure to bias valid results.

3. The University will not enter into any contract or grant that specifically prevents the free exchange of ideas, or prohibits the free publication of results, except as detailed in (4) below.

4. It is recognized that contracts or grants may legitimately vest proprietary rights in products or by-products, such as patentable inventions, in the sponsor of the contract or grant, and that the investigator may be required to protect these proprietary rights against disclosure. It is also recognized that contracts or grants may legitimately require preliminary or interim reports which are proprietary communications between the investigator or project director and the sponsor. Moreover, the practice of many funding agencies to require that results and reports be submitted to the sponsor for information and review before publication is viewed as normal and legitimate.

5. The Provisions of paragraphs (1) through (4) may be waived by the President of the University after consultation with the Research Council. The Research Council shall be informed by the President of all waivers of these provisions.

6. In time of national emergency, officially declared by the President or the Congress of the United States, this policy will be rescinded.

UM/EEOC-D. SCHMICH - 0967

**Policies and Procedures of the University of Miami Relating to Allegations of Misconduct in Research [297]**

Research in an institution such as the University of Miami is grounded upon the principles of academic freedom and mutual trust.  The fostering of inquiry and creativity requires an atmosphere in which all are presumed to adhere to high ethical standards in the conduct of research and other academic pursuits. Misconduct in research is a fundamental violation of this trust and represents an assault upon the integrity of the University community.

Acts of misconduct are fortunately rare events, but because of the seriousness of allegations and the special responsibilities of the University in such circumstances, both to individual researchers and to society, it is recognized that explicit procedures must be provided for dealing with instances of alleged misconduct.  It is the purpose of this document to outline the policies and procedures that will be followed in the investigation and reporting of allegations of research misconduct at the University of Miami.

In establishing these procedures, however, it must be emphasized that the best mechanism for dealing with misconduct is to prevent it.  Thus it is imperative that those who participate in research reaffirm their responsibility for the ethical conduct of all research activities with which they are associated. Principal investigators, laboratory supervisors and others who lead research must recognize their ultimate responsibility for the authenticity of research conducted and published in their names and realize that they must provide adequate supervision for their trainees and research teams.  It is also their responsibility to see that all persons who have contributed to the research receive appropriate credit for their work. It is incumbent upon collaborators and other contributors to research to understand that the inclusion of their names as co-authors of publications reflects a genuine contribution to the work, and signifies that they have approved the publication and are prepared to accept responsibility for the work reported.

In order to respond to allegations regarding the integrity of any published report, adequate records of the original protocols and research records, including all raw data, must be preserved for at least seven years (or longer if required by the funding agency), so they can be made available for inspection.

This policy is applicable to research misconduct arising from research conducted at the University, and/or conducted by University faculty and employees, including misconduct involving: (1) Applications or proposals for support for  extramural or intramural research, research training or activities related to that research or research training, such as the operation of tissue and data banks and the dissemination of research information; (2)  Supported extramural or intramural research; (3) Supported extramural or intramural research training programs; (4) Supported extramural or intramural activities that are related to research or research training, such as the operation of tissue and data banks or the dissemination of research information; and (5) Plagiarism of research records produced in the course of supported research, research training or activities related to that research or research training.   This includes any research proposed, performed, reviewed, or reported or any research record generated from that research, regardless of whether an application or proposal for

---

[297] Various areas of this policy updated per legislation #2005-04(B) and #2005-13(B)

UM/EEOC-D. SCHMICH - 0968

funds resulted in a grant, contract, cooperative agreement, or other form of extramural or intramural support.

This policy applies only to research misconduct occurring within six years of the date the University receives an allegation of research misconduct, unless (1) the respondent continues or renews any incident of alleged research misconduct that occurred before the six-year limitation through the citation, republication or other use, for the potential benefit of the respondent, of the research record that is alleged to have been fabricated, falsified, or plagiarized, or (2) the University, following consultation with the Office of Research Integrity (hereinafter "ORI"), determines that the alleged misconduct, if it occurred, would possibly have a substantial adverse effect on the health or safety of the public.  In the event the alleged misconduct occurred outside the time limit described above, the matter should be referred to the Committee on Professional Conduct.

## Definitions

Research means a systematic experiment, study, evaluation, demonstration or survey designed to develop or contribute to general knowledge (basic research) or specific knowledge (applied research).  Research, as used herein, includes all basic and applied research in all disciplines.  This includes, but is not limited to, research in economics, education, the humanities, linguistics, medicine, nursing, psychology, the natural and social sciences, engineering, mathematics and statistics, and includes any research involving human subjects or animals.

Research misconduct means fabrication, falsification, or plagiarism in proposing, performing, or reviewing research, or in reporting research results.  Fabrication is making up data or results and recording or reporting them.  Falsification is manipulating research materials, equipment, or processes, or changing or omitting data or results such that the research is not accurately represented in the research record.  Plagiarism is the appropriation of another person's ideas, processes, results, or words without giving appropriate credit.  Plagiarism may also include self-plagiarism.  Self-plagiarism refers to the author's re-use of their earlier work and passing it off as new or original material.  Research misconduct does not include honest error or honest differences of opinion.

Research record means the record of data or results that embody the facts resulting from scientific inquiry, including but not limited to, research proposals, laboratory records, both physical and electronic, progress reports, abstracts, theses, oral presentations, chapters, books, audio or video tapes, CDs, internal reports, journal articles, and any documents and materials provided to the University or to a University official by a respondent in the course of the research misconduct proceeding.

Research support means funding, or applications or proposals, for research, research training, or activities related to that research or training, that may be provided through:  (1) funding for intramural or extramural research by grants, cooperative agreements, or contracts; or (2) subgrants or subcontracts under those funding instruments; or (3) salary or other payments under those grants, cooperative agreements, or contracts.

UM/EEOC-D. SCHMICH - 0969

## The Committee to Investigate Misconduct in Research

The Committee to Investigate Misconduct in Research (hereinafter referred to as the Committee) is charged with the responsibility of investigating allegations of research misconduct by members of the academic community of the University of Miami.  It is the Committee's responsibility to determine if allegations of research misconduct can be substantiated, to ensure that the relevant authorities are informed of the existence and progress of any formal investigations, to make a final report on the findings of investigations, and to recommend appropriate action to the dean of the School or College and to the Provost.

The Committee shall be drawn from a standing body (the "pool") consisting of thirty-two tenured members of the faculty appointed by the Provost. There shall be at least six [298]members from each of the three major campuses represented in the pool.  Membership terms in the pool are for three years and shall be staggered.  Members whose terms are ending while a specific matter is under consideration shall continue to serve for the duration of that matter.  The Vice Provost for Research shall select six members from that pool to serve as the Committee for each investigation.  Members of a Committee shall continue to serve for the duration of that matter. The Assistant Provost for Research Standards shall be a non-voting ex-officio member of the Committee.  The members of the Committee will elect a chair to conduct the proceedings. Additional ad hoc members of the Committee with special expertise in the area of investigation may be appointed to the Committee from within or outside the full-time faculty of the University at the request of the Committee or by the Vice Provost for Research.  Only those ad hoc members who are full-time University faculty may vote.  In accordance with federal law, reasonable steps shall be taken to ensure an impartial and unbiased investigation to the maximum extent practicable, including participation of persons with appropriate scientific expertise who do not have unresolved personal, professional, or financial conflicts of interest with those involved with the inquiry or investigation.  Members of the Committee whose participation in the investigation of allegations against a specific individual could be construed as inappropriate or who are involved in the research in question will be expected to recuse themselves from such proceedings.  In case of doubt, the Vice Provost for Research, or the Committee by majority vote, may require a member to recuse himself or herself.

In the event the Vice Provost for Research has a conflict of interest related to an allegation, he or she will recuse himself or herself.  The Provost will appoint an appropriate individual to act for the Vice Provost for Research under these circumstances. [299]

## Procedures for the Investigation of Alleged Misconduct

The goal of the procedures is to investigate and resolve allegations of research misconduct in an expeditious, responsible and fair manner.  The responsibility of protecting the rights and reputations of all who are involved in any investigation of research misconduct is recognized as very important.  For this reason, disclosure of the identity of respondents and complainants in research misconduct proceedings shall be limited, to the extent possible, to those who need to know, consistent with a thorough, competent, objective and fair research misconduct proceeding, and as required or allowed by statute or regulation.  The University shall protect, to the extent possible, the privacy of those

---

[298] #2008-07(B)
[299] #2005-13(B)

UM/EEOC-D. SCHMICH - 0970

*Misconduct in Research*

who in good faith report apparent research misconduct and shall undertake all reasonable and practical efforts to protect the positions and reputations of any complainant, witness, or Committee member and to prevent potential or actual retaliation against these complainants, witnesses, and Committee members. Individuals responsible for carrying out any part of the research misconduct proceeding must not have unresolved personal, professional or financial conflicts of interest with the complainant, respondent or witnesses. The University and Committee shall afford the respondents, complainants and research subjects identifiable from research records or evidence confidential treatment to the extent possible. Persons accused of misconduct may consult with legal counsel, but legal counsel for neither the accused nor for the University may participate in any hearing or interview.

Steps in an investigation:

1. **Allegation –** Allegation means a disclosure of possible research misconduct through any means of communication. The disclosure may be by written or oral statement or other communication to an institutional official. Allegations of misconduct should normally be directed to the Vice Provost for Research or designee, who shall determine if an inquiry is warranted. Others who receive an allegation of misconduct should immediately forward it to the Vice Provost for Research.

2. An inquiry is warranted if the Vice Provost for Research determines that the allegation (1) falls within the definition of research misconduct and (2) is sufficiently credible and specific so that potential evidence of possible research misconduct may be identified.

3. **Inquiry -** An inquiry is an information gathering and initial fact finding process to determine if a formal investigation of misconduct should be undertaken. An inquiry will be conducted by an Inquiry Panel, made up of three tenured faculty members chosen by the Vice Provost for Research from the pool. Members who serve on the Inquiry Panel may not serve on the Investigation Committee for the same matter. The Assistant Provost for Research Standards shall be a non-voting ex-officio member of the Inquiry Panel. At the time of or before beginning an inquiry, the Vice Provost for Research must make a good faith effort to notify in writing the presumed respondent. If the Inquiry Panel subsequently identifies additional respondents, the Inquiry Panel will notify the Vice Provost for Research who in turn will notify them in writing.

   To the extent it has not already done so at the allegation stage, the University must, on or before the date on which the respondent is notified or inquiry begins, whichever is earlier, promptly take all reasonable and practical steps to (1) obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding, (2) inventory the records and evidence, and (3) sequester them in a secure manner, except that, where research records or evidence encompass scientific instruments shared by a number of users, custody may be limited to copies of the data or evidence on such instruments, so long as those copies are substantially equivalent in evidentiary value to the original data or evidence on the instruments. The University shall, where appropriate, give the respondent copies of, or reasonable, supervised access to, the research record. The University shall undertake all

UM/EEOC-D. SCHMICH - 0971

reasonable and practical efforts to take custody of additional research records or evidence that is discovered during the course of a research misconduct proceeding.

An inquiry must be completed within 60 calendar days of its initiation unless circumstances clearly warrant a longer period. A draft written report shall be prepared that states what evidence was reviewed, summarizes relevant interviews, and includes the conclusions of the Inquiry Panel as to whether an investigation is warranted. An investigation is warranted if there is (1) a reasonable basis for concluding that the allegation falls within the definition of research misconduct and (2) preliminary information-gathering and preliminary fact-finding from the inquiry indicates that the allegation may have substance.

The individual(s) against whom the allegations were made shall be given a copy of the draft report. If they wish to comment on that report, their comments must be submitted in writing to the Inquiry Panel within 14 calendar days of the date on which the individual(s) received the draft report and will be made part of the record. If the inquiry takes longer than 60 calendar days to complete, the record of the inquiry shall include documentation of the reasons for exceeding the 60-day period.

The final report of the Inquiry Panel, including any comments received from the individual(s) against whom the allegations were made, shall be sent to the Vice Provost for Research. The reasons for the decision whether an investigation is warranted should be documented in that report.

The Vice Provost for Research shall maintain sufficiently detailed documentation of inquiries to permit a later assessment of the reason for that decision. Such records shall be maintained in a secure manner for a period of at least seven years after the termination of the inquiry, and shall, upon request, be provided to authorized federal agency personnel as may be required by law.

Within 30 calendar days of finding that an investigation regarding research involving federal agency support is warranted the University shall provide ORI with the written findings and a copy of the report of the Inquiry Panel which shall include the following information: (1) The name and position of the respondent; (2) A description of the allegations of research misconduct; (3) The federal agency support, including for example, grant numbers, grant applications, contracts, and publications listing federal agency support; (4) The basis for recommending that the alleged actions warrant an investigation; and (5) Any comments on the report by the respondent. The University shall provide the following information to ORI upon request: (1) The institutional policies and procedures under which the inquiry was conducted; (2) The research records and evidence reviewed, transcripts or recordings of any interviews, and copies of all relevant documents; and (3) The charges for the investigation to consider.

4.   **Formal investigation of misconduct -** If findings from the inquiry provide a sufficient basis for conducting an investigation by the Committee, the Vice Provost for Research will initiate an investigation within 30 calendar days following receipt of the Inquiry Panel report. An investigation means the formal development of a factual record and the

**UM/EEOC-D. SCHMICH - 0972**

examination of that record leading to a decision either to make a finding that research misconduct was not shown or to recommend a finding of research misconduct; the latter finding may include a recommendation for appropriate actions, including administrative actions. The Vice Provost for Research will inform the respondent and any collaborators promptly, in writing, of the allegations, of the decision to initiate a formal investigation, and of the procedures that will be followed.  The Committee shall give the respondent and the Vice Provost for Research written notice of any new allegations of research misconduct within a reasonable amount of time after deciding to pursue any such allegations not addressed during the inquiry or included in the initial notice of investigation.

The Committee is empowered to call for and examine all relevant documentation, including, but not limited to, research data and proposals, laboratory notebooks, grant applications, publications, correspondence, memoranda of telephone calls and computer data, files and programs.  These materials may relate to any research with which the accused is involved.  To the extent the University has not already done so at the allegation or inquiry stages, the Committee shall take all reasonable and practical steps to (1) obtain custody of all the research records and evidence needed to conduct the research misconduct proceeding, (2) inventory the records and evidence, and (3) sequester them in a secure manner, except that, where the research records or evidence encompass scientific instruments shared by a number of users, custody may be limited to copies of the data or evidence on such instruments, so long as those copies are substantially equivalent in evidentiary value to the data or evidence on the instruments.  Whenever possible, the University shall take custody of the records (1) before or at the time the Vice Provost for Research notifies the respondent; and (2) promptly thereafter, whenever additional items become known or relevant to the investigation.  The University shall, where appropriate, give the respondent copies of or reasonable, supervised access to, the research record.

A first round of hearings will be conducted in which those who have brought the charges, those alleged to have committed research misconduct, and any others who might have knowledge relevant to the alleged misconduct will be interviewed individually in closed-door sessions. A transcription or recording of these interviews shall be prepared and given to each interviewed party for comment or revision, and included as part of the investigatory file.  Comments by any interviewed party or the accused must be made within 30 calendar days of receipt of the transcription or recording. The Committee shall consider and address any comments of the interviewed parties and the respondent before issuing a final report.  The Committee shall use diligent efforts to ensure that the investigation is thorough and sufficiently documented and includes examination of all research, records and evidence relevant to reaching a decision on the merits of the allegations.  The Committee shall pursue diligently all significant issues and leads discovered that are determined relevant to the investigation, including any evidence of additional instances of possible research misconduct, and continue the investigation to completion

At the conclusion of these hearings, the Committee will review the evidence and apprise all those who may bear some responsibility for the alleged misconduct of the results of

UM/EEOC-D. SCHMICH - 0973

the investigation to that point.  These individuals will then be granted the right of rebuttal and the opportunity to present additional evidence to the Committee. Following this, the Committee may recall earlier witnesses for re-examination, call new witnesses, or close the investigative phase.  In any case, before the Committee moves toward final deliberations, those bearing potential responsibility will always be given an opportunity to review and comment upon any new evidence uncovered subsequent to their last appearance before the Committee

The Committee must complete within 120 calendar days all aspects of investigation, including conducting the investigation, preparing the report of findings, providing the draft report for comment and sending the final report to the appropriate University officials in order that the final report can be submitted to ORI where required. If unable to complete the investigation in 120 calendar days, the Committee must provide the reasons for the delay to the Vice Provost for Research who must ask ORI for an extension in writing, where required.

### Committee Report and Recommendations

The Committee will evaluate all evidence and testimony in order to determine if the allegations of misconduct are substantiated and, if so, who must bear responsibility.  Because of the negative impact of charges of misconduct, whether ultimately substantiated or not, on the research career of an individual, it is important that the Committee's final decision be rendered in clear terms.  The destruction, absence of, or respondent's failure to provide research records adequately documenting the questioned research is evidence of research misconduct where the University establishes by a preponderance of the evidence that the respondent had research records and intentionally, knowingly, or recklessly failed to produce them in a timely manner and that the respondent's conduct constitutes a significant departure from accepted practices of the relevant research community.  In determining whether the University has carried the burden of proof imposed by this part, the Committee shall give due consideration to admissible, credible evidence of honest error or difference of opinion presented by the respondent.  The respondent has the burden of going forward with and proving by a preponderance of the evidence any and all affirmative defenses raised and any mitigating factors that are relevant to a decision to impose administrative actions following a research misconduct proceeding.

A finding of research misconduct requires a determination by the Committee by an eighty percent (80%) majority vote that 1) there was a significant departure from accepted practices of the relevant research community; 2) the misconduct was committed intentionally, knowingly, or recklessly; and 3) the allegation was proven by a preponderance of the evidence. Preponderance of the evidence means proof by information that, compared with that opposing it, leads to the conclusion that the fact at issue is more probably true than not. If the Committee cannot reach this conclusion, then it will report that the individual(s) under investigation have been exonerated.  A minority report by a Committee member may be written which will be included with the final report.  The Committee may make other relevant recommendations for action to be taken by the University, including, but not limited to, referring the matter to the Committee on Professional Conduct.

UM/EEOC-D. SCHMICH - 0974

At the close of its investigation, the Committee will prepare a draft written report, and make that draft report available for comment by the respondent(s). The comments of the respondent(s), if any, must be submitted in writing to the Committee within 30 calendar days of the date on which the respondent(s) received the draft report. If they can be identified, the complainant(s) should be provided with those portions of the report that address their role and opinions in the investigation. The comments of the complainant, if any, must be submitted in writing to the Committee within 30 calendar[300] days of the date on which the complainant received the draft investigation report or relevant portions of it. The Committee will submit the final report including any comments received from the respondent(s) or the complainant to the Provost, Dean of the School or College at which the respondent has an appointment, and the Vice Provost for Research.

The final Committee report must be in writing and must:

1. Describe the nature of the allegations of research misconduct;
2. Describe and document the funding support, if any, including for example, any grant numbers, grant applications, contracts, and publications listing funding agency support;
3. Describe the specific allegations of research misconduct for consideration in the investigation;
4. If not already provided where required to ORI with the inquiry report, include the institutional policies and procedures under which the investigation was conducted;
5. Identify and summarize the research records and evidence reviewed, and identify any evidence taken into custody but not reviewed;
6. For each separate allegation of research misconduct identified during the investigation, provide a finding as to whether research misconduct did or did not occur, and if so,
   a) Identify whether the research misconduct was falsification, fabrication, or plagiarism, and if it was intentional, knowing, or in reckless disregard.
   b) Summarize the facts and the analysis which support the conclusion and consider the merits of any reasonable explanation by the respondent;
   c) Identify the specific funding agency support, if any,
   d) Identify whether any publication needs correction or retraction;
   e) Identify the person(s) responsible for the misconduct; and
   f) For research involving federal agency funding, list any current support or known applications or proposals for support that the respondent has pending with Federal agencies.
7. Include and consider any comments made by the respondent and complainant on the draft investigation report.

For studies involving federal agency funding, the University must maintain and provide to ORI upon request all relevant research records and records of the institution's research misconduct proceeding, including results of all interviews and the transcripts or recordings of such interviews.

All recommendations of the Committee shall be considered as advisory to the dean of the School or College and to the Provost, who shall be responsible for further action consistent with University policy. In principle, anyone found to have committed research misconduct should, in the absence of extenuating circumstances, be recommended for dismissal from the University. In the case of tenured faculty, this is consistent with initiation of termination for cause proceedings as a

---

[300] #2011-35(B)

UM/EEOC-D. SCHMICH - 0975

consequence of dishonesty in research as defined in the <u>Faculty Manual</u>. If it is found that misconduct was committed by a collaborator or other member of a research team, and the supervisor of the research is found to have failed to make reasonable and periodic inquiry as to the authenticity of the data, and if this inquiry would have been likely to prevent or uncover the fraudulent research, the supervisor should be recommended for appropriate sanction. The Provost will determine what sanctions and/or corrective action will be taken in accordance with University policy (including the provisions of the Faculty Manual) and ensure that the report is submitted to any appropriate agencies.

If the Committee determines that the allegations of misconduct were made in bad faith, the Committee may recommend sanctions be imposed against those making bad faith allegations. This recommendation will be forwarded to the appropriate human resource department and to the Provost.

## <u>Notification During Inquiry or Investigation</u>

The relevant governmental agency shall be notified by the Provost or designee when the University determines that an investigation involving federally funded research is warranted. For all research, a determination of the need to inform other interested parties including the dean and the chair will also be made at this time. A determination as to whether other interested parties, such as collaborators, supervisors, and officials of sponsoring or funding agencies or institutions, shall be notified will normally be made only after a formal investigation is initiated.

The Provost or designee is responsible for immediately notifying the ORI if the Provost or designee ascertains at any stage of the inquiry or investigation of research misconduct involving federally sponsored research activities that there is reason to believe that any of the following conditions exist:

1. Health or safety of the public is at risk, including an immediate need to protect human or animal subjects.
2. Department of Health and Human Services (HHS) resources or interest are threatened.
3. Research activities should be suspended.
4. There is reasonable indication of possible violations of civil or criminal law.
5. Federal action is required to protect the interests of those involved in the research misconduct proceeding.
6. The research misconduct proceeding may be made public prematurely and HHS should be enabled to take appropriate steps to safeguard evidence and protect the rights of those involved.
7. The research community or public should be informed.

In such circumstances, consideration may be given to the advisability of notifying a funding agency as well.

For federally funded studies, the Vice Provost for Research will keep ORI apprised of any developments during the course of the investigation which disclose facts that may affect current or potential agency funding for the individual(s) under investigation or that the

UM/EEOC-D. SCHMICH - 0976

agency needs to know to ensure appropriate use of Federal funds and otherwise protect the public interest or as may be required by federal law or regulations.

**Interim Action**

If at any time during the formal investigation, the Committee feels that interim action by the administration is needed in order to safeguard the interests of any of the involved parties or funding agencies or to expedite the investigation, it may recommend appropriate measures to the Vice Provost for Research.  It will be the responsibility of the Vice Provost for Research to consult regularly with the Committee during the investigation and to apprise appropriate agencies of any developments material to their interests, and take appropriate action to protect sponsoring agency funds.

**<u>Notification of Third Parties after Investigation</u>**

The Committee shall identify and advise the Vice Provost for Research of all parties who should be notified of its findings; these may include the Faculty Senate, editors of journals or officers of societies where research papers or abstracts related to the research have appeared or are pending, and the officials of current or past granting agencies involved in funding or otherwise sponsoring any compromised research.  The Vice Provost for Research shall notify the Institutional Review Board or Institutional Animal Care and Use Committee where appropriate.  The Committee may also recommend actions concerning the release of information regarding the incident to the media and corrective actions to prevent further instances of misconduct in light of the experience gained from the investigation.

For research involving Public Health Service (PHS) funding, the Vice Provost for Research shall provide the ORI with a copy of the investigative report, including all attachments; a statement of whether the University found research misconduct and if so, who committed the misconduct; a statement whether the University accepts the Committee's findings; and a description of any pending or completed administrative actions against the respondent.

In the event the research is funded by a federal agency other than PHS agencies with scientific misconduct rules different from those of PHS, the University shall comply with the other funding agency rules and reporting requirements if they differ from this policy.

If the charges of misconduct are not substantiated, those under investigation shall be so notified in writing, and the University shall undertake diligent efforts to ensure that the reputations of those involved are restored as fully as possible.  This may require, with approval of the accused, notification of collaborators, granting agencies, and any others who might have become aware of the investigation.

The University agrees to cooperate fully with ORI during its oversight review or any subsequent administrative hearings or appeals as may be authorized by federal regulations.  This includes providing all research records and evidence under the institution's control, custody, or possession and access to all persons within its authority necessary to develop a complete record of relevant evidence.

UM/EEOC-D. SCHMICH - 0977

*Misconduct in Research*

**Dissemination of This Statement of Policies and Procedures**

This document shall be distributed to each faculty member on initial appointment and the faculty at large shall be notified through posting on the University website and through appropriate University list servers whenever changes are made.

**UM/EEOC-D. SCHMICH - 0978**

**UNIVERSITY OF MIAMI POLICY ON INVENTIONS, INTELLECTUAL PROPERTY AND TECHNOLOGY TRANSFER** [301]

## I.  GENERAL

1.1   Although the University does not undertake research or developmental work principally for the purposes of commercialization, patentable inventions and other works with commercial application may result from activities carried out by Applicable Personnel. The University has an obligation to appropriately develop Innovations to both benefit the public and generate resources that further support the academic mission of the University.  The purpose of this policy is to outline rights and responsibilities regarding inventions, intellectual property and technology transfer and to provide guidelines for the protection, management and commercial application of Innovations.

1.2   The policy is applicable to:

a)   all full- and part-time faculty, staff and employees, students, fellows and non-employees who use University funds, facilities or other resources, or participate in University-administered research, including visiting faculty and industrial personnel, regardless of obligations to other companies or institutions;

b)   Innovations conceived, created, made or disclosed on or after the Effective Date of this policy, and to those prior Innovations disclosed to the Office of Technology Transfer (OTT) as agreed by Applicable Personnel.

1.3   Responsible Official:  The Provost is responsible for administration of this policy.

Policy Review:  The Technology Transfer Policy Committee (TTPC) is responsible for review of proposed changes to the Faculty Manual in relation to this policy.

## II.      DEFINITIONS and ABBREVIATIONS

For the purposes of this policy, the following definitions shall apply.

**Applicable Personnel**:  all full- and part-time faculty, staff and employees, students, fellows and non-employees who use University funds, facilities or other resources, or participate in University-administered research, including visiting faculty and industrial personnel, regardless of obligations to other companies or institutions.

---

[301] #2015-26(B)

UM/EEOC-D. SCHMICH - 0979

**Commercialization Costs:**  costs incurred by the University for evaluating, protecting, defending, enforcing, marketing, negotiating, licensing, assigning, transferring and otherwise commercializing Innovations and/or University owned Intellectual Property.

**Courseware**:  course syllabi, assignments, assessments, and/or other materials that are first created and made available to students as part of the educational curriculum at the University.

**Creations**:  copyrightable works created in the course of Applicable Personnel's scholarly and artistic pursuits, including literary works, textbooks, other scholarly books, journal articles, novels, poems, plays, musical compositions and other artistic works to disseminate for scholarly study or artistic expression; a student work created using student dedicated resources, as part of the educational curriculum at the University, including Capstone projects, papers, dissertations and articles.

**Gross Revenue**: the amount received by the University under a license or assignment of the University's rights in Innovations, including option or license fees, milestone payments, royalties and proceeds from sale of equity.

**Incidental Use**:  use of none of the University's resources other than its library, limited secretarial or administrative resources, the University's computers and/or Applicable Personnel's office space.  Use of University laboratories, clinics and equipment may also be construed as an incidental use in accordance with written policies jointly developed by a school or college and the TTPC.

**Innovations**:  patentable or un-patentable inventions, discoveries, processes, compositions, research tools, data, ideas, databases, know-how, copyrightable works that are not scholarly or artistic Creations and tangible property, including biological organisms, engineering prototypes, drawings, and software created, conceived or made by Applicable Personnel within their normal duties (including clinical duties), course of studies, field of research or scholarly expertise or making more than Incidental Use of University's resources.

**Intellectual Property (IP)**: patent applications and patents, copyright registrations and renewals, trade secrets and trademarks.  IP may be categorized as Creations or Innovations as detailed in Section III.

**Net Revenue**:  Gross Revenue, less all Commercialization Costs and a 15% deduction for administration of OTT.

**CDA**:  Confidential Disclosure Agreement
**IP**:    Intellectual Property
**MTA**: Material Transfer Agreement

UM/EEOC-D. SCHMICH - 0980

*Patent and Copyright Policy*

**OTT**: Office of Technology Transfer
**TTPC**: Technology Transfer Policy Committee

## III.   OWNERSHIP

3.1   Consistent with long-standing academic tradition, Creations are owned by the author(s), unless otherwise agreed in a contract between the University and Applicable Personnel, including:

a) the University has expressly commissioned the Applicable Personnel in writing to produce, or participate in production of, the work with University's funds for a specific University purpose;

b) the University has expressly assigned the Applicable Personnel in writing to produce or participate in the production of the work; or

c) the work is otherwise subject to contractual obligations.

3.2   Creations meeting one of the above criteria (a-c) will be treated as Innovations and shall be owned by the University.

3.3   Innovations are owned by the University; revenues derived from commercialization of Innovations will be shared with the Applicable Personnel as detailed in Section VI.

a)   Applicable Personnel are required to assign and hereby do assign to the University all Innovations.  This assignment includes the right for the University to claim priority and recover for third party infringement or misappropriation.

b)   This assignment and abiding by this policy are conditions of employment and continued employment, access to University's resources and/or receipt of funding by the University.

c)   This policy governs in the event of any inconsistent obligation to which Applicable Personnel may agree, including in any consulting agreement.

3.4   Intellectual property made or developed with not more than Incidental Use of University resources and not within normal duties (including clinical duties), course of studies, field of research and scholarly expertise of Applicable Personnel will belong to the Applicable Personnel.  If Applicable Personnel are uncertain about the disposition of rights, they should make full disclosure of the potential Innovation or Creation to the OTT for determination of rights, as further described in Section 5.2.

UM/EEOC-D. SCHMICH - 0981

*Patent and Copyright Policy*

3.5     Criteria for ownership of Courseware developed by Applicable Personnel follow the guidelines for Creations and Innovations.

## IV.  ADMINISTRATION OF THE POLICY

4.1     The Provost is responsible for oversight and administration of this policy.  The Director of the OTT reports to the Provost or Provost's designee.

4.2     The TTPC is a committee consisting of seven voting faculty members, including the Provost or Provost's designee, the Vice Provost for Research and 5 additional faculty members, chosen by the Provost in consultation with the Faculty Senate chair.  The Director of OTT and a member of the Office of General Counsel will serve as advisors to the TTPC.   The five faculty members will serve two-year terms, which may be renewed.

a) The TTPC is charged with review of proposed changes to the *Faculty Manual* in relation to this policy;

b) TTPC proposed changes must be approved by the Provost and subsequently undergo the standard procedure for changes to the Faculty Manual, with final approval by the President and the Board of Trustees; and

c)  The TTPC will meet at least annually and otherwise as necessary and will be chaired by the Provost or Provost's designee.

4.3     The OTT:

a)  Evaluates Disclosure Forms and determines the commercial potential and the most appropriate mechanism, if any, for protecting each Innovation;

b)  Works with Applicable Personnel to identify and engage potential commercial partners for their Innovations;

c)  Undertakes negotiation and execution of agreements pertaining to Innovations, including licenses, data transfers, assignments, Material Transfer Agreements (MTA) that cover transmission of Innovations (outbound MTA), as well as Confidential Disclosure Agreements (CDA);

d)  Receives Gross Revenue and distributes Net Revenue received from commercialization of Innovations; and

e)  Interacts with University's research, compliance and finance units, including the Office of the Vice Provost for Research, Office of General Counsel, Office of Research Administration, Business Services, University Advancement, University Compliance Services and other units to ensure appropriate conduct

**UM/EEOC-D. SCHMICH - 0982**

of business and protection of the University's interests and recommend contractual language related to all Innovations.

4.4    Appeal Process. Disagreements with decisions made pursuant to this policy should be addressed to the Provost for final resolution.

4.5    Failure by Applicable Personnel to comply with the requirements of this policy may constitute unprofessional conduct and may lead to penalties including:

    a) The individual being deemed ineligible to hold principal investigator status on sponsored projects;

    b) The individual being deemed ineligible to enter into technology transfer agreements; and

    c) In the case of University Faculty, referral to the Senate's Committee on Professional Conduct for such other sanctions as it may recommend to the President and/or the Senate.

## V.    DISCLOSURE, REVIEW AND PROTECTION OF INNOVATIONS

5.1    Disclosure.

    a) Applicable Personnel are required to make timely and complete disclosure of Innovations to the OTT via submission of a Disclosure Form, available on the OTT website; early disclosure facilitates engagement of the OTT and allows for specific discussion and guidance toward determination of commercial potential.

    b) In general, disclosure to the OTT should occur at least 45 days prior to public disclosure of the Innovations, including submitting an abstract, poster, article, grant application or talking about the Innovation outside the University; this allows time for the OTT to evaluate commercial potential and identify mechanisms for protection of the Innovation.

    c) On the Disclosure Form, the Applicable Personnel will report

        1) the percent contribution of each of the Applicable Personnel to the Innovation;

        2) primary department and school for each Applicable Personnel;

        3) any center, institute or other department that supported the work that led to the Innovation;

UM/EEOC-D. SCHMICH - 0983

*Patent and Copyright Policy*

4) any Intellectual Property or tangible materials of a third party, including those that were generated at a previous institution or place of employment that has relevance to the disclosure;

5) any non-University inventors (i.e., inventors who are not Applicable Personnel as defined in this policy), including, individuals acting as independent contractors, or individuals at other universities, institutions, companies, foundations or other entities; and

6) the source of funding for the work that led to the Innovation and details regarding specific technology transfer language (for example, ownership of allocations, sharing of revenue or licensing of Intellectual Property) in the funding agreements.

5.2     Review and Protection of Innovations

a)          The OTT will evaluate each Innovation Disclosure Form to determine

1)          commercial potential;

2)          what Intellectual Property protection, if any, would be appropriate to facilitate the University's ability to incentivize investment in the commercial development of the Innovation; and

3)          whether or not the Disclosure Form is premature or incomplete, in which case, the Applicable Personnel may be asked to resubmit the Disclosure Form when additional information is obtained.

b)  Evaluation for such Innovation as described in Section 5.2(a) will be made to Applicable Personnel within 90 days of receipt of a complete Disclosure Form.

c)  Applicable Personnel will cooperate with the OTT in its efforts to evaluate, protect and transfer Innovations, including executing documents and taking other actions as reasonably requested by OTT.  The University encourages Applicable Personnel to participate through the OTT in the process of commercialization.

d)  Applicable Personnel are required to consult with the OTT to ensure that appropriate agreements are in place prior to disclosing the University's Innovations or sending materials embodying Innovations outside the University (for example, to another university, institution, company, foundation or other entity).

e)  Lack of patentability need not eliminate commercial potential for an Innovation and will not alter the University's ownership of the Innovation.

UM/EEOC-D. SCHMICH - 0984

f) The OTT is responsible for directing the filing of University-owned Intellectual Property.  The OTT may delegate this authority including by written agreement in connection with commercializing an Innovation.  As an example, the University retains qualified law firms to draft, submit and prosecute patents.

g)     The OTT decides when and whether to enter into agreements conveying Innovations and the terms and conditions in such agreements.

h) Applicable Personnel are required to record all research data and information accurately and clearly and to keep all such data in a permanent and retrievable form.  In addition, with regard to a patentable Innovation, original laboratory data must be kept for the life of the patent.  Tangible property, including biological materials, chemical compounds, etc., must be securely stored.  All of the foregoing are the University's property.  Exceptions to these requirements may be adopted in writing by the TTPC.

i)     It is the University's policy to publish research results as soon as possible; however, if publication may reveal an Innovation, Applicable Personnel should seek advice from OTT as to how and when to publish the results in order that patent or other protection is not compromised.

j)     Applicable Personnel are obligated to refrain from any act that would impair the University's rights in any Innovations and must maintain the confidentiality of Innovations, along with custody of applicable data and tangible property, consistent with the University's decisions regarding protection and commercialization.  This is especially important when the Innovations have been supported by outside entities through a grant or contract.

k) If Applicable Personnel leaves the University, all the Innovations arising prior to their departure remain the property of the University, and cannot be practiced, including being commercialized, without the University's written agreement;

5.3   Release of Technology.

a) In rare cases, the OTT may recommend that the University return the rights to an Innovation to the Applicable Personnel. When this situation occurs, the University will generally transfer its rights, and if so by in a written agreement that will allow the University to practice and have practiced the Innovation for research, education and/or patient care, at no cost, and may include other provisions to protect the University's interests;

UM/EEOC-D. SCHMICH - 0985

b) Such a release will not be given until all pre-existing commitments to third parties, including sponsoring agencies, with regard to Innovations have been cleared;

c) Prior to conducting activities, including research and clinical trials, that could reasonably appear to influence the financial value of the released Innovation, the Applicable Personnel must disclose the potential conflict of interest.

d) Improvements, new developments and modifications to these returned rights, otherwise satisfying the definition of Innovations, remain subject to this policy;

e) Release may be conditioned upon reimbursement to the University for all Commercialization Costs and 10% of the Applicable Personnel's net income from the released Innovation.

## VI.   DISTRIBUTION OF REVENUE DERIVED FROM COMMERCIALIZATION OF INNOVATIONS

6.1   Sharing of Revenue - Guidelines

a) Multiple units may contribute to the support of work that leads to an Innovation, including the departments and schools/colleges of Applicable Personnel, as well as centers or institutes of which the Applicable Personnel are members.

b) Distribution of Net Revenue will follow the percent allocation for Applicable Personnel as agreed upon on the Disclosure Form.  Absent agreement on the percent allocation among Applicable Personnel, and subject to notice of a dispute being resolved pursuant to Section 6.1(i), the Applicable Personnel will share equally.

c) Distribution to departments will follow the percent allocation for Applicable Personnel.  For those schools/colleges without departments, the department share will be distributed to the school/college.

d) The Applicable Personnel are responsible for disclosing whether a center or institute has provided financial or other support for the work that led to the Innovation, including laboratory space, supplies or significant administrative support. In such cases, upon disclosure of the Innovation, the involved department (or school/college in the absence of departments) will work with the center or institute to agree upon sharing of the department Net Revenue with the center or institute.  As centers and institutes often include faculty from more than one school or college, the Provost or Provost's designee will mediate disputes related to the department's share.

UM/EEOC-D. SCHMICH - 0986

e) In the event that departments, centers or institutes from different schools/colleges contribute to an Innovation, sharing of Net Revenue will follow the allocation as determined in 6.1(c) and (d).

f) University may make alternative arrangements for distribution of Gross Revenue or Net Revenue, whether due to co-ownership, grant, funding contract, gift or other agreement, only after review and approval of the Provost or Provost's designee.

g) The OTT is authorized to delay distribution where additional expenses are anticipated, including those associated with filing for patent protection in foreign countries.

h) The University has no fiduciary or other duty regarding whether or when to liquidate equity.  Unless equity is liquidated, there is no Net Revenue to distribute.

i) Any dispute regarding the distribution of Net Revenue may be addressed as set forth in Section 4.4 of this policy.

6.2   Formula for Sharing of Revenue

a) Accrued as a result of Innovations licensed or assigned **prior to** the effective date of this policy, and in the absence of special funding/gift agreements:

1) Commercialization Costs will be deducted from Gross Revenue; this does not include 15% for administration of OTT; and

2) The first $1,000 of cumulative Net Revenue shall be paid to the Applicable Personnel

3) Cumulative Net Revenue will then be distributed 1/3 to the Applicable Personnel; 1/3 to the departments of the Applicable Personnel and 1/3 to the University.

b) Accrued as a result of Innovations licensed or assigned **on or after** the effective date of this policy, and in the absence of special funding/gift agreements:

1) Commercialization Costs will be deducted from Gross Revenue; however, the 15% for administration of OTT will not be deducted from Gross Revenue until initial cumulative Net Revenue equal to $25,000 has been distributed to the Applicable Personnel; after which

2) Ongoing Commercialization Costs will be deducted from cumulative Gross Revenue, followed by deduction of 15% for administration of OTT;

UM/EEOC-D. SCHMICH - 0987

*Patent and Copyright Policy*

   3)  Cumulative Net Revenue greater than $25,000 and up to $2 million will be distributed 1/3 to the Applicable Personnel, 1/3 to the department(s), as well as institutes and centers, as described in Sections 6.1c - 6.1e and 1/3 to the University.

   4)  Cumulative Net Revenue greater than $2 million will be distributed 1/3 to Applicable Personnel; 1/3 to the school/college, with the Dean of the Applicable Personnel school/college having the authority to determine sharing of Net Revenue between department(s)/center(s)/institute(s) within the school/college; 1/3 to the University.

6.3    Additional Information

a) In the absence of extenuating circumstances, distributions of Net Revenue will generally be made within three months of receipt but no less than semi-annually.

b) If Applicable Personnel should change departments within the University, the department share of revenue will generally not follow the Applicable Personnel, except under special circumstances and only as agreed upon by the Dean of the school/college in which the original department resides.

c) If an Applicable Personnel should leave the University, the portion allocated to the Applicable Personnel's department will remain with the department.

d) Payments made to Applicable Personnel must be made to the Applicable Personnel and cannot be assigned by the Applicable Personnel to other parties or entities, except upon the Applicable Personnel's death, in which case the personal representative of the Applicable Personnel's estate will notify the University Controller's Office, in order to ensure that the appropriate paperwork and permissions are received for distribution of the revenue to the Applicable Personnel's estate/heirs.

UM/EEOC-D. SCHMICH - 0988

*University Administrative Structure*

## UNIVERSITY ADMINISTRATIVE STRUCTURE

### Board of Trustees

The government of the affairs of the University is vested in a Board of Trustees consisting of any number of members, as determined by the Board from time to time, except that the number can never be less than twenty. In addition, the Board may elect a maximum of six alumni to serve; these alumni have the same powers, rights, privileges as the other members of the Board. The President of the University is an *ex officio* member of the Board. No faculty member of the University may be a trustee unless the Board so authorizes at a meeting regularly called and held. The Board of Trustees has the power to delegate authority. In large measure this delegation is to the President of the University, who, in turn, delegates authority to the officers in charge of various units.

### Office of the President

As chief executive and administrative officer of the University, the President is responsible to the Board of Trustees for the supervision, management, and governance of the University and for interpreting and carrying out the policies of the Board. The President is assisted by the other officers of the Corporation; the Executive Vice President and Provost; the Vice Presidents, the General Counsel and Secretary of the University, and other business and academic officers.

### Division of Academic Affairs

The Executive Vice President and Provost is the chief academic and budget officer of the University and chief administrative officer of the Division of Academic Affairs. The Provost is assisted by the Vice Provost for Faculty Affairs and University Administration, the Vice-Provost for Undergraduate Affairs, the Vice Provost for Research, and the Vice Provost for Enrollments. The Provost is responsible for preserving the primacy of the academic function in the total University enterprise and serves as President in the President's absence.

### Academic Deans' Policy Council

The Academic Deans' Policy Council is chaired by the Executive Vice President and Provost. The members of the Council are the Deans of the Schools and Colleges and the University Librarian. The President, the Vice Provosts, and the Chair of the Faculty Senate are *ex officio* members of the Council. The Council considers policy matters relating to the academic or administrative operation of the University and makes appropriate recommendations to the Executive Vice President and Provost and to the President of the University. It also reviews the academic and administrative activities of the University that directly affect the academic activities of the University, including those directly under the control of the Council members.

UM/EEOC-D. SCHMICH - 0989

*University Administrative Structure*

**Academic Deans' Administrative Council**

The Academic Deans' Administrative Council is chaired by the Senior Vice Provost and Dean of Undergraduate Education[302]. The members of the Council are the Associate Deans or Deans and the Vice Provost for Enrollment. It assists the administration in all facets of undergraduate student life. The Chair of the Faculty Senate Academic Standards Committee is an *ex officio* member of the Council.

**Chairs of Academic Departments**

Each academic department of the University has a chair as its immediate supervisory officer. The chairs in a departmentalized school are appointed by the dean of the school in consultation with the department faculty. The department chair has responsibility under the general direction of a dean for: (1) organization and supervision of the courses and instruction offered by the department, for assignment of courses, for efficiency of the department's work, and for the care of equipment assigned to or in the custody of the department; (2) transaction of official department business with faculty and students; and (3) recommendations to the dean for appointments and promotions of the members of the department after consultation with department faculty. The department chair is expected to hold frequent department meetings on such matters as curriculum, instruction, and policy. Appointments or reappointments of department chairs are made annually; however, changes may be made as circumstances require.

Any administrative salary supplement for chair duties is normally identified separately on annual faculty appointment papers. Any reduction in teaching load for the chair is specified in a memorandum between the chair and the dean. When a department chair returns to their regular faculty duties, any administrative salary supplement or reduction in teaching load ceases.

In the case of a department whose function is both research and teaching, and as warranted by the size of the department, a second member of the department, selected jointly by the chair and the voting members of the department, may have primary responsibility for the undergraduate curriculum, advisement of undergraduate students, and preparation of schedules and teaching assignments. In the case of a department with clinical, research, and teaching functions (as in the Miller School of Medicine), a second member of the department, selected jointly by the chair and the voting members, may share responsibility for research or clinical functions, and a third member, similarly chosen, may share responsibility for teaching functions. In all the foregoing cases, the approval of the academic dean is required.

In exceptional cases a department may be authorized, with joint approval of the President and the Faculty Senate, to elect its chair and determine its own organization.

---

[302] #2007-16(B)

UM/EEOC-D. SCHMICH - 0990

## ACADEMIC REGULATIONS

The following provisions shall apply to all members of the general faculty and to all teaching assistants who serve as the primary instructors of a class. [303]

### Academic Bulletins

The academic bulletins of the University contain general academic regulations and the specific regulations for each school or college in the University. Faculty members should be familiar with both the University-wide academic rules and regulations and those that apply within their own academic area.

### Attendance Policy[304]

Except as specifically provided to the contrary, this policy is binding on students and faculty members in undergraduate programs. Schools offering graduate or professional programs, including undergraduate professional programs, are strongly encouraged to adhere to these policies to the maximum extent practicable.

Regular and punctual class attendance is vital for all students. Each faculty member shall announce during the first meeting of a class, or include in the syllabus or course requirements document for that course, the penalties for non-attendance and for missed assignments and examinations, since these vary. Any student may be dropped from a course or receive a lowered grade for unauthorized absences that are in excess of those permitted without penalty by the faculty member. Unless a student is absent for a University-approved reason, the faculty member determines whether or not an absence is for an acceptable reason. Within one calendar[305] week of return to school, the student should contact the faculty member about making up missed work. Failure to do so may result in the inability of the student to make up the work missed during the term of absence. It is the student's responsibility to know the faculty member's policies regarding examinations, penalties for absences, and late or missed work. Nothing in this policy shall preclude faculty members from limiting the total number of student absences for any reason to a reasonable number of absences.

Verification that an absence was approved by the University shall be issued by the appropriate University official, as indicated below. Faculty members in undergraduate programs must allow students absent for University-approved reasons the opportunity either to make up or be excused from the work missed, without penalty. Approved absences and the means of verification are:

(1) A student has participated in an activity approved by the Academic Deans' Policy Council, such as music and debate activity, R.O.T.C. function, or varsity athletic trip. (Issued by the sponsor when authorized by the Executive Vice President and Provost.)

(2) A student has participated in a special academic activity, such as a field trip or other special event connected with course-work. (Issued by the sponsor when authorized by the Executive Vice President and Provost.)

---

[303] #2011-44(B)
[304] #2011-45(B)
[305] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0991

(3) A student has been a patient of the Health Center, as certified by the Student Health Service, or has suffered a serious illness or hospitalization, as documented by a note from a physician verifying the illness or hospitalization.

All other reasons for absence from required sessions, including those in accordance with the University's Religious Holy Day policy[306], are primarily the concern of the student and the faculty member. If the faculty member does not accept the reason for absence, the student may initiate an appeal through the chair of the department or director of the program in which the course is offered.

No department or official of the University may schedule for any student or group of students in the name of the University any activity that will entail continuous absence from classes for more than one calendar[307] week during a regular semester. Exceptions to this rule require the prior approval of the Academic Deans' Administrative Council; it is the responsibility of officials desiring such exceptions to make prior arrangements with the Council. If permission is granted, it becomes the responsibility of the official to make sure there is no undue interference with the student's academic work.

A faculty member who fails to abide by this policy or penalizes a student contrary to its provisions may have committed unprofessional conduct, and thus may be subject to a complaint to the COMMITTEE ON PROFESSIONAL CONDUCT under the provisions of Section B4.9 of the *Faculty Manual*.

### Changes of Courses or Withdrawals

Provisions are made for graduate or undergraduate[308] students to change courses or to withdraw within a specified number of days after registration. These regulations are set forth in the academic bulletins.

### Class Periods

The standard length of an undergraduate[309] class period during the regular semester is fifty minutes for Monday- Wednesday-Friday classes, and one hour and fifteen minutes for Tuesday-Thursday classes. Laboratory, performance and clinical practice periods may be two to four times as long as regular class period.[310]

### Class Rolls

Class rolls are issued to faculty members by the Registrar as soon as possible after registration. Undergraduate[311] students should not be permitted to remain in class if the student's name is not

---

[306] #2011-36(B)
[307] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12
[308] #2011-44(B)
[309] #2011-44(B)
[310] #2005-19(B)
[311] #2011-44(B)

UM/EEOC-D. SCHMICH - 0992

on the official roll. Undergraduate students appearing without authorization should be sent immediately to the Registrar. They may be readmitted upon written authorization by the Registrar, indicating that their name has been added officially to the class roll. Roll and grade records should be retained and filed in the department office for at least three years after the close of each term.

## Grade Reports

Midterm Academic Deficiency Reports for undergraduate students [312] are due on the 30th class day of the semester [313]. The faculty member reports only D and F grades at that time. Undergraduate students doing below average work are notified that their work is unsatisfactory. Final grades for undergraduate students are recorded on-line or on official grade report forms provided by the Registrar several days before the final examination period. These on-line or posted forms must be completed or returned by the date and time specified.

## Grading System

The grading system is described in academic bulletins. Should questions of interpretation arise, the faculty member should consult the department chair or the dean of the school.

## Religious Holy Day Policy [314]

The University of Miami, although a secular institution,  is determined to accommodate those students who wish to observe religious holy days. It seeks to reflect its awareness of and sensitivity to religious holy days whenever possible when scheduling University activities. The following provisions are meant to apply equitably to all religious groups and to provide opportunities to all to meet their religious obligations.

1.  Except as specifically provided to the contrary, this policy is binding on all students and faculty members in undergraduate programs. Schools offering graduate or professional programs, including undergraduate professional programs, are strongly encouraged to adhere to these policies to the maximum extent practicable.

2.  Any student absent from class in observance of a religious holy day shall not be penalized in any way for an examination or assignment missed during the period of absence. Absence in observance of a religious holy day does not relieve students from responsibility for any part of the course work required during the period of absence. Students who are absent on days of examinations or class assignments shall be offered a reasonable opportunity to make up the work without penalty, if the student previously arranged to be absent. Nothing in this policy shall preclude faculty members from limiting the number of student absences to a reasonable number of absences for any reason. The faculty member has discretion to determine how the make-up obligation will be fulfilled. A faculty member who penalizes a student contrary to these provisions may have committed unprofessional conduct, and thus may be subject to a

---

[312] #2011-44(B)
[313] #98009(B)
[314] #2011-36(B)

UM/EEOC-D. SCHMICH - 0993

complaint to the COMMITTEE ON PROFESSIONAL CONDUCT under the provisions of Section B4.9 of the *Faculty Manual*.

3.  It is the student's obligation to provide faculty members with notice of the dates they will be absent due to observance of religious holy days, preferably before the beginning of classes but no later than the end of the first three class days. For religious holy days that fall within the first three class days, students must provide faculty members with notice no later than two class days before the absence. Missing a class due to travel plans associated with a particular religious holy day does not constitute an excused absence. Absences due to observance of religious holy days that are not pre-arranged with the relevant faculty member within the first three class days may be considered unexcused, and the faculty member may therefore prevent the student from making up examinations or assignments missed during the period of absence.

4.  Faculty members are encouraged to anticipate days when a substantial number of students will be absent for observance of religious holy days and should avoid scheduling examinations and assignment deadlines on those days. Faculty members are expected to reasonably assist students in obtaining class information the student missed during the period of absence in observance of a religious holy day.  In that regard, faculty members are urged to allow taping or recording of the class session, with the reproduction limited to the student's personal use, when a student misses a class due to observance of a religious holy day. To assist in identifying religious observance days, faculty members are encouraged to consult the illustrative list provided in the Interfaith Calendar (http://projectinterfaith.org/page/interfaith-calendars ).  Faculty members are urged to remind students of their obligation to inform faculty members within the first three class days of any anticipated absences due to observance of religious holy days and should include that information in the syllabus or course requirements document for that course.

## Undergraduate[315] Final Examination Policy

Final Examinations may not be given during a regularly-scheduled class period.

No examination shall be permitted during the reading period.

Final Examinations may be rescheduled only with the permission of the dean.

No student shall be required to take more than two final examinations in a twenty-four hour period. A student having three or more final examinations scheduled during a twenty-four hour period may request the instructor of the course most easily rescheduled (normally the course with the smallest enrollment) to reschedule the examination for that individual. The request shall be made no later than two calendar[316] weeks before the last class day.

A student who has a conflict between a final examination and a religious observation may request that the instructor reschedule that student's examination. The request shall be made no later than two calendar weeks before the last class day.

---

[315] #2010-18(B)
[316] #2011-42(A) – approved by the faculty and the Board of Trustees, effective as of 11/27/12

UM/EEOC-D. SCHMICH - 0994

For the resolution of any problem pertaining to the scheduling of final examinations, a student should consult with the following entities or persons in this order: the relevant instructor, the department chair, the Dean or designee. If the matter cannot be resolved at the school or college, the student should contact the Office of the Provost.

**Classroom Assignment**

The general purpose classrooms on the Coral Gables campus are assigned by the Registrar. Special-purpose classrooms (e.g., laboratories, studios) on the Coral Gables campus are assigned by individual schools or departments. Requests for rooms by faculty members for make-up classes or other purposes should be made to the Registrar. [317]

Classrooms on the campuses of the Rosenstiel School of Marine and Atmospheric Science, the Miller School of Medicine and the School of Law are assigned by personnel of those schools.

**Class Schedules**

The schedule of classes is published prior to the beginning of each fall and spring semester. Chairs of departments prepare individual department schedules for their academic deans who coordinate the various department schedules for their schools and transmit them to the Registrar. [318]

---

[317] 2011-18(B)
[318] 2011-18(B)

UM/EEOC-D. SCHMICH - 0995

**FACULTY-ADMINISTRATIVE COMMITTEES**

The administration appoints committees upon which faculty members may be asked to serve. The administration will advise the Faculty Senate of all such appointments. The following is a list of these committees showing the office to which each reports, and statements of the function and composition of each. Committees are expected to keep minutes of their meetings and to file copies of these in the appropriate offices.

| COMMITTEE: | REPORTS TO: |
|---|---|
| Academic Computing Advisory | See committee charge (below) |
| Animal Care | Vice Provost for Research |
| Budget Advisory | Provost |
| Campus Sports and Recreation Advisory | Student Affairs |
| Building and Grounds | President |
| Employee Benefits Advisory Council[319] | Sr. V. P. for Business and Finance |
| Parking Appeals Committee | Parking and Transportation Department[320] |
| Patents and Copyright | Vice Provost for Research |
| Strategic Planning | President |
| Student Organizations | Student Affairs |
| Student Publications Board | Student Affairs |
| Union Board of Governors | Student Affairs |
| Use of Human Subjects | Vice Provost for Human Subject Research |
| UM Retirement Plans Review Committee | Sr. VP for Business and Finance & |
| CFO[321] | |
| WVUM Advisory Board | Student Affairs |

The ACADEMIC COMPUTING ADVISORY COMMITTEE (ACAC)[322] approves policies concerning academic computing, and engages in strategic planning, systems evaluation, and needs identification for academic computing, including the hardware, software, services, central and school-level IT infrastructure and networks that support the academic units of the University. The ACAC has responsibility for keeping the faculty and university administration informed about IT activities, opportunities, challenges and problems.  The ACAC provides formal and informal reports as appropriate to the Provost, the Senior Vice President for Business and Finance, the Chief Information Officer, the Vice Provost for Research, the Academic Deans Policy Council, and/or the Faculty Senate, as appropriate.

The ACAC conducts its work in close consultation with and reviews the work of IT committees and task forces, and ACAC sub-committees. In the event of a disagreement between the ACAC and the Chief Information Officer on a matter of academic computing policy, the matter shall be referred to the Provost and the Chair of the Faculty Senate for resolution.  The ACAC provides

---

[319] #2007-30(B)
[320] #2012-06(C)
[321] #2012-18(B) – Effective 12/20/2012
[322] #2011-16(B)

UM/EEOC-D. SCHMICH - 0996

advice on the charges and scope-of-work of these bodies.  It may recommend or establish objectives for these groups, and shall monitor the results.

The ACAC specifically:

a.  Reviews IT's strategic plan and ensures that it supports the University's academic objectives;
b.  Engages in strategic planning that reflects the technology needs of the academic enterprises of the University;
c.  Makes recommendations on technology policy development and implementation;
d.  Advises on the promulgation of University-wide IT architecture standards and infrastructure;
e.  Participates in policy development in key areas such as security, name identity, e-mail systems, and protection of privacy;
f.  Identifies emerging and unaddressed needs, opportunities, and challenges; and
g.  Advises on priorities of IT initiatives, particularly those dealing with academic computing, taking into consideration need, funding, operations, and training issues.

The ACAC shall normally meet once each month except December, June, July and August.  It may meet on such other occasions as the Chair shall decide are necessary.  The Chair shall prepare and distribute an agenda prior to each meeting.

Except as provided in this paragraph, each academic dean and the University Librarian shall appoint one faculty member with an interest in academic computing to serve on the ACAC, with the understanding that regular attendance is essential.  The Dean of the Miller School of Medicine shall appoint two members, one a clinician and the other a medical researcher.  The College of Arts and Sciences shall appoint three members, one each from the physical and natural sciences, another from the social and psychological sciences, and a third from the arts and humanities.  The Chair of the Faculty Senate shall appoint three members to annual, renewable terms.  The Chair of the Senate's Library and Information Resources Committee shall serve as an *ex officio* voting member.  The Chief Information Officer and the Assistant Vice President for Academic and Research Systems shall serve as *ex officio* non-voting members.

The Chair shall be appointed by the Provost after consultation with the Chief Information Officer and the Chair of the Faculty Senate.

The Chair may invite other interested persons to participate in the discussions of the ACAC on a particular agenda item.  He or she has the discretion to invite schools and colleges having their own IT professionals to appoint an observer, either for a particular session or for the academic year.

The ANIMAL CARE COMMITTEE is responsible for formulation of policy regarding animal care, determining that all divisions conform to regulations dealing with laboratory animals, and informing all faculty members of their responsibilities under the Laboratory Animal Welfare Act. The Committee reports to the Vice President for Medical Affairs, who has the responsibility of seeing that policy is adhered to, reports to the President or a designee from time to time on the

UM/EEOC-D. SCHMICH - 0997

work of the Committee, and refers to the President or the designee any questions or problems that cannot be resolved.

The BUDGET ADVISORY COMMITTEE advises the President through the Executive Vice President and Provost on the determination of the annual budget. The Committee includes the Executive Vice President and Provost, the Senior Vice President for Business and Finance, the Chair and Vice Chair of the Faculty Senate, and the Chair of the Faculty Senate Budget and Compensation Committee.

The BUILDING AND GROUNDS COMMITTEE serves as an advisory source to the President on campus planning and design issues.  They typically convene on the third Thursday of each month, and review items involving modifications to public spaces (i.e. areas the general public will have access to), exterior spaces, and capital project planning and design issues.

The CAMPUS SPORTS AND RECREATION ADVISORY COMMITTEE is composed of thirteen members, eight of whom are students, five of whom are faculty or staff members. The purpose of the committee is to recommend changes in policies and procedures for the Campus Sports and Recreation Department.

The EMPLOYEE BENEFITS ADVISORY [323] COUNCIL reviews and makes recommendations to the administration and, through its representatives, to the Faculty Senate concerning changes in non-retirement benefits proposed by the administration. It may also initiate examination and evaluation of possible changes that arise within the Council's discussions. The Council meets regularly throughout the year, providing advice, guidance, and meaningful input on benefits and playing an active role in educating employees about their benefits. The Senior Vice President for Business and Finance chairs the Council, which consists of 16 members, selected to be representative of the University's workforce and drawn from all campuses and employment categories. Four faculty members shall be appointed by the Faculty Senate Chair, including two from the Miller School of Medicine. The other members of the Council are appointed by the Senior Vice President for Business and Finance. Consideration shall be given to appointing members who have a genuine interest in issues relating to benefits and who are willing to express their views to the Council and to the administration. Members serve staggered three-year terms, and no member may serve more than two consecutive terms. The Vice President for Human Resources, the Associate Vice President for Medical Human Resources, and the Assistant Vice President of Benefits Administration are *ex officio* members of the Council.

The PARKING APPEALS COMMITTEE  reviews parking citation appeals. The Student Government President shall appoint five to seven student members, the Faculty Senate Chair shall appoint two faculty members each to serve one-year terms; and the Parking Director shall appoint one to two staff members. [324]

The PATENT AND COPYRIGHT COMMITTEE is appointed by the President. It is made up of four faculty members and three members of the administration. The Vice Provost for Research serves

---

[323] #2007-30(B)
[324] #2012-06(C)

UM/EEOC-D. SCHMICH - 0998

*Faculty-Administrative Committees*

as chair and University Counsel serves as counsel to the committee. Matters related to Patents and Copyrights should be addressed to this Committee.

The STRATEGIC PLANNING COMMITTEE makes recommendations on future academic and fiscal policy and allocation of resources.

The COMMITTEE ON STUDENT ORGANIZATIONS studies and makes recommendations in the field of undergraduate[325] student organizational life, determines criteria for establishing student organizations, evaluates annually the achievements of student organizations, hears petitions for University registration of student organizations, and addresses issues of conduct pertaining to student organizations. The committee is expected to perform other duties, as assigned for the effective functioning of student organizations. Members are appointed annually by the Vice President for Student Affairs. The Coordinator for Student Organizations serves as the Executive Secretary of the Committee. Other members of the Committee are the Dean of Students or a representative, three students, and one faculty member. The Vice President for Student Affairs annually designates a member of the Committee to serve as Chair. All members of the Committee shall be entitled to vote, except the Chair who votes only to break a tie.

The STUDENT PUBLICATIONS BOARD supervises all undergraduate student publications of the University and is expected to recognize and to protect student freedom of speech and the press while simultaneously insuring that those freedoms are accompanied by an equal measure of responsibility. In the cases of *The Miami Hurricane, The Ibis* and *Distraction Magazine*, the Board shall elect the editors-in-chief of *The Miami Hurricane*, *IBIS* and *Distraction Magazine* and the Business Manager of *The Miami Hurricane*. Editors-in-chief are elected on the basis of character, scholastic ability, experience, and demonstrated knowledge of the highest journalistic principles of objectivity and fair play. The Board should recognize that there may be honest divisions of opinions respecting the best policy for the University, and that editors have the right to express their views. The Board makes recommendations to the vice president for student affairs with regard to policies concerning publications distributed, free of charge, at the University and whose primary purpose is the dissemination of news and/or editorial opinion, or information directly relevant to a sponsoring student organization. To this end, the Board has the authority (1) to approve or disapprove of the establishment and distribution of any student publications; (2) to recommend to the administration appropriate action against any student or student publications distributed without its prior approval; (3) to formulate policies for advertising, distribution, and subscriptions; (4) to review the financial condition of any student publication to ensure financial soundness of the publication; and (5) to act as the hearing body for the University in all policy disputes pertaining to student publications, whether they occur among staff members of a publication or involve an individual or group seeking redress from a publication.

The Board meets at least twice per academic year (fall and spring) and minutes are submitted to the Vice President for Student Affairs and to each member of the board as soon as possible after each meeting. The Board's chair is appointed annually by the Vice President for Student Affairs. Other members of the Board are as follows: senior advisor of *The Miami Hurricane* appointed by the Vice President for Student Affairs; senior advisor of *IBIS* appointed by the Vice President for

---

[325] 2013-35(C)

UM/EEOC-D. SCHMICH - 0999

Student Affairs; senior advisor of Distraction Magazine appointed by the Vice President for Student Affairs; the financial advisor of *The Miami Hurricane* ,*IBIS* and Distraction Magazine appointed by the Vice President for Student Affairs; a faculty member (at-large) appointed by the Provost; a faculty member (from the School of Communication) appointed by the Vice President for Student Affairs; the editor-in-chief of *The Miami Hurricane*; the editor-in-chief of Distraction Magazine; the editor-in-chief of *The Ibis*; the Business Manager of *The Miami Hurricane*; the president of the Society of Professional Journalists chapter, or his/her designee; the President of Undergraduate Student Government or his/her designee, and, in the absence of the chair, the members of the board will elect an acting chair for the purpose of conducting the meeting in question. The acting chair retains the right to vote. [326]

The UM RETIREMENT PLANS REVIEW COMMITTEE is responsible for providing advice and oversight on all retirement plans sponsored by the university (including the Faculty Retirement Plan, the Retirement Savings Plan, the Supplemental Retirement Annuity Plan and the Employees Retirement Plan), provided that this responsibility does not extend to any plan that is required to conform to a collective bargaining agreement.  The committee shall make recommendations on retirement plan changes and on policies concerning the administration of the retirement plans. It shall assure a simultaneous review of all plans within the scope of its responsibilities in the event of a decision to change any one of them.  The committee shall consist of the Vice President for Human Resources as Chair, four staff members (who are not employed within Human Resources) appointed by the Chair, and four faculty members appointed by the Chair on the recommendation of the Chair of the Faculty Senate.  The committee shall meet as frequently as necessary, as determined by its Chair or upon the request of any three of its members, but in any event not less frequently than once each year.  The committee shall report to the Senior Vice President for Business & Chief Financial Officer, and shall consult with the Vice President of Finance and Treasurer and with the Faculty Senate as needed, including on any matters that may require changes in the *Faculty Manual*, and on proposed retirement plan changes that would significantly affect any group of employees or that could have an adverse financial impact on the university. [327]

The UNION BOARD OF GOVERNORS considers all matters directly or indirectly related to the operation, function or activities of the Student Union. The Board consists of ten undergraduate students, two faculty members, and eight staff members and administrators.

The USE OF HUMAN SUBJECTS COMMITTEE is responsible for formulation of policy, as regards the ethical and moral aspects of experiments involving human subjects; for determining that the University complies with its assurances to various funding agencies, and to the requirements of federal and local law; for informing faculty members of their responsibilities; and for the review of activities involving the use of human subjects at risk. The Committee will prepare for the appropriate University authority such reports as from time to time may have to be made.

The WVUM ADVISORY BOARD oversees the Radio Station and recommends to the Station's Corporate Board general station policy. The fourteen members of the Board include faculty members, administrators, and students.

---

[326] 2015-03(B)
[327] 2012-18(B) – effective December 20, 2012

UM/EEOC-D. SCHMICH - 1000

## FACULTY-STUDENT RELATIONS

### Advising[328]

Student advising is a broad responsibility that is not confined entirely to the student personnel officers of the University. Members of the faculty should recognize the essential contribution to be made to the overall student experience by developing meaningful professional relationships with students with whom they come into contact.

Responsibility for academic advising rests with the academic deans, their staffs, and the members of the faculty. The various academic deans and their assistants confer with each student during the year. Faculty members are also expected to serve as faculty advisers.

Primary responsibility for non-academic advising rests with the Divisions of Student Affairs and Undergraduate Education. Student support services provided by the Division of Student Affairs include:

> Orientation and Commuter Student Involvement
> Student Activities and Student Organizations
> Student Center Complex
> Student Health Service
> Counseling Center
> Toppel Career Center
> University Chaplains Association
> Housing and Residential Life
> Butler Center for Service and Leadership
> Wellness and Recreation Center

A complete description of the services provided by these departments can be found at http://www.miami.edu/studentlife . Each works closely with the academic units of the University to solve problems arising from student concerns and can provide valuable background and supplemental information regarding students and welcomes interchange with interested faculty.

### Faculty Responsibilities in Student Activities

Student involvement outside the classroom is an important supplement to the classroom educational experience. Student organizations offer academic, cultural, religious, social and athletic opportunities for experiential learning. Students must maintain satisfactory academic and enrollment standing to participate in student activities. All student organizations are required to have a full-time faculty member or administrator as advisor. Faculty members are encouraged to serve as advisors or as resource persons. Interested faculty should contact the Assistant Director of Student Activities and Student Organizations[329] for more information.

---

[328] 2013-35(C)
[329] 2013-35(C)

**UM/EEOC-D. SCHMICH - 1001**

*Faculty-Student Relations*

**Faculty Roles in Student Volunteer Service**[330]

There are many opportunities for faculty involvement in community service and social advocacy through the Butler Center for Service and Leadership. Faculty members are encouraged to participate as advisors for student service and advocacy organizations and as participants in various service events. The Butler Center provides placement information to faculty who integrate community-based projects, case studies or field experiences into their curricula. The Butler Center also serves as a liaison between community agencies and the University, providing any services and resources for faculty members engaged in service learning.

**Non-Academic Discipline**[331]

The administration of non-academic discipline is the responsibility of the Division of Student Affairs. For specific information regarding University policies, procedures and regulations pertaining to non-academic discipline, consult the Student Rights and Responsibilities Handbook (www.miami.edu/srr), which is prepared by the Office of the Dean of Students.

**Honor Code**

The Undergraduate Student Honor Code was established to protect the academic integrity of the University by encouraging consistent ethical behavior by undergraduate students in assigned course work. The Code provides standards that are necessary to maintain a community where one has the right to compete fairly in the classroom. The Code covers all written and oral examinations, term papers, creative works, assigned computer-related work and any other academic work to be submitted for credit.

The Honor Council is a standing committee that derives its authority from the University and that hears allegations of academic cheating. All undergraduate students are under the jurisdiction of the Honor Council and subject to penalties that it may impose for violation of the Code. The Council consists of a sufficient number of undergraduate student representatives to act in a timely manner, with at least one representative from each undergraduate[332] School or College.

An Honor Council case begins with the filing of a complaint with the Executive Secretary of the Council, proceeds with an official inquiry into the alleged violations, and continues through a Preliminary Hearing, a Final Hearing, and an Appeal Hearing, when requested. Penalties are based on the nature of the violation and may include disciplinary warning, disciplinary probation, suspension, expulsion and/or University community service.

---

[330] 2013-35(C)
[331] 2013-35(C)
[332] 2013-35(C)

UM/EEOC-D. SCHMICH - 1002

*Faculty-Student Relations*

The Honor Code is included in the Student Rights and Responsibilities guide and copies are available in the Office of the Dean of Students. Questions regarding the Honor Code should be directed to the Executive Secretary of the Honor Council in the Office of the Dean of Students.

**Ombudsperson and University Troubleshooters[333] Program**

In 1970, the University of Miami established an Ombudsperson Program to help open channels of communication between students and the University community and to provide students with readily identifiable persons to whom they may turn to express grievances about the University. University ombudspersons and troubleshooters are appointed by the Vice President for Student Affairs, the Dean of Undergraduate Education, and the School of Medicine.[334]

The University ombudspersons are authorized to investigate matters within their jurisdiction. The purpose of the University ombudspersons is to listen to a student's grievance, to investigate the facts surrounding it, and to attempt to resolve the situation informally before it becomes a matter in a formal grievance proceeding. Ombudspersons neither make policy nor override a policy of the University. Because of their knowledge of the University, however, ombudspersons are in a position to interpret the University's policies for students and to make recommendations to the administration when policy changes are perceived to be needed. Ombudspersons expedite the decision-making process within the University and ensure that the University follows its own published policies and procedures.

All students may access the Ombudsperson and University Troubleshooters program (non-degree, undergraduate, graduate, law and medical).Ombudspersons are appointed from Student Affairs, Undergraduate Education and Medical Affairs. For further information regarding the Ombudsperson University Troubleshooters program, visit www.miami.edu/ombudsperson [335].

**Student Records**

A federal law, commonly referred to as "FERPA," the Federal Education Rights and Privacy Act,[336] provides certain rights to students with respect to their education records. The University also maintains a policy in this regard available from the Registrar. The law and the University policy provide students with the right of access to their educational records, the right to a hearing to challenge the contents of their educational records, and the right not to have the contents of their educational records disclosed without the student's written consent.  For further information, the University policy should be consulted.

---

[333] 2013-35(C)
[334] 2013-35(C)
[335] 2013-35(C)
[336] 2013-35(C)

UM/EEOC-D. SCHMICH - 1003

## UNIVERSITY ADVANCEMENT

### Division of University Advancement

The University of Miami conducts an active development program under the supervision of the Vice President for University Advancement. This program combines the functions of fund raising, alumni relations, public relations and government relations in the overall effort to maintain the University's excellent image and strengthen its financial position. The Division of University Advancement acts to secure financial support for academic and physical expansion programs approved by the Board of Trustees. It does this through constant contacts with the corporate community, foundations, state funding agencies and individual donors. All University programs requiring external financing must conform to the University's Fund Raising Policy, copies of which may be obtained in the Office of the Vice President for University Advancement. The Office of University Relations keeps the University's many constituencies--students, faculty, staff, alumni, friends, members of the press and the general public--informed about University programs and activities.

### Alumni Association

The University considers its more than 125,000 alumni to be essential members of the University family. In order to provide services to them and maintain a communications system for them, the University has a full-time staff under the supervision of the Director of Alumni Relations. Any large scale communication effort with alumni should be coordinated with the Alumni Office. The Director of Alumni Relations welcomes any suggestions from members of the faculty on programs for various alumni groups.

### Citizens' Board

Established in 1946, the University of Miami's Citizens' Board serves as a major link between the University and the greater Miami community. More than 300 leaders of the business and professional community make up the Citizens Board membership. By offering counsel on matters of mutual interest and conducting an annual corporate fund raising campaign, they serve the University and the community. Membership is by invitation.

### University Volunteer Groups

Active community involvement remains a key ingredient in the University's successful development program. Participation of dedicated individuals who share the University's commitment to academic excellence and community service is made possible through a variety of University sponsored volunteer organizations. Information concerning these organizations may be obtained from the Division of University Advancement.

**UM/EEOC-D. SCHMICH - 1004**

*University Advancement*

## Advertising

As a general rule the University does not subscribe to paid advertising in any publications or at the request of any non-profit organization. The University is itself a non-profit institution and it is not in a position to make gifts or devote its resources to advertising solicited by other similar organizations. With the exception of academically related advertising, all matters concerning advertisement affecting any facet of the University must be cleared through the Division of University Advancement.

## Public Information Policy

The President is the official spokesperson for the University on matters of policy and official action. In most cases, this authority is delegated to the Office of University Relations and exercised by the Director of Media Relations. The Director is responsible for releasing all information pertaining to activities of the University, emergencies or controversies or routine, to which the press has reasonable claim.

The Office of University Relations will ensure that all news media get facts as accurately and quickly as possible. To enhance efficiency and avoid confusion, deliberations of official University boards, commissions, committees and the like that are to be released to the press will be disseminated through the Office of University Relations.

It is the responsibility of all administrators and faculty to keep the Office of University Relations fully informed of matters subject to media interest. The Office shall also systematically query administrators and faculty to remain current about issues effecting the University. In consultation with persons directly involved, the Director will decide what information is to be released to the press and in what manner. The Office of University Relations facilitates communication to internal and external audiences, and is available to individuals or groups on campus to assist in the preparation of news materials for the public.

It is not the intent of the University to censor or inhibit freedom of expression on the part of any individual affiliated with the University when the person speaks or writes as an individual. Queries from news media should be referred to the Office of University Relations when: (1) The query deals with an area of responsibility outside that of the person being contacted by news media; (2) The query deals with a matter of University-wide concern or policy; or (3) The Office of Public Affairs has already been provided with information sought by the inquirer.

It is the policy of the University to be forthright and candid with news media. University personnel should realize that attempts to suppress unfavorable news often lead to adverse judgments about the University.

UM/EEOC-D. SCHMICH - 1005

## OTHER GENERAL MATTERS

### Archives

The University Archives are housed in the Archives and Special Collections Department of the Otto G. Richter Library. Holdings in the Archives include the published and unpublished records of University offices, schools, departments, programs and organizations. The Archives contain a wide variety of materials, including correspondence, memoranda, reports, studies, documents, photographs, audiotapes, videotapes, and machine-readable records. Faculty are encouraged to contact the University Archivist with any questions or concerns regarding the University Archives. Transfer of records to the University Archives requires the approval of the University Archivist.

### Bookstore

The University Bookstore is owned and operated by the University or a vendor selected by the University for the faculty and students. Faculty members are entitled to discounts on many articles upon presentation of an identification card. The Bookstore sells both new and used books. All orders for textbooks and supplies should be cleared through department chairs.

### Audio/Visual Services

Contact the Office of Instructional Advancement, Equipment Maintenance Technician, for a list of audio/visual services available for the Whitten Learning Center and Dooley Memorial classrooms.  Responsibility for classroom audio/visual services in other buildings resides with the controlling school/department (the one which "owns" the specific room).

### Faculty Club

The Faculty Club is open to all faculty and staff for lunch between 11:30 a.m. and 1:30 p.m. The Club is also available for banquets and parties.

### Holidays

The University observes as holidays: New Year's Day; Martin Luther King's Birthday; Memorial Day; Independence Day; Labor Day; Thanksgiving Day; and Christmas Day. Other days are observed by different campuses in accordance with the University Holiday Policy of the Policies and Procedures Manual. A faculty member who wishes to observe a religious holy day shall make arrangements to have another instructor conduct the class, if possible.

### Office of Human Resources

The mission of Human Resources is to innovatively manage and improve the delivery of high quality employment related services to departments in order to effectively recruit, select, retain, develop, and manage the University's diverse workforce.  The Vice President for Human

UM/EEOC-D. SCHMICH - 1006

Resources is responsible for designing, recommending, implementing and managing related programs based on principles of fairness and equality.  Such programs include staffing, compensation, benefits, affirmative action, employee relations, and professional development and training for the University.  Application of these programs to faculty is described in the Faculty Manual.

Human Resources assists individuals and departments throughout the University with personnel issues that arise in the context of day-to-day management and uses outside counsel and consultants as appropriate.   Comprehensive personnel policies and procedures applicable to clerical/technical/service staff and research, administrative/professional staff is available by following the links from http://www.miami.edu/index.php/hr/ .

**Parking**

Faculty members desiring access to parking at the University must purchase hang tags giving them access to the parking lots. The purchase of a hang tag does not, however, guarantee that space will be available in a specific lot at a particular hour.

**Post Office**

The Post Offices are located in the Student Union and on the Medical School Campus in the Parking Plaza. This is not a University post office but a U.S. Post Office, University Branch, operated by University employees. Faculty members may rent boxes at their own expense. Departments rent boxes through the Office of the Treasurer.

**Solicitations**

General solicitation of faculty, staff, and students by salesmen is not permitted except in the case of book publishers wishing to make professional contacts with faculty members. On-campus solicitations of students by University of Miami student organizations must be cleared through the Office of Student Affairs. Permission for any other solicitation must be obtained through the Office of the Senior Vice President for Business and Finance.

**UM/EEOC-D. SCHMICH - 1007**